# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF OKLAHOMA

1) THE NATIONAL BEN GAMLA JEWISH CHARTER SCHOOL FOUNDATION, INC., and
2) PETER DEUTSCH,

     *Plaintiffs*,

v.

1) GENTNER DRUMMOND, in his official capacity as Attorney General of Oklahoma,
2) REBECCA WILKINSON, in her official capacity as Executive Director,
3) BRIAN T. SHELLEM, in his official capacity as Chairman,
4) AMBER HIDY, in her official capacity as member of the Statewide Charter School Board,
5) BRITNI TOMCHO, in her official capacity as member of the Statewide Charter School Board,
6) DAMON GARDENHIRE, in his official capacity as member of the Statewide Charter School Board,
7) DAVID RUTKAUSKAS, in his official capacity as member of the Statewide Charter School Board,
8) DR. KITTY CAMPBELL, in her official capacity as member of the Statewide Charter School Board,
9) JARED BUSWELL, in his official capacity as member of the Statewide Charter School Board,
10) LINDEL FIELDS, in his official capacity as member of the Statewide Charter School Board,
11) WILLIAM PEARSON, in his official capacity as member of the Statewide Charter School Board, and
12) SKYLER H. LUSNIA, in his official capacity as Director of School Performance for the Statewide Charter School Board,

     *Defendants*.

Case No. _____

**COMPLAINT**

**JURY DEMAND**

**INTRODUCTION**

1.      The Oklahoma Charter Schools Act, Okla. Stat. Ann. tit. 70, §§ 3-130 to 3-169 ("OCSA" or the "Act"), provides families with educational opportunities by empowering individuals and institutions to create new state-funded but privately-owned and -operated schools that educate Oklahoman children facing a variety of circumstances across the state.

2.      Charter schools thus come in all shapes and sizes, with some focused on science, the fine arts, language immersion, cultural awareness, or classical education. And unsurprisingly in Oklahoma, there are also tribally-authorized charter schools like the bilingual Comanche Academy Charter School in Lawton, which was authorized under the Act by the Comanche Nation of Oklahoma.

3.      But there is one glaring exception to this all-comers policy: religious charter schools. Under the express terms of the Act, each charter school "shall be nonsectarian in its programs, admission policies, employment practices, and all other operations." Okla. Stat. Ann. tit. 70 § 3-136(A)(2). Nor may any charter school be authorized if it is "affiliated with a nonpublic sectarian school or religious institution." *Id.*

4.      That discriminatory exclusion of religious charter schools violates the Constitution several times over.

5.      Under the Free Exercise Clause, governments are not allowed to discriminate against religious institutions in the provision of public benefits.

6.      Similarly, if a government's policies are not scrupulously neutral and generally applicable, then those policies must be subjected to strict scrutiny.

7.    And discriminating on the basis of religion also violates the Equal Protection Clause of the Fourteenth Amendment.

8.    These violations directly affect Plaintiffs the National Ben Gamla Jewish Charter School Foundation, Inc. and Peter Deutsch.

9.    Plaintiffs seek to create a vibrant virtual charter school built on academic excellence and the millennia-old Jewish ethical, cultural, and religious tradition. But Ben Gamla's application was denied by Defendants on the sole basis that Ben Gamla proposes a charter school that is religious.

10.    This is therefore a simple case—can Oklahoma arbitrarily exclude religious people from the charter school program? The Constitution says no.

11.    For relief from these constitutional violations, Plaintiffs seek a declaration and injunction against Oklahoma's unlawful policy and nominal damages, so they can open their school and serve Oklahoman children.

## THE PARTIES

12.    Plaintiff National Ben Gamla Jewish Charter School Foundation, Inc. ("Ben Gamla") is an Oklahoma non-profit corporation.

13.    Plaintiff Peter Deutsch is an individual resident in Florida. He is the founder of the National Ben Gamla Jewish Charter School Foundation, Inc.

14.    Defendant Gentner Drummond is the Attorney General of Oklahoma with responsibility for enforcing the OCSA. He is sued in his official capacity only.

