## UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF OKLAHOMA

------------------------------------------------ :

THE NATIONAL BEN GAMLA
JEWISH CHARTER SCHOOL
FOUNDATION, INC., et al.,

          *Plaintiffs*,

    -against-

GENTNER DRUMMOND, in his official
capacity as Attorney General of
Oklahoma, et al.,

          *Defendants*.

------------------------------------------------ :

        :
        : Case No. 5:26-cv-00582-R
        :

## PROPOSED BRIEF IN OPPOSITION
## BY PROPOSED INTERVENORS RABBI DANIEL KAIMAN ET AL.
## TO PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION

**TABLE OF CONTENTS**

INTRODUCTION ........................................................................................................... 1

LEGAL AND FACTUAL BACKGROUND ................................................................. 1

ARGUMENT ................................................................................................................. 4

I.  Plaintiffs are unlikely to succeed on the merits ........................................................ 5

    A.  Plaintiffs lack Article III standing .................................................................... 5

    B.  Plaintiffs' claims are not ripe ........................................................................... 7

    C.  Plaintiffs' Free Exercise Clause arguments fail ............................................... 7

        1.  Oklahoma virtual charter schools are state actors because they
           are governmental entities ......................................................................... 8

        2.  Alternatively, Oklahoma virtual charter schools are state actors
           under state-action tests that apply to private entities ........................... 14

        3.  The Tenth Circuit and numerous other courts have concluded that
           charter schools are governmental entities and state actors ................... 19

        4.  Because public charter schools are state actors, Plaintiffs may not
           assert their free-exercise challenge ....................................................... 21

        5.  The Establishment Clause prohibits religious charter schools ............. 22

        6.  *Carson*, *Espinoza*, and *Trinity Lutheran* are inapplicable ................... 24

II.  Plaintiffs do not satisfy the remaining preliminary-injunction factors ...................... 25

CONCLUSION ............................................................................................................. 25

## TABLE OF AUTHORITIES

**Cases**

*Abbott Lab'ys v. Gardner*,
387 U.S. 136 (1967).................................................................................... 7

*Agostini v. Felton*,
521 U.S. 203 (1997).................................................................................. 23

*Arkansas v. Texas*,
346 U.S. 368 (1953).................................................................................. 13

*Blanco v. Success Acad. Charter Schs., Inc.*,
722 F. Supp. 3d 187 (S.D.N.Y. 2024)....................................................... 20

*Bd. of Educ. v. Grumet*,
512 U.S. 687 (1994).................................................................................. 23

*Biden v. Nebraska*,
600 U.S. 477 (2023)............................................................................. 9, 13

*Bowen v. Kendrick*,
487 U.S. 589 (1988).................................................................................. 23

*Brammer-Hoelter v. Twin Peaks Charter Acad.*,
602 F.3d 1175 (10th Cir. 2010) ................................................................ 19

*Brentwood Acad. v. Tenn. Secondary Sch. Athletic Ass'n*,
531 U.S. 288 (2001).................................................................................. 19

*Capitol Square Rev. & Advisory Bd. v. Pinette*,
515 U.S. 753 (1995).................................................................................. 22

*Carson ex rel. O.C. v. Makin*,
596 U.S. 767 (2022).................................................................................. 25

*Caviness v. Horizon Cmty. Learning Ctr, Inc.*,
590 F.3d 806 (9th Cir. 2010) .................................................................... 21

*Coleman v. Utah State Charter Sch. Bd.*,
673 F. App'x 822 (10th Cir. 2016) ........................................................... 19

*Comm. for Pub. Educ. & Religious Liberty v. Nyquist*,
413 U.S. 756 (1973).................................................................................. 24

*Daugherty v. Vanguard Charter Sch. Acad.*,
116 F. Supp. 2d 897 (W.D. Mich. 2000) ........................................................ 20

*Day v. Bond*,
500 F.3d 1127 (10th Cir. 2007) .................................................................. 5, 6

*Dep't of Transp. v. Ass'n of Am. R.Rs.*,
575 U.S. 43 (2015) ............................................................................................ 8

*DeShaney v. Winnebago Cnty. Dep't of Soc. Servs.*,
489 U.S. 189 (1989) ....................................................................................... 19

*Dillon v. Twin Peaks Charter Acad.*,
241 F. App'x 490 (10th Cir. 2007) ......................................................... 19–20

*Drummond ex rel. State v. Okla. Statewide Virtual Charter Sch. Bd.*,
558 P.3d 1 (Okla. 2024),
*aff'd by an equally divided court*, 605 U.S. 165 (2025) .................................. 2, 12, 15

*Edwards v. Aguillard*,
482 U.S. 578 (1987) ....................................................................................... 22

*Engel v. Vitale*,
370 U.S. 421 (1962) ....................................................................................... 23

*Epperson v. Arkansas*,
393 U.S. 97 (1968) ......................................................................................... 23

*Espinoza v. Mont. Dep't of Revenue*,
591 U.S. 464 (2020) ....................................................................................... 25

*Everson v. Bd. of Educ.*,
330 U.S. 1 (1947) ........................................................................................... 23

*Evans v. Newton*,
382 U.S. 296 (1966) ....................................................................................... 18

*Fam. C.L. Union v. Dep't of Child. & Fams.*,
837 F. App'x 864 (3d Cir. 2020) ................................................................... 20

*Fields v. Speaker of Pa. House of Representatives*,
936 F.3d 142 (3d Cir. 2019) .......................................................................... 22

*Garcetti v. Ceballos*,
547 U.S. 410 (2006) ....................................................................................... 22

*Gundy v. City of Jacksonville*,
    50 F.4th 60 (11th Cir. 2022) ...................................................................... 22

*Illinois ex rel. McCollum v. Bd. of Educ.*,
    333 U.S. 203 (1948) ................................................................................. 23

*Jackson v. Metro. Edison Co.*,
    419 U.S. 345 (1974) ............................................................................ 13, 14

*Jones v. SABIS Educ. Sys., Inc.*,
    52 F. Supp. 2d 868 (N.D. Ill. 1999) ......................................................... 20

*Larkin v. Grendel's Den, Inc.*,
    459 U.S. 116 (1982) ................................................................................. 23

*Lebron v. Nat'l R.R. Passenger Corp.*,
    513 U.S. 374 (1995) ............................................................... 8, 11, 13, 14

*Lee v. Weisman*,
    505 U.S. 577 (1992) ................................................................................. 22

*Lindke v. Freed*,
    601 U.S. 187 (2024) ................................................................................... 8

*Logiodice v. Trs. of Me. Cent. Inst.*,
    296 F.3d 22 (1st Cir. 2002) ...................................................................... 21

*Lujan v. Defs. of Wildlife*,
    504 U.S. 555 (1992) ................................................................................... 5

*Manhattan Cmty. Access Corp. v. Halleck*,
    587 U.S. 802 (2019) .............................................................. 13, 15, 17, 18

*Murthy v. Missouri*,
    603 U.S. 43 (2024) .................................................................................. 5, 6

*Nampa Classical Acad. v. Goesling*,
    447 F. App'x 776 (9th Cir. 2011) ............................................................. 20

*Patrick v. Success Acad. Charter Schs., Inc.*,
    354 F. Supp. 3d 185 (E.D.N.Y. 2018) ...................................................... 20

*Peltier v. Charter Day Sch.*,
    37 F.4th 104 (4th Cir. 2022) ............................................................... 15, 20

iv

*Pleasant Grove City v. Summum*,
   555 U.S. 460 (2009)..................................................................................................22