15.    Defendant Rebecca Wilkinson is Executive Director of the Oklahoma Statewide Charter School Board. She is sued in her official capacity only.

16. Defendant Brian T. Shellem is the Chairman of the Oklahoma Statewide Charter School Board. He is sued in his official capacity only.

17. Defendant Britni Tomcho is a voting member of the Oklahoma Statewide Charter School Board. She is sued in her official capacity only.

18. Defendant Amber Hidy is a voting member of the Oklahoma Statewide Charter School Board. She is sued in her official capacity only.

19. Defendant Damon Gardenhire is a voting member of the Oklahoma Statewide Charter School Board. He is sued in his official capacity only.

20. Defendant William Pearson is a voting member of the Oklahoma Statewide Charter School Board. He is sued in his official capacity only.

21. Defendant Jared Buswell is a voting member of the Oklahoma Statewide Charter School Board. He is sued in his official capacity only.

22. Defendant David Rutkauskas is a voting member of the Oklahoma Statewide Charter School Board. He is sued in his official capacity only.

23. Defendant Lindel Fields is a voting member of the Oklahoma Statewide Charter School Board. He is sued in his official capacity only.

24. Defendant Dr. Kitty Campbell is a voting member of the Oklahoma Statewide Charter School Board. She is sued in her official capacity only.

25. Defendant Skyler H. Lusnia is the Director of School Performance for the Oklahoma Statewide Charter School Board. Defendant Lusnia signed the formal letters denying Ben Gamla's application. He is sued in his official capacity only.

## JURISDICTION AND VENUE

26.    This action arises under the Constitution and laws of the United States. The Court has subject-matter jurisdiction under 28 U.S.C. §§ 1331 and 1343.

27.    The Court has authority to issue the declaratory and injunctive relief sought under 28 U.S.C. §§ 2201 and 2202. Venue also lies in this district under 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to the claims in this lawsuit occurred in the Western District of Oklahoma.

## FACTUAL ALLEGATIONS

### The Oklahoma Charter Schools Act

28.    In 1999, the Oklahoma Legislature passed the Oklahoma Charter Schools Act ("the OCSA" or "the Act"). Okla. Stat. Ann. tit. 70, § 3-130 to § 3-169. The Act invites any qualified "private college or university, private person, or private organization" to apply for state funding to operate a charter or virtual charter school. *Id.* § 3-134(C).

29.    The OCSA's stated purposes are to "[e]ncourage the use of different and innovative teaching methods," "[p]rovide additional academic choices for parents and students," and "[e]stablish new forms of accountability for schools." *Id.* § 3-131.

30.    Oklahoma allows private institutions substantial flexibility to run charter schools. *Id.* § 3-136(A)(1), (3). Indeed, subject to some exceptions, "a charter school and virtual charter school shall be exempt from all statutes and rules relating to schools, boards of education, and school districts." *Id.* § 3-136(A)(1).

31.     Charter schools need not follow Oklahoma's core curriculum requirements and may instead craft "a curriculum which emphasizes a specific learning philosophy or style or certain subject areas." *Id*. § 3-136(A)(3).

32.     A charter school is run by a private "governing board" "which shall be responsible for the policies and operational decisions of the charter school." *Id*. § 3-136(A)(7). Charter schools may adopt their own "personnel policies, personnel qualifications, and method of school governance." *Id*. § 3-136(C).

33.     State funding of charter schools is directly tied to enrollment. *Id*. § 3-142(A), (C). A charter school "receive[s] the State Aid allocation … and any other state-appropriated revenue generated by its students for the applicable year." *Id*. § 3-142(A).

34.     The OCSA states that charter schools are "public," "free" to all students, and "supported by public taxation." *Id*. § 3-136(A)(9); *id*. § 1-106.

35.     Charter schools are not however, "public" in the sense that the government owns and operates them, as it does with traditional public schools.

36.     Instead, charter schools are owned and operated by private parties with the goal of providing alternatives to traditional government-owned and -operated public schools. *Id*. § 3-131.

37.     The OCSA has resulted in innovation and expansion of parental choice by funding a diverse range of private institutions.