*Pocono Mountain Charter Sch. v. Pocono Mountain Sch. Dist.*,
   908 F. Supp. 2d 597 (M.D. Pa. 2012) .....................................................................20

*Polk County v. Dodson*,
   454 U.S. 312 (1981)............................................................................................13, 14

*Rendell-Baker v. Kohn*,
   457 U.S. 830 (1982)............................................................................................20, 21

*Riester v. Riverside Cmty. Sch.*,
   257 F. Supp. 2d 968 (S.D. Ohio 2002) ....................................................................20

*Robert S. v. Stetson School, Inc.*,
   256 F.3d 159 (3d Cir. 2001) ....................................................................................21

*Roberts v. U.S. Jaycees*,
   468 U.S. 609 (1984)..................................................................................................22

*Rocky Mountain Gun Owners v. Polis*,
   121 F.4th 96 (10th Cir. 2024) ...................................................................................5

*Santa Fe Indep. Sch. Dist. v. Doe*,
   530 U.S. 290 (2000)..................................................................................................22

*Sch. Dist. v. Schempp*,
   374 U.S. 203 (1963)..................................................................................................23

*Trinity Lutheran Church of Columbia, Inc. v. Comer*,
   582 U.S. 449 (2017)..................................................................................................25

*United States v. Ackerman*,
   831 F.3d 1292 (10th Cir. 2016) ............................................................................9, 14

*United States v. Minn. Transitions Charter Schs.*,
   50 F. Supp. 3d 1106 (D. Minn. 2014)......................................................................20

*Utah Republican Party v. Cox*,
   892 F.3d 1066 (10th Cir. 2018) .................................................................................7

*Wallace v. Jaffree*,
   472 U.S. 38 (1985)................................................................................................22–23

*West v. Atkins*,
　487 U.S. 42 (1988) ................................................................................ 18, 19

*Wilson v. Glenwood Intermountain Props., Inc.*,
　98 F.3d 590 (10th Cir. 1996) .......................................................................... 5

*Winter v. Nat. Res. Def. Council, Inc.*,
　555 U.S. 7 (2008) ............................................................................................. 5

*Wittner v. Banner Health*,
　720 F.3d 770 (10th Cir. 2013) ...................................................................... 19

*Ysursa v. Pocatello Educ. Ass'n*,
　555 U.S. 353 (2009) ...................................................................................... 21

*Zelman v. Simmons-Harris*,
　536 U.S. 639 (2002) ...................................................................................... 24

*Zorach v. Clauson*,
　343 U.S. 306 (1952) ...................................................................................... 22

## Constitutional Provisions

Okla. Const. art. I, § 5 .................................................................. 10, 15, 18, 19

Okla. Const. art. XI, § 2 ........................................................................ 10, 18

Okla. Const. art. XI, § 3 ........................................................................ 10, 18

Okla. Const. art. XIII, § 1 ........................................................ 10, 15, 16, 18, 19

## Statutes

20 U.S.C. § 7801 ............................................................................................ 12

Okla. Stat. tit. 70, § 1-109 ............................................................................ 11

Okla. Stat. tit. 70, §§ 3-130 to 3-145.11 ..................................................... 1, 9

Okla. Stat. tit. 70, § 3-131 ............................................................................ 10

Okla. Stat. tit. 70, § 3-132.1 ...................................................................... 9, 21

Okla. Stat. tit. 70, § 3-132.2 ................................................................ 1, 12, 20

Okla. Stat. tit. 70, § 3-134 .............................. 1, 2, 4, 9, 10, 11, 14, 19, 24

Okla. Stat. tit. 70, § 3-136 ........................................................ 2, 6, 10, 11, 12, 14, 15, 18

Okla. Stat. tit. 70, § 3-137 ...................................................................................... 2, 10

Okla. Stat. tit. 70, § 3-140 ........................................................................................ 6, 10

Okla. Stat. tit. 70, § 3-141 ............................................................................................ 11

Okla. Stat. tit. 70, § 3-142 ............................................................................... 2, 11, 12, 24

Okla. Stat. tit. 70, § 3-144 ............................................................................................ 24

Okla. Stat. tit. 70, § 6-401 ............................................................................................ 11

Okla. Stat. tit. 70, § 9-108 ............................................................................................ 11

Okla. Stat. tit. 70, § 11-103.6m ..................................................................................... 11

Okla. Stat. tit. 70, § 11-103.16 ...................................................................................... 11

Okla. Stat. tit. 70, § 11-202 ........................................................................................... 11

Okla. Stat. tit. 70, § 18-200.1 .................................................................................. 2, 11, 24

Okla. Stat. tit. 70, § 18-201.1 .................................................................................. 2, 11, 24

Okla. Stat. tit. 70, § 24-100.10 ...................................................................................... 11

Okla. Stat. tit. 70, § 24-101.3 ........................................................................................ 11

Okla. Stat. tit. 70, § 24-157 ........................................................................................... 11

Okla. Stat. tit. 70, § 1210.196 ....................................................................................... 11

Okla. Stat. tit. 70, § 1210.201 ......................................................................................... 6

Okla. Stat. tit. 70, § 1210.508 ....................................................................................... 11

Okla. Stat. tit. 70, § 1210.508-5 .................................................................................... 11

Okla. Stat. tit. 70, § 1210.508-6 .................................................................................... 11

Okla. Stat. tit. 70, § 1210.508B ..................................................................................... 11

Okla. Stat. tit. 70, § 1210.545 ....................................................................................... 10

**Regulations**

Okla. Admin. Code § 210:35-3-201 ................................................................. 10

Okla. Admin. Code § 210:35-33-2 .................................................................. 11

Okla. Admin. Code § 210:40-87-6 .................................................................. 11

Okla. Admin. Code § 777:10-3-3 ............................................................ 2, 7, 25

**Other Authorities**

Carl F. Kaestle, *Pillars of the Republic: Common Schools and American
  Society, 1780–1860* (Eric Foner, ed., 1983)........................................... 16, 17

Derek W. Black, *The Fundamental Right to Education*,
  94 Notre Dame L. Rev. 1059 (2019) ........................................................ 16

Derek W. Black, *Localism, Pretext, and the Color of School Dollars*,
  107 Minn. L. Rev. 1415 (2023) ................................................................. 16

Dianna Everett, *The Encyclopedia of Oklahoma History and Culture:
  Schools, Common*, Okla. Hist. Soc'y, https://perma.cc/544H-RJH8.................... 15, 16

Johann N. Neem, *Democracy's Schools: The Rise of Public Education in
  America* (2017) ....................................................................................... 17

Okla. Jud. Ethics Op. 2023-3,
  538 P.3d 572 (Okla. Jud. Ethics Advisory Panel 2023) ............................ 14

Oscar William Davison, *Oklahoma's Educational Heritage*,
  27 Chrons. Okla. 354 (1949), https://perma.cc/M6YQ-JNVS ................... 15

## INTRODUCTION

Because all children have the right to an education, public schools must be open to and welcoming of all students, and they must not promote any particular religion. Plaintiffs seek to upend these longstanding principles—and violate federal and state constitutional and statutory prohibitions—by opening the nation's first religious public charter school. Their motion for a preliminary injunction should be denied.

To start, Plaintiffs lack standing. Ben Gamla's charter-application materials include disqualifying deficiencies distinct from the school's plans to inculcate one religion. Thus, Plaintiffs have not demonstrated an injury that would be redressed by the relief they seek. Similarly, Plaintiffs' claims are not ripe because they have not completed necessary steps in the charter-application process.