38.     The OCSA provides that charter schools may be sponsored only by public school districts, higher education institutions, federally recognized Indian tribes, or by the

Statewide Charter School Board. All virtual charter schools must be sponsored by the Board.

39.     Publicly-funded charter schools owned and operated by private entities include those focused on science, the fine arts, language immersion, cultural awareness, tribal identity, classical education, and more.

40.     For example, there are tribally-authorized charter schools, like Comanche Academy Charter School located in Lawton, Academy of Seminole in Seminole, and Academy of Okmulgee in Okmulgee.

41.     However, the OCSA categorically forbids one type of private entity from participating in the charter school program: religious groups. The OCSA expressly requires that a charter school be "nonsectarian in its programs, admission policies, employment practices, and all other operations." § 3-136(A)(2). This "nonsectarian" requirement means that "[a] sponsor may not authorize a charter school or program that is affiliated with a nonpublic sectarian school or religious institution." *Id.*

### *The St. Isidore Case*

42.     Recently, this nonsectarian requirement became the subject of litigation. *Drummond ex rel. State v. Okla. Statewide Virtual Charter Sch. Bd.*, 558 P.3d 1 (Okla. 2024).

43.     In 2023, the Charter School Board approved the charter application of a Catholic school, St. Isidore of Seville Catholic Virtual School. *Id.* at 6 ¶ 5.

44.     Though the previous Oklahoma Attorney General issued guidance that the state's exclusion of religious charter schools violated the federal Constitution, Attorney

General Drummond, upon taking office, sought a writ of mandamus from the Oklahoma Supreme Court to bar St. Isidore's charter, claiming the contract with and chartering of St. Isidore violated the OCSA, the Oklahoma Constitution, and the federal Constitution. *Id.* at 7 ¶ 8.

45.    Drummond, as the Attorney General for the State of Oklahoma and "chief law officer of the State," Okla. Stat. Ann. tit. 74 § 18, sought a writ of mandamus because the Oklahoma Attorney General has the authority to initiate "any action in which the interests of the state or the people of the state are at issue." *Id.* § 18b(A)(3).

46.    In other words, the Attorney General is the "proper party to maintain litigation to enforce a matter of public interest." *Howard v. Okla. Corp. Comm'n*, 614 P.2d 45, 52 (Okla. 1980).

47.    In filings in the lawsuit, the Attorney General made clear his hostility toward minority faiths, especially Muslims.

48.    For example, the Attorney General's brief before the Oklahoma Supreme Court stated that granting religious institutions equal footing in Oklahoma's charter school program would "require the State to permit extreme sects of the Muslim faith to establish a taxpayer funded public charter school teaching Sharia Law" and that those religious "tenets are diametrically opposed by most Oklahomans." *See* Pet'rs Br., *Drummond ex rel. State v. Okla. Statewide Virtual Charter Sch. Bd.*, No. 121694, 2023 WL 11915548, *1 (Okla. Oct. 20, 2023).

4912-8803-8298,

49.    Based on the Attorney General's lawsuit, the Oklahoma Supreme Court issued a split decision, agreeing with the Attorney General and ruling against St. Isidore and the Board. *Drummond*, 558 P.3d at 7 ¶ 8.

50.    St. Isidore and the Board sought writs of certiorari from the United States Supreme Court. *St. Isidore of Seville Catholic Virtual Sch. v. Drummond*, 145 S. Ct. 1134 (2025); *Okla. Statewide Charter Sch. Bd. v.  Drummond*, 145 S. Ct. 1134 (2025).

51.    The Supreme Court granted certiorari and consolidated the cases, but after a recusal from Justice Barrett, affirmed the Oklahoma Supreme Court in a split 4-4 *per curiam* decision. *Okla. Statewide Charter Sch. Bd. v. Drummond*, 605 U.S. 165 (2025).

52.    Following the Supreme Court's decision, the Oklahoma Attorney General again singled out Muslim schools in public comments.