Even if Plaintiffs have standing and the case is ripe, Plaintiffs' claims fail on the merits. As recognized by numerous courts—including the Tenth Circuit and the Oklahoma Supreme Court—charter schools are governmental entities or other state actors. As such, they cannot assert Free Exercise Clause claims. And even if they could, the Establishment Clause bars charter schools from promoting religion.

## LEGAL AND FACTUAL BACKGROUND

Ben Gamla seeks authorization to become a virtual charter school. (Compl. ¶ 9, ECF No. 1.) Virtual charter schools are "public school[s] established by contract with . . . the Statewide Charter School Board." Okla. Stat. tit. 70, § 3-132.2(C)(1)(b); *see also id.* § 3-134(E)(3). The Oklahoma legislature created virtual charter schools through the Oklahoma Charter Schools Act ("OCSA," Okla. Stat. tit. 70, §§ 3-130 to 3-145.11) to

1

carry out a state constitutional duty to provide free and universal public education. *Drummond ex rel. State v. Okla. Statewide Virtual Charter Sch. Bd.*, 558 P.3d 1, 12 (Okla. 2024), *aff'd by an equally divided court*, 605 U.S. 165 (2025).  Before a virtual charter school can enter into a contract with the Board, the Board must approve a detailed charter application.  *Id.* § 3-134(B).  The Board and other governmental entities oversee virtual charter schools throughout their existence (*e.g., id.* §§ 3-134(I), 3-137(H)), and the Board may dissolve a school for poor performance or other good cause (*id.* § 3-137(C)–(F)).  Virtual charter schools must "be as equally free and open to all students as traditional public schools" (*id.* § 3-136(A)(9)) and are funded under the same statutory formulas that apply to other public schools (*id.* §§ 3-142(A), 3-142(C), 18-200.1, 18-201.1).  And, like other public schools, they are subject to a comprehensive statutory and regulatory framework that governs their academic programs, treatment of students, reporting obligations, records, meetings, and boards.  *See infra* at 11–12.

    Like all other public schools, Oklahoma charter schools must be neutral toward religion.  *Id.* § 3-136(A)(2), (9); Okla. Admin. Code § 777:10-3-3(b)(8)(L); *Drummond*, 558 P.3d at 18.  But Plaintiffs have made clear that Jewish religious teachings will be integrated into "every dimension of . . . life" at their proposed school (ECF No. 1-2 at 8, 38) and that a core part of the school's mission will be to help students "develop[] deep Jewish knowledge, faith, and values" (ECF No. 1-5 at 1, 16).  Students will take mandatory "religion/theology classes"; learn "Jewish religious beliefs, principles, and ethical frameworks"; and study "religious rituals."  (ECF No. 1-2 at 4, 8, 16, 61.)

2

In addition, statements in Ben Gamla's application demonstrate that the school plans to follow discriminatory policies and practices.  Though Ben Gamla professes that it will accept students "of different faiths or no faith," it belies that statement by warning that "[a]dmission assumes the student and family willingness to adhere with respect to the beliefs, expectations, policies, and procedures of the school."  (*Id.* at 59.)  The school plans to promote "core Jewish teachings related to . . . the sanctity of life, the sanctity of marriage . . . and the ethical guidance our tradition offers regarding sexuality and gender."  (*Id.* at 38.)  And while Ben Gamla states that it "shall not discriminate" on the basis of a variety of characteristics that include "biological sex," it does not list sexual orientation and gender identity among the protected traits.  (*Id.* at 63.)  Further, the school will refrain from disability-based discrimination only insofar as students "can be served by virtual learning."  (*Id.*)  Ben Gamla also "retains its right to consider religion as a factor in employment-related decisions."  (*Id.* at 54.)  Employees will be required to "support the principles, teachings, and commitments of the Jewish community"; "refrain from actions that are contrary to the teachings of the community"; and "uphold the standards of the Jewish tradition in their day-to-day work and personal lives."  (*Id.* at 3.)

The Board twice rejected Ben Gamla's application—once at a February 9, 2026 meeting, and again at a March 9, 2026 meeting after Ben Gamla's submission of an addendum to its application.  (ECF No. 1-4 at 1–2; ECF No. 1-6.)  The addendum purported "to satisfy the concerns" that the Board had raised during its February 9 meeting and in a subsequent rejection letter.  (ECF No. 1-5 at 1.)  But the addendum did not alter Ben Gamla's plans to provide a religious education.  (ECF No. 1-5.)

3

Nor did the addendum remedy various other application deficiencies. For instance, as Attorney General Drummond has explained in an ongoing state-court lawsuit, even after the addendum, Ben Gamla's application materials contain substantial discrepancies in enrollment projections. Pet. Writ Mand. 5–6, 9–10, *Drummond v. Okla. Statewide Charter Sch. Bd.*, No. CV-2026-649 (Okla. Dist. Ct. Mar. 11, 2026), https://perma.cc/769E-AQBP.[1]  Drummond also raised concerns about the school's board and operational structure. *Id.* at 6, 10–11. In addition, Ben Gamla's application did not include proposed governing bylaws or documentation showing completion of the Board's pre-application training (ECF No. 1-2; Ex. 1 hereto)—both of which are required by OCSA (Okla. Stat. tit. 70, § 3-134(A), (B)(9), (B)(22))—and neither defect was remedied by Ben Gamla's addendum (ECF No. 1-5). And while the addendum addressed one problematic clause in Ben Gamla's application relating to special-education compliance (*id.* at 4–5), it did not address (*id.* at 1–5) any of the above-described statements in the application that evince plans to follow discriminatory policies and practices (*supra* at 3).

## ARGUMENT

"A plaintiff seeking a preliminary injunction must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in

---

[1] The Attorney General's lawsuit points only to discrepancies between Ben Gamla's letter of intent and its application. Pet. Writ Mand., *Drummond*, No. CV-2026-649, at 5–6. But there are also enrollment-projection discrepancies *within* the application itself. (*Compare* Ex. 2 hereto (initial target enrollment of 400), *with* ECF No. 15-5 at 2 (budget projecting enrollment of 500).)

the public interest." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008).

Plaintiffs do not satisfy any of these requirements, so the Court should deny their motion.

## I.  Plaintiffs are unlikely to succeed on the merits.

### A.  Plaintiffs lack Article III standing.

Plaintiffs lack standing.  To establish standing, Plaintiffs must show (1) a concrete

and particularized, actual or imminent injury; (2) resulting from Defendants' conduct; (3)

that is likely to be redressed by a favorable judgment.  *Lujan v. Defs. of Wildlife*, 504

U.S. 555, 560–61 (1992).  Applying these principles, the Tenth Circuit has held that "a

person who fails to satisfy lawful, nondiscriminatory requirements or qualifications for

[a] benefit lacks standing to raise claims of discrimination in the denial of [that] benefit."

*Wilson v. Glenwood Intermountain Props., Inc.*, 98 F.3d 590, 593 (10th Cir. 1996);

*accord Day v. Bond*, 500 F.3d 1127, 1135 (10th Cir. 2007).

"At the preliminary injunction stage . . . the plaintiff must make a clear showing

that she is likely to establish each element of standing."  *Murthy v. Missouri*, 603 U.S. 43,

58 (2024) (citation modified).  When "the information pertaining to standing is in the

plaintiff's possession . . . then the plaintiff must move beyond the mere allegations in

their pleadings and provide specific facts, supported by affidavits or other evidence, to

demonstrate standing."  *Rocky Mountain Gun Owners v. Polis*, 121 F.4th 96, 108 (10th

Cir. 2024) (citation modified).  Plaintiffs have not done so here.