53.    The Oklahoma Attorney General issued a press release stating that the Supreme Court's "ruling ensures that Oklahoma taxpayers will not be forced to fund radical Islamic schools." A true and correct copy of that press release, published on May 22, 2025 on the Oklahoma Attorney General's website and available at https://perma.cc/6HJ6-K6F3, is attached as **Exhibit 1.**

54.    National Ben Gamla Jewish Charter School Foundation

55.    Plaintiff Peter Deutsch is the founder of Ben Gamla. Deutsch served for 12 years as a member of Congress for a House district in Florida.

56.    After his Congressional career ended, Deutsch took on the issues of education. To that end, Deutsch founded a Florida non-profit corporation, the National Ben Gamla Charter School Foundation, Inc. ("Ben Gamla Florida"), in 2006.

4912-8803-8298,

57.    Ben Gamla Florida opened its first charter school in Hollywood, Florida, in 2007 and now operates a network of four charter schools across Florida. *Ben Gamla Strategic Plan for 2019-2025*, Ben Gamla Charter School Foundation, https://perma.cc/X8BJ-3DU6.

58.    These schools were "the first English-Hebrew Charter School[s] in the United States" and "integrate[ ] Hebrew instruction" into learning to give their students "a useful tool in our global society." *Misson & Vision*, Ben Gamla Charter School Foundation, https://perma.cc/TLR4-FAV5.

59.    When Ben Gamla Florida opened its first charter school, some in the Jewish community, such as the Jewish Federation, expressed concerns over starting a Jewish charter school.

60.    Despite opposition from some in the Florida Jewish community, Ben Gamla schools experienced remarkable success because of their educational model.

61.    Ben Gamla Florida has educated thousands of students and now must waitlist students because there are not enough spots to accommodate everyone.

62.    Ben Gamla Florida's schools are dedicated to the driving principle of charter schools: to exercise "autonomy and choice to set many of their own policies related to such things as curriculum delivery, parent involvement, discipline, and special programs" and to achieve "maximum student achievement and personal growth." *FAQS*, Ben Gamla Charter School Foundation, https://perma.cc/H8D8-SBWW.

63.    Deutsch also founded Plaintiff National Ben Gamla Jewish Charter School Foundation, Inc. ("Ben Gamla") as an Oklahoma non-profit corporation in 2025.

64.     Both Plaintiff Ben Gamla and Ben Gamla Florida are named after Yehoshua Ben Gamla, a first-century Jewish leader and high priest who established the first formal system of Jewish education.

65.     In December 2025, Plaintiff Ben Gamla submitted a charter school application to the Board. A true and correct copy of that application is attached to this Complaint as **Exhibit 2**.

66.     Plaintiff Ben Gamla aims to create a charter school in Oklahoma where students receive a rigorous academic education alongside a deep cultural and ethical grounding derived from the Jewish faith, heritage, and tradition. Ex. 2 at 4.

67.     For many Jewish parents, and especially Orthodox Jewish parents, it is an important religious obligation to send their children to Jewish schools, where they will receive an education in secular subjects as well as the Jewish faith.

68.     This belief concerning the importance of religious education comes straight for the Torah, the Talmud, and the Jewish Code of Law, which explain that Jewish parents have a solemn responsibility to transmit the Jewish faith to their children.

69.     Unfortunately, a Jewish education is not widely available in many parts of the United States. Where it is available, it can often be prohibitively expensive and beyond the reach of many Jewish families.

70.     Plaintiff Ben Gamla thus seeks to fill a gap by partnering with Jewish parents in upholding their religious beliefs and obligation to provide a Jewish education to their children.

4912-8803-8298,                          11

71.    Indeed, the transmission of Jewish religious beliefs and practices to children is a core aspect of Ben Gamla's religious mission. Ex. 2 at 4.

72.    In following its Jewish heritage and tradition, Ben Gamla "seeks to provide outstanding academic and co-curricular programs infused with a Jewish understanding of the human person and grounded in the enduring Jewish values of truth (*emet*), beauty (*yofi*), and goodness (*tov*), as expressed in Jewish thought and tradition." Ex. 2 at 5.

73.    In December 2025, Ben Gamla applied to charter Ben Gamla Jewish Charter School in Oklahoma ("Ben Gamla School" or "the School").