Plaintiffs request a preliminary injunction that would prohibit Defendants from

"exclud[ing] Plaintiffs from participating in Oklahoma's charter school program on

account of their religious status, beliefs, or practices."  (Pls.' Mot. Prelim. Inj. 1.)  But

5

Ben Gamla's application materials include deficiencies that "disqualify [the school] from eligibility for [charter authorization] even absent" Oklahoma's requirement that charter schools be nonreligious. *See Day*, 500 F.3d at 1135. Plaintiffs therefore "cannot show injury caused by" the challenged requirement; "nor can [they] show injury that would be redressed by a decision in [their] favor." *See id.*

For instance, Ben Gamla's application demonstrates that the school plans to follow discriminatory policies and practices (*supra* at 3–4) that violate OCSA's prohibitions on discrimination on any basis against students and religious discrimination in employment (Okla. Stat. tit. 70, §§ 3-136(A)(2), 3-136(A)(6), 3-136(A)(9), 3-140, 1210.201). Plaintiffs fall far short of making a "clear showing" (*Murthy*, 603 U.S. at 58) that their proposed school would be "as equally . . . open to all students as traditional public schools" (Okla. Stat. tit. 70, § 3-136(A)(9)). The school cannot be "open to all" in any meaningful sense while requiring students and their families to "adhere with respect to" the school's particular beliefs, including beliefs about religion, sexuality, and gender. (ECF No. 1-2 at 38, 59.) Moreover, Ben Gamla's statement that it will refrain from discriminating based on disability only insofar as a student "can be served by virtual learning" (ECF No. 1-2 at 63) disregards OCSA's unqualified prohibition against discrimination in admissions based on "disabling condition" (Okla. Stat. tit. 70, § 3-140(D)). And Ben Gamla's application materials contain various other material deficiencies (*supra* at 4), including deficiencies that Attorney General Drummond considers disqualifying (Pet. Writ Mand. 9–12, *Drummond*, No. CV-2026-649).

Because of its application's deficiencies, Ben Gamla would be precluded from being a charter school even if the Court grants Plaintiffs' requested relief. Thus, Plaintiffs have not met their burden to show that they likely have standing.

### B. Plaintiffs' claims are not ripe.

This case is also unripe. To determine whether a case is ripe, courts "evaluate both the fitness of the issues for judicial decision and the hardship to the parties of withholding court consideration." *Abbott Lab'ys v. Gardner*, 387 U.S. 136, 149 (1967). Doing so prevents "premature adjudication." *Id.* at 148. Plaintiffs have yet to complete all necessary application steps, such as submitting proposed bylaws and documentation of pre-application training. (*Supra* at 4.) And there are ongoing disputes among the Defendants over the reasons for rejecting Ben Gamla's application (*id.*), which cast significant "uncertainty" on the issues in this case and render them unfit for adjudication. *See Utah Republican Party v. Cox*, 892 F.3d 1066, 1093 (10th Cir. 2018). As for "hardship to the parties," Plaintiffs would not be "significantly impaired" by deferring adjudication (*see id.*), because Ben Gamla could not open its school until July 2027 even if it were to obtain a preliminary injunction tomorrow. The Board's regulations require charter applications to "be submitted at least eighteen (18) months . . . prior to July of the expected school opening year." Okla. Admin. Code § 777:10-3-3(a)(4). Ben Gamla submitted its application in December 2025. (Compl. ¶ 65.)

### C. Plaintiffs' Free Exercise Clause arguments fail.

Even if Plaintiffs have standing and their claims are ripe, they fail on the merits. Oklahoma virtual charter schools are public schools, governmental entities, and state

7

actors. As such, they do not have Free Exercise Clause rights to challenge the very laws that create them. But even if Ben Gamla could do so, the Establishment Clause prohibits religious charter schools.

### 1. Oklahoma virtual charter schools are state actors because they are governmental entities.

In cases involving governmental employees or entities, "state action is easy to spot," and "[c]ourts do not ordinarily pause to consider whether [the Constitution] applies to the actions of police officers, public schools, or prison officials." *Lindke v. Freed*, 601 U.S. 187, 195 (2024). Thus, to determine whether a party is a state actor, courts first consider whether the party is a governmental entity; if it is, there is no need to consider state-action tests applicable to private parties. For example, in *Lebron v. National Railroad Passenger Corp.*, 513 U.S. 374, 378, 399 (1995), the Supreme Court held that Amtrak "is part of the Government for purposes of the First Amendment," and that it was therefore "unnecessary to traverse th[e] difficult terrain" of determining when the acts of private entities can be regarded as state action.

The Supreme Court explained in *Lebron* that Amtrak was created by legislation, is controlled by government-appointed officials, and exists to pursue governmental objectives. *Id.* at 383–86, 391, 397–400. The Supreme Court reaffirmed that Amtrak is a governmental entity in *Department of Transportation v. Ass'n of American Railroads*, 575 U.S. 43, 52–53 (2015), pointing to these and additional considerations, including that "Congress has mandated certain aspects of Amtrak's day-to-day operations," that Amtrak is "dependent on federal financial support," that Amtrak must provide annual reports on

8

certain matters to Congress and the President, and that Amtrak has other characteristics of governmental entities, such as being subject to the Freedom of Information Act. Likewise, in *Biden v. Nebraska*, 600 U.S. 477, 491 (2023), the Supreme Court held that the Missouri Higher Education Loan Authority ("MOHELA") is a governmental entity because "[i]t was created by the State to further a public purpose, is governed by state officials and state appointees, reports to the State, and may be dissolved by the State."  In addition, then-Judge Gorsuch applied similar analysis in *United States v. Ackerman*, 831 F.3d 1292, 1295–1300 (10th Cir. 2016), concluding that a clearinghouse for missing children was a governmental entity because it was given exclusive duties and powers by a federal statute, was funded primarily by the federal government, and was controlled by the government, including via "statutorily required . . . functions, a fact that evinces the sort of 'day-to-day' statutory control over its operations that the Court found tellingly present in the Amtrak cases."

Oklahoma virtual charter schools have all the characteristics listed in these cases.

***Created and subject to dissolution by governmental action.***  Governmental action is responsible for the creation of Oklahoma virtual charter schools in two respects.  First, virtual charter schools were authorized by the Oklahoma legislature through OCSA, Okla. Stat. tit. 70, §§ 3-130 to 3-145.11.  Second, an individual virtual charter school can come into existence only if the Board—a governmental entity—approves a detailed application for a charter.  *Id.* §§ 3-132.1(A), 3-132.1(I), 3-134(B), 3-134(I).  Oklahoma virtual charter schools can also be dissolved by governmental action.  They could be abolished entirely by repeal of OCSA.  And the Board may deny renewal of or terminate

9

the charter of an individual school for poor performance or other good cause. *Id.* § 3-137(D)–(F).

*Controlled by governmental officials.* Throughout their existence, Oklahoma virtual charter schools remain under the control of governmental officials. The Board must provide "oversight of the operations of . . . virtual charter schools" with respect to performance and legal compliance. *Id.* § 3-134(I)(1), (7). It must also "approve or deny" certain "proposed contracts" that virtual charter schools seek to sign. *Id.* § 3-134(I)(6). Moreover, the schools must submit annual accreditation applications to the Oklahoma State Department of Education. Okla. Admin. Code § 210:35-3-201(a). And the Oklahoma State Board of Education must identify underperforming virtual charter schools through a statutorily defined process that can lead to school closure. Okla. Stat. tit. 70, § 3-137(H) (citing *id.* § 1210.545).