74.    Ben Gamla School's mission is "to educate the entire child: soul, heart, intellect, and body of each child enrolled through a curriculum that will reach students at an individual level, with an interactive learning environment that is rooted in virtue, rigor and innovation." Ex. 2 at 1.

75.    As part of that distinctive religious mission, students will receive instruction in Jewish religion, culture, values, rituals, texts, holidays, and practices. Ex. 2 at 4. This includes "[t]he study of mitzvot (commandments)," Ex. 2 at 4, the call of tikkun olam ("shaping the world toward justice, compassion, and g-dliness"), Ex. 2 at 3, and other Jewish traditions and religious practices. Ex. 2 at 4.

76.    Ben Gamla believes that because G-d created the universe and orders all within it, a Jewish perspective permeates all subjects, including academics, and unifies all knowledge. Ex. 2 at 3.

77.    Ben Gamla's application explained that while also furthering its religious mission, Ben Gamla School will promote academic excellence using best practices in

general and virtual education. Ex. 2 at 4. Ben Gamla answered all questions posed by the Board-provided application form.

78.     After Ben Gamla submitted its application, a Board representative, Defendant Skyler Lusnia, reached out to Ben Gamla on January 27, 2026, for a "capacity interview" to discuss various compliance issues.

79.     Defendant Lusnia explained that, under the OCSA, the Board for the Ben Gamla School must be comprised exclusively of Oklahoma residents. Ben Gamla affirmed that the Board of the School, once formed, will comply in all respects with Oklahoma law.

80.     Defendant Lusnia also explained that the application process proceeds in two phases, and that the Board of the School need not be formed until the "ready-to-open" phase post-approval.

81.     The Board denies Ben Gamla's application

82.     The Board held a hearing on January 12, 2026, where Deutsch made an oral presentation in support of Ben Gamla's charter school application. Oklahoma Statewide Charter School Board, OKSCSB Meeting: 01/12/26, at 1:42:38-1:59:22 (YouTube, Jan. 12, 2026), https://www.youtube.com/live/AknrUunlTIY.

83.     On February 9, 2026, the Board discussed and voted on Ben Gamla's application. Oklahoma Statewide Charter School Board, OKSCSB Meeting: 02/09/26, at 2:10:26-2:31:04 (YouTube, Feb. 9, 2026), https://www.youtube.com/watch?v=_CxrYka29tY.

84.     During the discussion, Defendant Lusnia noted some discrepancies with Ben Gamla's application, but it also noted that "for the most part, these concerns were alleviated in

the applicant's capacity interview, with clear statements of assurance that they would fully comply with federal, state, and local applicable laws and regulations." *Id.* at 2:13:17-31. Other concerns, he explained, could be addressed if the application moved forward. *Id.* at 2:13:53-56.

85.    Defendant Lusnia also noted that Ben Gamla committed "to fully align and exceed, actually, Oklahoma's academic standards." *Id.* at 2:11:33-40. He also explained that the Ben Gamla Florida's schools have a "demonstrated record of educational success." *Id.* at 2:12:33-37.

86.    Nonetheless, the Board voted unanimously to reject Ben Gamla's application.

87.    Mr. Gardenhire remarked that the Board's "hands are tied" by the "writ of mandamus from the state Supreme Court," so any other potential issues with Ben Gamla's application were "immaterial to the discussion." *Id.* at 2:20:03-18.

88.    Mr. Gardenhire also noted that other publicly-funded schools, specifically one focused on Native American culture, "[also] had essentially a cultural-spiritual component embedded within it to honor the culture and spirituality of Native Americans, and the school operated that way, and nobody raised any concerns at that point." He explained that he didn't think Ben Gamla was "materially different," and he was "troubled" by that unequal treatment. *Id.* at 2:20:51-2:21:39.

89.    Other Board members agreed with Mr. Gardenhire.

90.    Mr. Rutkauskas or another Board member stated that even though "the Ben Gamla Jewish Charter School has an excellent reputation in Florida" and "do[es] a fantastic

job," "our hands are tied most definitely." "The decision today won't be because they are not a good candidate or qualified or a school that I think would bring tremendous assets to the State of Oklahoma." *Id.* at 2:21:49-2:22:18.