*Pursue governmental objectives.* Oklahoma virtual charter schools are charged with fulfilling governmental objectives, including an Oklahoma constitutional mandate to provide free education that is open to all. *See* Okla. Const. art. I, § 5; art. XI, §§ 2–3; art. XIII, § 1; Okla. Stat. tit. 70, § 3-131(A). To that end, OCSA requires virtual charter schools to "be as equally free and open to all students as traditional public schools." Okla. Stat. tit. 70, § 3-136(A)(9). Thus, OCSA prohibits virtual charter schools from "charg[ing] tuition or fees" (*id.*) and requires that a lottery be used to select which students may enroll in a charter school if the number of students applying exceeds the space available (*id.* § 3-140(A), (D)).

***Directed by statutory mandates.*** Oklahoma exercises significant control over virtual charter schools' day-to-day operations through extensive statutory requirements that do not apply (*see generally* Okla. Admin. Code § 210:35-33-2) to private schools. Oklahoma virtual charter schools must establish "academic program[s] aligned with state standards" (Okla. Stat. tit. 70, § 3-134(B)(12))[2] and must adhere to various other requirements and prohibitions that apply to other public schools.[3] Plaintiffs point out that Oklahoma virtual charter schools are exempt from certain rules that govern other public schools. (Pls.' Br. Supp. Prelim. Inj. 2–3 (citing Okla. Stat. tit. 70, § 3-136(A)(1).) But these exemptions do not change any of the numerous characteristics, described herein, that render Oklahoma virtual charter schools governmental entities. *See Lebron*, 513 U.S. at 392 (Amtrak was a governmental entity despite being exempted from various legal requirements ordinarily applicable to governmental bodies).

***Fully funded by the state.*** Oklahoma provides full state funding for virtual charter schools based on the same statutory formulas that apply to traditional public schools. Okla. Stat. tit. 70, §§ 3-142(A), 3-142(C), 18-200.1, 18-201.1.

---

[2] Plaintiffs' assertion that "charter schools need not follow Oklahoma's core curriculum requirements" (Pls.' Br. Supp. Prelim. Inj. 3) is incorrect (Okla. Stat. tit. 70, § 3-134(B)(12)).

[3] *E.g., id.* §§ 11-103.6m(C) (computer-science course requirements); 11-103.16 (cursive-handwriting instruction); 24-157(B)(1) (prohibition against teaching certain concepts); 1210.508B(D) (prohibition of a particular teaching model); 3-136(A)(10), 1-109(A) (school year length); 3-141(A), 9-108 (bus transportation); 3-136(A)(4), 1210.508(F), 1210.508-5 (student testing); 3-136(A)(11), 24-101.3 (student suspension); 11-202 (school libraries); 6-401 (electronic communication with students); 24-100.10(A), 1210.196(B) (provision of health-related information); 1210.508-6 (college financial-aid applications); Okla. Admin. Code § 210:40-87-6(a)–(b) (insurance coverage and fidelity bonding).

11

***Mandatory reporting requirements.***  Oklahoma virtual charter schools must submit to the Board detailed annual reports that cover a wide range of topics, such as "student academic proficiency" and "financial performance and sustainability."  *Id.* § 3-136(A)(18); *see also id.* § 3-136(A)(17).  And they must comply with all other "reporting requirements" that apply to public "school district[s]."  *Id.* § 3-136(A)(5).

***Other attributes of governmental entities.***  Like other governmental entities, Oklahoma virtual charter schools must "comply with the Oklahoma Open Meeting Act and the Oklahoma Open Records Act."  *Id.* § 3-136(A)(15).  Governing board members are "subject to the same conflict of interest requirements" and "continuing education requirements" as members of local school boards.  *Id.* § 3-136(A)(7).  Oklahoma virtual charter schools and their employees are eligible for many of the same benefits that Oklahoma provides to public schools and their employees.  *Id.* §§ 3-136(A)(13)–(14), 3-142(F).  And Oklahoma virtual charter schools are "considered . . . school district[s] for purposes of tort liability."  *Id.* § 3-136(A)(12).

***Defined as public schools and governmental entities.***  OCSA defines "charter school" as "a public school established by contract."  *Id.* § 3-132.2(C)(1)(b).  Furthermore, each Oklahoma virtual charter school is "considered a local education agency" (*id.* § 3-142(D)), which is "a public board of education or other public authority" that administers public schools (20 U.S.C. § 7801(30)(A)).  And, of course, the Oklahoma Supreme Court concluded in *Drummond*, 558 P.3d at 10–11, that Oklahoma virtual charter schools are governmental entities as a matter of state law.

To be sure, in determining whether an entity is governmental for federal constitutional purposes, how the entity is defined by statute cannot override the substance of what the entity is. *See Lebron*, 513 U.S at 392–93, 397. Nevertheless, the U.S. Supreme Court has accorded considerable weight to how a state defines an entity. *See Biden*, 600 U.S. at 490–91 (emphasizing that MOHELA was statutorily defined as a "public instrumentality" and concluding that MOHELA was governmental both "[b]y law and function"); *Arkansas v. Texas*, 346 U.S. 368, 370 & nn.7–9 (1953) (relying on state judicial opinions that held that University of Arkansas was a state entity, together with factors similar to those used in Amtrak cases, to conclude that University was governmental). Here, the substance and the definition both lead to the same conclusion—that Oklahoma virtual charter schools are governmental entities.

Plaintiffs point to three cases in which entities or persons labeled as "public" were not engaged in state action: *Manhattan Community Access Corp. v. Halleck*, 587 U.S. 802, 805 (2019); *Jackson v. Metropolitan Edison Co.*, 419 U.S. 345, 350 n.7 (1974); and *Polk County v. Dodson*, 454 U.S. 312, 317–20 (1981). (Pls.' Br. 18.) But the entity at issue in *Halleck* was not even labeled "public"—it was a private nonprofit corporation that merely operated a public-access cable channel (587 U.S. at 805); and the entity at issue in *Jackson* was a "privately owned and operated" utility company (419 U.S. at 350). Neither entity was defined under state law as governmental, and neither had any substantive attributes of governmental entities. *See Halleck*, 587 U.S. at 805, 809–11 & n.1; *Jackson*, 419 U.S. at 350–53. And in *Polk*, the Court concluded that public defenders are not state actors when acting as counsel in a criminal proceeding because in

13

doing so they act as adversaries to the state.  *See* 454 U.S. at 318–20, 325.  Oklahoma

virtual charter schools are defined as governmental entities under state law, have

numerous attributes of governmental entities, and do not act as adversaries to the state.

Pointing out that OCSA allows "private organization[s]" to *apply* to establish a

virtual charter school (Okla. Stat. tit. 70, § 3-134(C)), Plaintiffs nevertheless repeatedly

describe charter schools as "private" (Pls.' Br. 2–4, 10, 14).  But in *Ackerman*, then-Judge

Gorsuch rejected a similar framing, reasoning that "an admittedly private entity can be

made into a public one later."  831 F.3d at 1299.  So even if Ben Gamla was private when

it submitted a charter application, upon approval it would become a governmental body,

and the members of its board would become public officials.  *See* Okla. Jud. Ethics Op.