91.    Mr. Pearson or another Board member remarked that he "would love to vote for a school of this type, but because of the rule of law that we have in Oklahoma, … it has a rippling effect down to our statute … [and] our own administrative rules." He then stated that "I don't think we can approve this application today." *Id.* at 2:24:56-2:25:33; 2:26:32-2:26:37.

92.    Board Chairman Shellem or another Board member also stated disappointedly that "we are bound by the Oklahoma Supreme Court" in explaining his no vote. *Id.* at 2:28:31-35.

93.    Ms. Tomcho or another Board member similarly said, "Regardless of this school's reputation or whatever strengths that it has, we have to follow the law and right now the law says no." *Id.* at 2:29:44-52.

94.    The Board then unanimously denied the application, citing the reasons stated on the record, namely the Oklahoma's Supreme Court's decision in *Drummond*. *Id.* at 2:30:20-2:31:03.

95.    Following the denial of Ben Gamla's application, the Board issued a press release concerning its vote. A true and correct copy of that press release, published on February 9, 2026 on the Board's website and available at https://perma.cc/HSQ9-VFN9, is attached as **Exhibit 3.**

96.    The Board's press release stated that the Board's "decision primarily was based on binding legal precedent established by the Oklahoma Supreme Court in 2024, which held that a religious charter school would be unlawful under the state's Constitution." Ex. 3 at 1.

97.    Board Chairman Shellem commented, "I believe the Board was placed in a difficult position. … While we value innovation, parental choice, and high-quality educational opportunities for families, we are unfortunately bound by the Oklahoma Supreme Court ruling from 2024, even if we disagree with it." *Id*.

98.    Board Chairman Shellem continued, "Merit should be the deciding factor if a charter is awarded to an applicant. Families deserve more high-quality, publicly funded schools from which to choose and our nation's collective future depends on improving its education system. … Alienating proven, successful partners runs contrary to us achieving that goal, which is why this deserves resolution at the highest level with the U.S. Supreme Court." *Id.* at 2.

99.    On February 13, the Board sent a formal rejection letter to Ben Gamla, claiming nine additional reasons why it denied Ben Gamla's application. A true and correct copy of the formal letter is attached as **Exhibit 4.**

100.    On February 27, Ben Gamla submitted an addendum to its application, curing all defects noted by the Board—except for compliance with the nonsectarian requirement. Ben Gamla filed its revised application well within the thirty-day deadline. Okla. Stat. Ann. tit. 70 § 3-134(E)(2). A true and correct copy of Ben Gamla's addendum to its application is attached as **Exhibit 5**.

4912-8803-8298,                                    16

101. On March 9, the Board met and discussed Ben Gamla's revised application.

102. Defendant Lusnia explained that "[u]pon agency staff review of the revised application, the applicant was found to have sufficiently resolved nine out of the Board's ten concerns." Oklahoma Statewide Charter School Board, OKSCSB Meeting: 03/09/26, at 1:10:08-18 (YouTube, Mar. 9, 2026) https://www.youtube.com/watch?v=6hd17f_KoIw. "That being said, the religious tenets of the application are still present. So there is one item—the requirement to be nonsectarian—that the revised application does not resolve. As the Board is aware, the Oklahoma Charter School Act states that a charter school shall be nonsectarian. Further, the Supreme Court of Oklahoma concluded that under Oklahoma law, a charter school is a public school and as such, must be nonsectarian. Finally, the Supreme Court of the United States ordered that the judgment of the Supreme Court of Oklahoma is affirmed." *Id.* at 1:10:51-1:11:26.

103. Following a brief discussion, the Board voted unanimously to deny Ben Gamla's application based solely on its religious character and Oklahoma's nonsectarian requirement. *Id*. at 1:16:20-1:19:20.

104. On March 10, Defendant Lusnia sent an official letter formally denying Ben Gamla's application due to its religious character. A true and correct copy of the formal letter is attached as **Exhibit 6**.

105. On March 11, Defendant Drummond filed a petition for writ of mandamus in Oklahoma state district court. The petition requests that the court compel the Board to deny Ben Gamla's application on other grounds.