2023-3, 538 P.3d 572, 572 (Okla. Jud. Ethics Advisory Panel 2023) (treating service on

board of Oklahoma charter school as "appointment to a governmental committee, board,

commission, or other governmental position"); Okla. Stat. tit. 70, § 3-136(A)(7).

As Oklahoma virtual charter schools are governmental entities, there is no doubt

that they are state actors, and this should end the inquiry.  *See Lebron*, 513 U.S. at 378.

## 2. Alternatively, Oklahoma virtual charter schools are state actors under state-action tests that apply to private entities.

Even if Oklahoma virtual charter schools are not governmental entities, they are

still state actors.  In some circumstances, the conduct of private entities "may be fairly

treated as that of the State itself."  *Jackson*, 419 U.S. at 351.  Oklahoma virtual charter

schools are state actors under three of the state-action tests that apply to private entities.

***Traditional, exclusive public function.***  A private entity is a state actor when it exercises a function "traditionally *and* exclusively performed" by the government. *Halleck*, 587 U.S. at 809.  Oklahoma virtual charter schools perform the traditional, exclusive public function of providing education that is "free and open to all students" (Okla. Stat. tit. 70, § 3-136(A)(9)).  *See Peltier v. Charter Day Sch.*, 37 F.4th 104, 115–23 (4th Cir. 2022) (en banc) (public charter schools "perform the traditionally exclusive government function of operating the state's public schools"); *Drummond*, 558 P.3d at 12.

In Oklahoma, the provision of education that is free and open to all has been an exclusively public function since the state came into existence.  Prior to statehood in 1907, schools in Oklahoma generally fell into three categories: subscription schools, mission schools, and schools operated by Indigenous people.  Dianna Everett, *The Encyclopedia of Oklahoma History and Culture: Schools, Common*, Okla. Hist. Soc'y, https://perma.cc/544H-RJH8.  These schools were not free and open to all.  Subscription schools relied on funding from pupils' parents.  *Id.*  Mission schools and those operated by Indigenous people primarily served only Indigenous pupils.  *See* Oscar William Davison, *Oklahoma's Educational Heritage*, 27 Chrons. Okla. 354, 362–65 (1949), https://perma.cc/M6YQ-JNVS.  While the children of white settlers were sometimes allowed to attend these schools, they were required to pay tuition.  *Id.* at 365–66.  Under this hodgepodge educational framework, many children did not have access to educational facilities.  Everett, *supra*.

But after the enactment of the 1907 Oklahoma Constitution—which guaranteed "free" education for "all the children of the state" (Okla. Const. art. I, § 5; art. XIII, §

15

1)—education expanded rapidly in Oklahoma.  According to the state's first superintendent of public instruction, Oklahoma enrolled in 1908 "not less than 140,000 children who never entered a public schoolhouse before and a vast majority of whom never attended a school of any kind a single day."  Everett, *supra*.  Oklahoma public schools had done what private education simply could not: provide a system of free education for all children.

Oklahoma's experience mirrors that of states across the union, where "tax support was a necessary condition for a free school system."  Carl F. Kaestle, *Pillars of the Republic: Common Schools and American Society, 1780–1860* 151 (Eric Foner, ed., 1983).  In the early days of the Republic, schools were generally "a product of private action" and were "not open to all, free, or a part of some formal system of schools."  Derek W. Black, *Localism, Pretext, and the Color of School Dollars*, 107 Minn. L. Rev. 1415, 1450 (2023).  Early schools "depended heavily on tuition," and "many communities had no schools at all."  *Id.*  This changed with the advent of the "common schools" movement, which transformed education in the North in the 1820s and 1830s and in the South after the Civil War.  *Id.* at 1450–51.  Common schools "fell under the purview of public officials" and were "funded by state and local taxes."  *Id.* at 1451.

Soon, states "began abolishing tuition and fees in common schools," and many states mandated "free" education for "all" in their constitutions.  *Id.* at 1457–58.  As a result, nationwide school enrollment increased quickly after the Civil War.  *See* Derek W. Black, *The Fundamental Right to Education*, 94 Notre Dame L. Rev. 1059, 1094 (2019).

Public education grew in the nineteenth century because private schooling had proven to be incapable of providing a system of free education open to all.  *See* Johann N. Neem, *Democracy's Schools: The Rise of Public Education in America* 67 (2017).  In some places, private charity schools offered free education "explicitly for the poor," but "traditional views" dictated that "[s]chooling should not be free for those able to pay for it."  *See* Kaestle, *supra*, at 60, 149.  Meanwhile, the affluent sent their children to "expensive and exclusive" independent pay schools.  *Id.* at 60.  Assessing this class-segregated education system, lawmakers across the country concluded that "free public education in common schools was vital."  Neem, *supra*, at 67.  In the words of North Carolina state senator Archibald Murphey, provision of universal education "*require[d]* a system of public education" because "private effort" had failed to accomplish that goal.  *Id.* (emphasis added).  Thus, education that is free and open to all students is a traditionally exclusive public function both in Oklahoma and nationwide.

Plaintiffs contend that the Court should analyze a broader function—"the education of children"—not education that is free and open to all.  (Pls.' Br. 16.)  But the conduct at issue must be identified with specificity instead of being defined too broadly.  For example, although the government does not conduct elections for private offices, such as positions on corporate boards, running elections for *public* office is a quintessential example of a traditionally exclusive public function.  *See Halleck*, 587 U.S. at 809–10 (collecting cases).  Similarly, although both private and public parks exist, trustees of public parks are considered state actors because operating a public park is a

17

function that "traditionally serves the community." *See Evans v. Newton*, 382 U.S. 296, 302 (1966). So too is education that is free and open to all.

**Outsourced constitutional obligation.** "[A] private entity may" also "be deemed a state actor when the government has outsourced one of its constitutional obligations to [the] entity." *Halleck*, 587 U.S. at 810 n.1. For instance, in *West v. Atkins*, 487 U.S. 42, 56 (1988), the Court held that a physician who contracted with the state to provide medical services to incarcerated individuals was a state actor even though he was not a state employee, because the state had "delegated" to the doctor "its constitutional duty to provide adequate medical treatment to those in its custody." The Oklahoma Constitution obligates the state to provide free education that is open to all. *See* Okla. Const. art. I, § 5; art. XI, §§ 2–3; art. XIII, § 1. Oklahoma virtual charter schools are statutorily created to perform this constitutionally mandated state duty. *See* Okla. Stat. tit. 70, § 3-136(A)(9). Thus, they are state actors.

Plaintiffs point out that the state would not be delegating *all* responsibility for public education for the entire state to Ben Gamla. (Pls.' Br. 16–17.) But the state in *West* did not delegate responsibility for all medical care in prisons across the state to a single doctor. Indeed, the state prison at issue employed both a "full-time staff physician" and contract doctors such as the defendant there. 487 U.S. at 44. A partial delegation of a constitutional duty is a delegation all the same.

Plaintiffs also try to distinguish *West* by pointing out that the incarcerated individual there "could turn only to 'those physicians authorized by the State.'" (Pls.' Br. 16–17 (quoting *West*, 487 U.S. at 55).) But the Court in *West* discussed this lack of

18

choice only to explain why a constitutional duty existed there notwithstanding that there is no recognized, freestanding right to healthcare under the Constitution. *See* 487 U.S. at 54; *DeShaney v. Winnebago Cnty. Dep't of Soc. Servs.*, 489 U.S. 189, 196 (1989). Here, Oklahoma children enjoy an express right to access public education that is free and open to all. *See* Okla. Const. art. I, § 5; art. XIII, § 1. And, as in *West*, Oklahoma's virtual charter schools—like other public schools—provide that education to children only upon approval by the state. *See* Okla. Stat. tit. 70, § 3-134(B).