106.    The petition explains that "[t]he Attorney General takes **no position** in this proceeding on the constitutional or statutory questions resolved by the Oklahoma Supreme Court" in the *St. Isidore* case.

## CLAIMS FOR RELIEF
### COUNT I
**42 U.S.C. § 1983**
**FREE EXERCISE CLAUSE VIOLATION**
**CATEGORICAL EXCLUSION FROM OTHERWISE-**
**AVAILABLE GOVERNMENT BENEFITS**

107.    All preceding paragraphs are realleged and incorporated herein by reference.

108.    The Free Exercise Clause of the First Amendment provides, "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof." U.S. Const. amend. I.

109.    The Free Exercise Clause applies to states and their subdivisions and instrumentalities through the Fourteenth Amendment to the U.S. Constitution.

110.    Under the Free Exercise Clause, imposing "special disabilities on the basis of religious views or religious status" triggers strict scrutiny. *Trinity Lutheran Church of Columbia, Inc. v. Comer*, 582 U.S. 449, 460-61 (2017) (quoting *Employment Division v. Smith*, 494 U.S. 872, 877 (1990)).

111.    Thus, a system that precludes religious entities from obtaining generally available state benefits solely because of an organization's religious character or conduct is unconstitutional unless the government can satisfy strict scrutiny. *Espinoza v. Mont. Dep't of Revenue*, 591 U.S. 464, 484 (2020).

4912-8803-8298,                                                    18

112.    Plaintiffs' Jewish beliefs and identity are their motivation for seeking to own and operate a publicly-funded charter school. Offering education from a Jewish perspective is a core part of their religious exercise.

113.    Oklahoma offers a public benefit through the OCSA, providing funding for privately-run charter schools to provide students with an education.

114.    Okla. Stat. Ann. tit. 70, § 3-136(A)(2) discriminates against religious institutions on its face by excluding them from the charter school program entirely.

115.    The OCSA thus requires Plaintiffs to choose between maintaining their Jewish religious identity and receiving an otherwise available benefit.

116.    Plaintiffs are thus "disqualified from this generally available benefit 'solely because of their religious character.'" *Carson v. Makin*, 596 U.S. 767, 780 (2022) (quoting *Trinity Lutheran*, 582 U.S. at 462).

117.    "By condition[ing] the availability of benefits in that manner," the OCSA "effectively penalizes the free exercise of religion." *Id.* (internal quotations omitted).

118.    The exclusion of Plaintiffs serves no compelling, substantial, or legitimate government interest.

119.    The exclusion of Plaintiffs is not narrowly tailored to achieve any government interest.

120.    Defendants are persons within the meaning of 42 U.S.C. § 1983.

121.    Plaintiffs are not state actors or otherwise engaged in state action.

122.    Plaintiffs have suffered, are suffering, and will suffer irreparable harm and other forms of harm absent relief.

## COUNT II

### 42 U.S.C. § 1983
### FREE EXERCISE CLAUSE VIOLATION
### NOT GENERALLY APPLICABLE

123.   All preceding paragraphs are realleged and incorporated herein by reference.

124.   State action "burdening religious practice must be of general applicability." *Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 542 (1993).

125.   A law is not generally applicable if it treats "*any* comparable secular activity more favorably than religious exercise." *Tandon v. Newsom*, 593 U.S. 61, 62 (2021); *see also Fulton v. City of Philadelphia*, 593 U.S. 522, 533 (2021); *Lukumi*, 508 U.S. at 542-46.

126.   Under this rule, the OCSA is not generally applicable on its face or in its application. The exclusion of religious applicants like Plaintiffs because they are religious is not generally applicable.

127.   Defendants must therefore satisfy strict scrutiny.

128.   Discriminating against religious applicants is not the least restrictive means of furthering a compelling governmental interest.