*Entwinement.* Under the "entwinement" test, an entity is a state actor when it is "entwined with governmental policies, or when government is entwined in [its] management or control." *Brentwood Acad. v. Tenn. Secondary Sch. Athletic Ass'n*, 531 U.S. 288, 296 (2001) (citation modified); *accord Wittner v. Banner Health*, 720 F.3d 770, 778 (10th Cir. 2013). Oklahoma virtual charter schools are entwined with the state in this manner. Only the Board—a governmental entity—may sponsor virtual charter schools and grant charters. Governmental entities exercise control over Oklahoma virtual charter schools in many respects. And the operations of virtual charter schools are further directed by numerous statutory and regulatory requirements. *See supra* at 9–12.

### 3. The Tenth Circuit and numerous other courts have concluded that charter schools are governmental entities and state actors.

Consistently with the analysis above, the Tenth Circuit has treated charter schools as governmental entities. *See Brammer-Hoelter v. Twin Peaks Charter Acad.*, 602 F.3d 1175, 1180, 1188 (10th Cir. 2010); *Coleman v. Utah State Charter Sch. Bd.*, 673 F. App'x 822, 830 (10th Cir. 2016); *Dillon v. Twin Peaks Charter Acad.*, 241 F. App'x 490, 496–97

19

(10th Cir. 2007).  Many other federal courts—including the en banc Fourth Circuit,

panels of the Third and Ninth Circuits, and numerous district courts—have treated charter

schools as governmental entities or other state actors as well.[4]

Ignoring these authorities, Defendants rely on the Supreme Court's decision in

*Rendell-Baker v. Kohn*, 457 U.S. 830 (1982), to assert that Oklahoma virtual charter

schools are not state actors.  (Pls.' Br. 13–14.)  But there, the Supreme Court ruled that a

*private* school for troubled youths was not a state actor for purposes of employment-

related claims.  457 U.S. at 832–35, 843.  As discussed above, Oklahoma virtual charter

schools are public schools, not private ones.  Okla. Stat. tit. 70, § 3-132.2(C)(1)(b).  They

are created through governmental action (*supra* at 9), unlike the school in *Rendell-Baker*

(*see* 457 U.S. at 832).  They perform the traditionally exclusive public function of

providing education that is free and open to all students (*supra* at 15–18), while the

school in *Rendell-Baker* was for "students who could not be served by traditional public

schools," a function "that until recently the State had not undertaken" (457 U.S. at 842).

Moreover, unlike the educational functions of Oklahoma virtual charter schools (*supra* at

9–12), "regulators showed relatively little interest in the [*Rendell-Baker*] school's

---

[4] *See, e.g.*, *Peltier*, 37 F.4th at 115–23; *Fam. C.L. Union v. Dep't of Child. & Fams.*, 837
F. App'x 864, 869 (3d Cir. 2020); *Nampa Classical Acad. v. Goesling*, 447 F. App'x 776,
777–78 (9th Cir. 2011); *Blanco v. Success Acad. Charter Schs., Inc.*, 722 F. Supp. 3d 187,
227 (S.D.N.Y. 2024); *Patrick v. Success Acad. Charter Schs., Inc.*, 354 F. Supp. 3d 185,
209 n.24 (E.D.N.Y. 2018); *United States v. Minn. Transitions Charter Schs.*, 50 F. Supp.
3d 1106, 1120 (D. Minn. 2014); *Pocono Mountain Charter Sch. v. Pocono Mountain Sch.
Dist.*, 908 F. Supp. 2d 597, 604–05 (M.D. Pa. 2012); *Riester v. Riverside Cmty. Sch.*, 257
F. Supp. 2d 968, 972–73 (S.D. Ohio 2002); *Daugherty v. Vanguard Charter Sch. Acad.*,
116 F. Supp. 2d 897, 906–07 (W.D. Mich. 2000); *Jones v. SABIS Educ. Sys., Inc.*, 52 F.
Supp. 2d 868, 876, 879 (N.D. Ill. 1999).

personnel matters," and the Supreme Court's holding in the case addressed only whether the school was a state actor with respect to employment claims (*see* 457 U.S. at 841–42).

Other cases that Plaintiffs cite (Pls.' Br. 19–21) are inapposite for similar reasons. In *Caviness v. Horizon Community Learning Center, Inc.*, 590 F.3d 806, 812–14, 817–18 (9th Cir. 2010), the court held that a charter school's employment decisions were not state action based on an analysis of Arizona statutory and constitutional provisions that are substantially different from Oklahoma's.  Moreover, the *Caviness* court did not decide whether performance of the school's *educational* functions was state action.  *Id.*  Finally, *Logiodice v. Trustees of Maine Central Institute*, 296 F.3d 22, 24–25 (1st Cir. 2002), and *Robert S. v. Stetson School, Inc.*, 256 F.3d 159, 162, 166 (3d Cir. 2001), were lawsuits against private schools, not charter schools.

### 4. Because public charter schools are state actors, Plaintiffs may not assert their free-exercise challenge.

Because Oklahoma virtual charter schools are governmental entities and state actors, they have no right under the Free Exercise Clause to present religious programming that state law prohibits.  Oklahoma virtual charter schools are created by state law and through charters granted by the Board—a governmental entity to which the schools are subordinate.  *See* Okla. Stat. tit. 70, § 3-132.1(A).  "[S]ubordinate unit[s] of government . . . ha[ve] no privileges or immunities under the federal constitution which [they] may invoke in opposition to the will of [their] creator."  *Ysursa v. Pocatello Educ. Ass'n*, 555 U.S. 353, 363 (2009) (citation modified).

21

In addition, when a state actor speaks in the course of exercising their official duties, their speech is government speech. *See Garcetti v. Ceballos*, 547 U.S. 410, 421 (2006). A person delivering government speech has no right under the First Amendment, including its Free Exercise Clause, to deliver speech that a statute or a governmental policy prohibits. *See Pleasant Grove City v. Summum*, 555 U.S. 460, 467 (2009); *Gundy v. City of Jacksonville*, 50 F.4th 60, 80–81 (11th Cir. 2022); *Fields v. Speaker of Pa. House of Representatives*, 936 F.3d 142, 158–60 (3d Cir. 2019).

**5. The Establishment Clause prohibits religious charter schools.**

Even if Plaintiffs could challenge Oklahoma's bar against religious charter schools under the First Amendment, that bar cannot violate the Free Exercise Clause because it is necessary to comply with the Establishment Clause. Adherence to the Establishment Clause is a compelling governmental interest that satisfies any level of scrutiny under the First Amendment. *See Capitol Square Rev. & Advisory Bd. v. Pinette*, 515 U.S. 753, 761–62 (1995); *Lee v. Weisman*, 505 U.S. 577, 587 (1992). And limitations that the Establishment Clause requires are, inherently, narrowly tailored to that interest. *See Roberts v. U.S. Jaycees*, 468 U.S. 609, 628–29 (1984). Oklahoma's prohibition against religious charter schools is required by the Establishment Clause for three reasons.