129.   Defendants are persons within the meaning of 42 U.S.C. § 1983.

130.   Plaintiffs are not state actors or otherwise engaged in state action.

131.   Plaintiffs have suffered, are suffering, and will suffer irreparable harm and other forms of harm absent relief.

4912-8803-8298,

## COUNT III

### 42 U.S.C. § 1983
#### FREE EXERCISE CLAUSE VIOLATION
#### NOT NEUTRAL

132.   All preceding paragraphs are realleged and incorporated herein by reference.

133.   "At a minimum, the protections of the Free Exercise Clause pertain if the law at issue discriminates against some or all religious beliefs or regulates or prohibits conduct because it is undertaken for religious reasons." *Lukumi*, 508 U.S. at 532.

134.   "Government fails to act neutrally when it proceeds in a manner intolerant of religious beliefs or restricts practices because of their religious nature." *Fulton*, 593 U.S. at 533.

135.   The OCSA is not neutral on its face. The exclusion of religious applicants like Plaintiffs because they are religious is not neutral.

136.   The inconsistent treatment of different religious groups is not neutral.

137.   Hostility toward religious groups is not neutral.

138.   Defendants must therefore satisfy strict scrutiny.

139.   Discriminating against religious applicants is not the least restrictive means of furthering a compelling governmental interest.

140.   Defendants are persons within the meaning of 42 U.S.C. § 1983.

141.   Plaintiffs are not state actors or otherwise engaged in state action.

142.   Plaintiffs have suffered, are suffering, and will suffer irreparable harm and other forms of harm absent relief.

## COUNT IV

### 42 U.S.C. § 1983
### EQUAL PROTECTION VIOLATION
### DISCRIMINATION BASED ON RELIGION

143.    All preceding paragraphs are realleged and incorporated herein by reference.

144.    The Equal Protection Clause prohibits discrimination on the basis of religion.

145.    Okla. Stat. Ann. tit. 70, § 3-136(A)(2) discriminates against religion on its face because it excludes applicants seeking to run religious charter schools from the charter school program.

146.    Defendants must therefore satisfy strict scrutiny.

147.    Defendants do not have a compelling interest in discriminating on the basis of religion and denying religious people equal protection.

148.    Defendants' religious discrimination is not the least restrictive means of furthering a compelling governmental interest.

149.    Defendants are persons within the meaning of 42 U.S.C. § 1983.

150.    Plaintiffs are not state actors or otherwise engaged in state action.

151.    Plaintiffs have suffered, are suffering, and will suffer irreparable harm and other forms of harm absent relief.

### PRAYER FOR RELIEF

Wherefore, Plaintiffs request that the Court:

a.    Declare that Okla. Stat. Ann. tit. 70, § 3-136(A)(2) violates the Free Exercise Clause of the First Amendment to the United States Constitution;

b.    Declare that Okla. Stat. Ann. tit. 70, § 3-136(A)(2) violates the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution;

c.    Issue preliminary and permanent injunctive relief prohibiting Defendants from enforcing Okla. Stat. Ann. tit. 70, § 3-136(A)(2) or otherwise denying Plaintiffs eligibility to obtain a charter on the basis of their religious identity, beliefs, or practices;

d.    Award reasonable attorneys' fees and costs; and

e.    Award all such other relief as the Court may deem proper.

## JURY DEMAND

Plaintiffs demand a trial by jury of all issues so triable.

Dated: March 24, 2026                    Respectfully submitted,

/s/ *Robert G. McCampbell*

ROBERT G. MCCAMPBELL, OBA No. 10390
DAVID R. HERBER, OBA No. 33527
**GABLEGOTWALS**
499 W. Sheridan Ave., Suite 2200
Oklahoma City, OK 73102
Tel 405-235-5500 | Fax 405-235-2875
RMcCampbell@Gablelaw.com
DHerber@Gablelaw.com

- and -

ERIC S. BAXTER, DC Bar No. 479221
ERIC C. RASSBACH, TX Bar No. 24013375
DANIEL L. CHEN, DC Bar No. 1781783
**The Becket Fund for Religious Liberty**
1919 Pennsylvania Ave, N.W., Suite 400
Washington, D.C. 20006
(202) 955-0095
EBaxter@becketfund.org
ERassbach@Becketfund.org
DChen@Becketfund.org

4912-8803-8298,                    23