***First***, "[g]overnment may not . . . undertake religious instruction []or blend secular and sectarian education." *Zorach v. Clauson*, 343 U.S. 306, 314 (1952). The Supreme Court has repeatedly held that the Constitution does not permit public schools to inculcate religion. *See Santa Fe Indep. Sch. Dist. v. Doe*, 530 U.S. 290, 310–13 (2000); *Lee*, 505 U.S. at 598; *Edwards v. Aguillard*, 482 U.S. 578, 596–97 (1987); *Wallace v.*

*Jaffree*, 472 U.S. 38, 61 (1985); *Epperson v. Arkansas*, 393 U.S. 97, 109 (1968); *Sch. Dist. v. Schempp*, 374 U.S. 203, 205 (1963); *Engel v. Vitale*, 370 U.S. 421, 424 (1962); *Illinois ex rel. McCollum v. Bd. of Educ.*, 333 U.S. 203, 211–12 (1948).  As Oklahoma virtual charter schools are public schools and state actors, they may not integrate religious instruction into their curriculum or otherwise promote religion to students.

*Second*, the Establishment Clause "means at least this: Neither a state nor the Federal Government can set up a church." *Everson v. Bd. of Educ.*, 330 U.S. 1, 8, 15–16 (1947).  Relatedly, the Establishment Clause prohibits "a fusion of governmental and religious functions." *Schempp*, 374 U.S. at 222.  Consistently with these principles, the Supreme Court has held that states may not operate "joint public-school religious-group program[s]." *McCollum*, 333 U.S. at 205, 209–10.  Nor may they create special public-school districts structured around a single religious sect.  *See Bd. of Educ. v. Grumet*, 512 U.S. 687, 690 (1994).  "The Framers did not set up a system of government in which important, discretionary governmental powers would be delegated to or shared with religious institutions," particularly where such powers are "employed for explicitly religious goals." *Larkin v. Grendel's Den, Inc.*, 459 U.S. 116, 125, 127 (1982).  The Board therefore may not establish a religious public school or delegate the core governmental function of providing public education to a religious institution that will impose religious doctrine in carrying out that function.

*Third*, the Establishment Clause bars the government from directly providing public funds to institutions for support of religious activities.  *See, e.g., Agostini v. Felton*, 521 U.S. 203, 228–30 (1997); *Bowen v. Kendrick*, 487 U.S. 589, 621 (1988);

*Comm. for Pub. Educ. & Religious Liberty v. Nyquist*, 413 U.S. 756, 780 (1973). There is a narrow exception to this rule: Public funds may support religious education when "a government aid program is neutral with respect to religion, and provides assistance *directly to a broad class of citizens* who, in turn, direct government aid to religious schools *wholly* as a result of their own genuine and independent private choice." *See Zelman v. Simmons-Harris*, 536 U.S. 639, 652 (2002) (emphases added). For this "true private choice" exception to apply, "government aid" must "reach[] religious schools *only* as a result of the genuine and independent choices of private individuals." *Id.* at 649 (emphasis added). Oklahoma's funding of virtual charter schools does not satisfy this exception. Public funds are not allocated or paid directly to a broad class of citizens and do not reach virtual charter schools solely as a result of parental choices. Rather, public funds are allocated and paid by the state directly to virtual charter schools, as part of the state's funding of public schools. *See* Okla. Stat. tit. 70, § 3-142(A). The Board, not private individuals, has the power to approve virtual charter schools. *Id.* § 3-134(B). And the amount of funding is determined primarily through a complex statutory formula that—though it includes the number of students served—also incorporates a number of other factors. *See id.* §§ 3-142(A)–(B), 18-200.1, 18-201.1. Moreover, regardless of how many students they serve, virtual charter schools are eligible to receive additional state funds for start-up expenses and certain other costs. *Id.* § 3-144(A).

### 6.  *Carson*, *Espinoza*, and *Trinity Lutheran* are inapplicable.

Because permitting Ben Gamla to operate as a religious public charter school would violate the Establishment Clause, the three principal cases on which Plaintiffs rely

(Pls.' Br. 10–12) for their free-exercise argument—*Carson ex rel. O.C. v. Makin*, 596 U.S. 767 (2022); *Espinoza v. Montana Department of Revenue*, 591 U.S. 464 (2020); and *Trinity Lutheran Church of Columbia, Inc. v. Comer*, 582 U.S. 449 (2017)—are inapplicable. In all three of those cases, the Supreme Court held that the state support requested for the religious schools at issue would not have violated the Establishment Clause. All of those schools were private schools, not public ones. None of them was a governmental entity or other state actor. And in *Carson*, the Court explicitly held that a state "may provide a strictly secular education in its public schools." 596 U.S. at 785.

## II. Plaintiffs do not satisfy the remaining preliminary-injunction factors.

Finally, the remaining preliminary-injunction factors weigh against Plaintiffs. As noted above (*supra* at 7), because Ben Gamla submitted its application in December 2025 (Compl. ¶ 65), the school could not open before July 2027 even if the Court were to grant the preliminary injunction Plaintiffs seek. *See* Okla. Admin. Code § 777:10-3-3(a)(4). So even if Plaintiffs face harm here, there is no rush—any such harm could be prevented by a final decision on the merits (if Plaintiffs are entitled to prevail) after discovery and full briefing. Proposed Intervenors and the public, however, would be harmed by a preliminary injunction that would require tax funding of an unconstitutional religious school and erode Oklahoma's system of free public schools that are open to all students.

## CONCLUSION

For the foregoing reasons, Plaintiffs' motion should be denied.

25

Respectfully submitted on April 17, 2026.

s/ Alex J. Luchenitser

| | |
|---|---|
| Brent Rowland, OBA No. 13415<br>Morgan Bandy, WI Bar No. 1130673*<br>Oklahoma Appleseed Center for<br>    Law & Justice<br>624 S. Denver Ave., Suite 400<br>Tulsa, OK 74119<br>Telephone: (918) 519-5750<br>brent@okappleseed.org /<br>morgan@okappleseed.org | Alex J. Luchenitser,<br>DC Bar No. 473393*<br>Luke Anderson, DC Bar No. 90042004*<br>Americans United for Separation of<br>    Church and State<br>1310 L Street NW, Suite 200<br>Washington, DC 20005<br>Telephone: (202) 466-7306 /<br>(202) 898-2134<br>luchenitser@au.org / anderson@au.org |
| Daniel Mach, DC Bar No. 461652*<br>Heather L. Weaver, DC Bar No. 495582*<br>American Civil Liberties Union<br>    Foundation<br>915 15th Street, NW, Suite 600<br>Washington, DC 20005<br>Telephone: (202) 675-2330<br>dmach@aclu.org / hweaver@aclu.org | Jessica Levin, CA Bar No. 338240*<br>Wendy Lecker, NY Bar No. 2283125*<br>Patrick Cremin, CA Bar No. 345406*<br>Katrina Reichert, CA Bar No. 357984*<br>Education Law Center<br>60 Park Place, Suite 300<br>Newark, NJ 07102<br>Telephone: (973) 624-1815<br>JLevin@edlawcenter.org /<br>WLecker@edlawcenter.org /<br>PCremin@edlawcenter.org /<br>KReichert@edlawcenter.org |
| Nancy A. Noet, WI Bar No. 1023106*<br>Samuel T. Grover, WI Bar No. 1096047*<br>Freedom From Religion Foundation<br>PO Box 750<br>Madison, WI 53701<br>Telephone: (608) 256-8900<br>noetn@ffrf.org / sgrover@ffrf.org | |

*Attorneys for Proposed Intervenors*
* Admitted *pro hac vice*.

26