**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF OKLAHOMA**

THE NATIONAL BEN GAMLA
JEWISH CHARTER SCHOOL
FOUNDATION, INC., *et al.*,

      *Plaintiffs*,

v.

GENTNER DRUMMOND, in his
official capacity as Attorney General of
Oklahoma, *et al.*,

      *Defendants*.

Case No. 5:26-cv-00582-R

## <u>DECLARATION OF HIRAM S. SASSER, III</u>

I, Hiram Stanley Sasser, III, pursuant to 28 U.S.C. § 1746, hereby declare as follows:

1.     My name is Hiram S. Sasser, III. I represent the Oklahoma Statewide Charter School Board in this action. I am submitting this Declaration in support of Oklahoma Statewide Charter School Board Defendants' Response to Plaintiffs' Motion for Preliminary Injunction. I am of lawful age to make this declaration and have knowledge of the facts herein.

2.     A true and correct copy of the now-withdrawn Attorney General Opinion, 2022 AG Op. 7 (Dec. 1, 2022) is attached as **Exhibit 1-A.**

3.     A true and correct copy of Attorney General Gentner Drummond's letter withdrawing Attorney General Opinion, 2022 AG Op. 7 (Feb. 23, 2023) is attached as **Exhibit 1-B.**

4.     A true and correct copy of Respondents' Brief in Response to Petitioner's Application and Petition, No. MA-121694, Drummond v. Oklahoma Statewide Virtual Charter Sch. Bd. (Okla. Nov. 21, 2023) is attached as **Exhibit 1-C.**

1

5.      A true and correct copy of Petitioner's Application to Assume Original Jurisdiction and Petition for Writ of Mandamus and Declaratory Judgment, No. MA-121694, Drummond v. Oklahoma Statewide Virtual Charter Sch. Bd. (Okla. Oct. 20, 2023) is attached as **Exhibit 1-D.**

6.      A true and correct copy of Petitioner's Notice of Automatic Substitution of Parties and Request for this Court to Require Substituted Parties to Comply with its Writ of Mandamus or Face a Contempt Citation, No. MA-121694, Drummond v. Oklahoma Statewide Virtual Charter Sch. Bd. (Okla. July 30, 2024) is attached as **Exhibit 1-E.**

7.      A true and correct copy of Brief in Opposition to Petition for Writ of Mandamus, No. CV-2026-649, Drummond v. Oklahoma Statewide Charter School Board (Okla. Cnty. Dist. Ct. Apr. 2, 2026) is attached as **Exhibit 1-F.**

Signed this 17 day of April 2026.


                                        _/s/ Hiram S. Sasser, III_

                                        Hiram S. Sasser, III

2

# EXHIBIT 1-A



JOHN M. O'CONNOR
ATTORNEY GENERAL

### ATTORNEY GENERAL OPINION
### 2022-7

Rebecca L. Wilkinson, Ed.D.                           December 1, 2022
Executive Director
Statewide Virtual Charter School Board
2501 N. Lincoln Blvd., Suite 301
Oklahoma City, OK 73105

Dear Executive Director Wilkinson,

This office has received your request for an official Attorney General Opinion in which you ask, in effect, the following question:

> **Currently, an Oklahoma charter school must not be "affiliated with a nonpublic sectarian school or religious institution," and must "be nonsectarian in its programs, admission policies, employment practices, and all other operations" under 70 O.S.2021, § 3-136(A)(2).**
>
> **After the U.S. Supreme Court's holdings in *Trinity Lutheran Church of Columbia, Inc. v. Comer*, 137 S. Ct. 2012 (2017), *Espinoza v. Montana Department of Revenue*, 140 S. Ct. 2246 (2020), and *Carson v. Makin*, 142 S. Ct. 1987 (2022), construing the First Amendment's Free Exercise Clause, may the Statewide Virtual Charter School Board continue to enforce the nonsectarian requirements set forth in 70 O.S.2021, §3-136(A)(2)?**

### I.
### BACKGROUND

#### A.    Charter schools in Oklahoma

In 1999, the State Legislature enacted the Oklahoma Charter Schools Act ("the Act") to increase learning opportunities, encourage "the use of different and innovative teaching methods," and provide "additional academic choices for parents and students." 70 O.S.2021, § 3-131(A). Nearly twenty-five years later, there are approximately 30 charter schools in Oklahoma that serve over 80,000 schoolchildren. *See* OKLA. STATE DEP'T OF EDUC., Okla. Charter School Report 2021 at 4, 10-11. Those children make up around 11.7% of public school students in Oklahoma. *Id.* at 11.

313 N.E. 21ST STREET • OKLAHOMA CITY, OK 73105 • (405) 521-3921 • FAX: (405) 521-6246


recycled paper

This number "has increased dramatically over the last few years as a result of the expansion of virtual charter schools" in 2012. *Id.* In terms of funding, the "total State Aid Allocation to charter schools in the 2020-21 school year" was around $420 million. *Id.* at 8.

A charter school, according to the Act, is a "public school established by contract . . . to provide learning that will improve student achievement . . . ." 70 O.S.2021, § 3-132(D). A sponsor and an operator partner together to form a charter school. Sponsors must be public entities such as school districts, state colleges, or the State Board of Education. *Id.* § 3-132(A). Sponsors have various powers and duties, including approving charter applications if they "meet identified educational needs and promote a diversity of educational choices." *Id.* § 3-134(I)(3). Before approving a new school, sponsors must consider factors such as an applicant's "strong and reliable record of academic success," "financial and operational success," and "ability to transfer successful practices to a potentially different context that includes reproducing critical cultural, organizational, and instructional characteristics." *Id.* § 3-132(C).

Operators who are authorized to establish a charter school may be public or private: this includes a "private college or university, private person, or private organization," although an existing private school is ineligible. *Id.* § 3-134(C). An entity seeking to operate a charter school must submit a written application to the sponsor that includes, *inter alia*, a "description of the instructional design of the charter school, including the type of learning environment, class size and structure, curriculum overview and teaching methods." *Id.* § 3-134(B)(14). Upon approval of the application, the sponsor and operator enter a contract. This contract must make the charter school "as equally free and open to all students as traditional public schools," it must require "the same academic standards and expectations as existing public schools," and it must contain a "description of the requirements and procedures for the charter school to receive funding in accordance with statutory requirements and guidelines for existing public schools." *Id.* § 3-135(A).

As the name indicates, a charter school is also required to adopt a charter that ensures compliance with certain requirements. *Id.* § 3-136(A). Under the charter, the school must participate in standardized testing and report test results as if it is a school district. *Id.* § 3-136(A)(4). The school must educate children with disabilities the same way a public school district does. *Id.* § 3-136(A)(7). The school cannot charge tuition or fees. *Id.* § 3-136(A)(10). The school is considered a school district for tort liability under The Governmental Tort Claims Act. *Id.* § 3-136(A)(13). In addition, charter school employees are authorized to participate in the Teachers' Retirement System of Oklahoma. *Id.* § 3-136(A)(14).

Charter schools have substantial flexibility in terms of curriculum. A "charter school may offer a curriculum which emphasizes a specific learning philosophy or style or certain subject areas such as mathematics, science, fine arts, performance arts, or foreign language." *Id.* § 3-136(A)(3). Indeed, from its inception, the Act has "exempt[ed] charter schools from the new core curriculum requirements for public schools found at 70 O.S.Supp.1999, § 11-103.6(B)." 1999 OK AG 64; *see also* 70 O.S.2021, § 3-136(A)(3) ("The charter of a charter school which offers grades nine through twelve shall specifically address whether the charter school will comply with the graduation requirements established in Section 11-103.6 of this title."). Nor are charter schools required "to adhere to the Teacher and Leader Effectiveness standards set by the state of Oklahoma." OKLA. STATE DEP'T OF EDUC., Okla. Charter Schools Program, https://sde.ok.gov/faqs/oklahoma-charter-

schools-program (last visited Nov. 28, 2022). Teachers at charter schools are not required to hold valid Oklahoma teaching certificates, either. *Id.* Overall, for curriculum and beyond, "[e]xcept as provided for in the Oklahoma Charter Schools Act and its charter, a charter school shall be exempt from all statutes and rules relating to schools, boards of education, and school districts." 70 O.S.2021, § 3-136(A)(5).

Funding for Oklahoma charter schools is primarily public, but also includes some private sourcing. Like public schools, charters are funded mostly through the State Aid allocation. *Id.* § 3-142(A). They also receive federal funds if they are eligible and qualify, "and any other state-appropriated revenue generated by [their] students for the applicable year." *Id.* A "Charter Schools Incentive Fund" also exists, which contains "all monies appropriated by the Legislature, gifts, grants, devises and donations from any public or private source." *Id.* § 3-144(A).

Finally, at the center of this opinion request is 70 O.S.2021, § 3-136(A)(2), which provides: (1) that a "charter school shall be nonsectarian in its programs, admission policies, employment practices, and all other operations," and (2) that a "sponsor may not authorize a charter school or program that is affiliated with a nonpublic sectarian school or religious institution."

## B.    *Trinity Lutheran*, *Espinoza*, and *Carson*

The First Amendment to the U.S. Constitution states that "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof." The U.S. Supreme Court has "repeatedly held that a State violates the Free Exercise Clause when it excludes religious observers from otherwise available public benefits." *Carson v. Makin*, 142 S. Ct. 1987, 1996 (2022). In the past five years alone, the U.S. Supreme Court has prevented officials in three States from excluding religious adherents from different types of public benefit programs relating to pre-K, primary, or secondary schools.

*First*, in *Trinity Lutheran Church of Columbia, Inc. v. Comer*, 137 S. Ct. 2012 (2017), the U.S. Supreme Court analyzed a Missouri policy barring churches, sects, or other religious entities from receiving financial grants to install softer playground surfaces made from recycled tires. Applying this policy, Missouri denied a grant to the Trinity Lutheran Church Child Learning Center. *Id.* at 2017-18. In doing so, Missouri relied upon a provision in the Missouri Constitution stating that "no money shall ever be taken from the public treasury, directly or indirectly, in aid of any church, sect or denomination of religion . . . ." *Id.* (quoting MO. CONST. art. I, § 7).

The U.S. Supreme Court found Missouri's discriminatory behavior "odious" to the U.S. Constitution. *Id.* at 2025. Missouri, the Court held, had "expressly require[d] Trinity Lutheran to renounce its religious character in order to participate in an otherwise generally available public benefit program." *Id.* at 2024. Applying the "most rigorous" and strict judicial scrutiny to the policy, the Court held that there was a "clear infringement on free exercise" and no compelling anti-establishment interest that could justify such discrimination. *Id.* (citation omitted).

*Second*, in *Espinoza v. Montana Department of Revenue*, 140 S. Ct. 2246 (2020), the U.S. Supreme Court evaluated a program in which Montana gave a tax credit to a person who sponsored a scholarship for a child's tuition at any private school chosen by the child's family. The Montana

Constitution prohibits government aid to any "sectarian" school—*i.e.*, any school "controlled in whole or in part by any church, sect, or denomination." MONT. CONST. art. X, § 6(1). The Montana Department of Revenue cited this provision to prohibit families from using these scholarships at schools "owned or controlled in whole or in part by any church, religious sect, or denomination." *Espinoza*, 140 S. Ct. at 2252 (citation omitted). Montana's Attorney General disagreed, arguing that the discriminatory policy "very likely" violated the U.S. Constitution. *Id.* The Montana Supreme Court, on the other hand, dismantled the entire scholarship program because religious schools were required to be included. *Id.* at 2253-54.

On appeal, the U.S. Supreme Court reversed the Montana Supreme Court. "A State need not subsidize private education," the Court explained, "[b]ut once a State decides to do so, it cannot disqualify some private schools solely because they are religious." *Id.* at 2261. The Montana Supreme Court's application of the Montana Constitution wrongly barred "religious schools from public benefits solely because of the religious character of the schools." *Id.* at 2255. "Given the conflict between the Free Exercise Clause and the application of the no-aid provision here, the Montana Supreme Court should have 'disregard[ed]' the no-aid provision and decided this case 'conformably to the [C]onstitution' of the United States." *Id.* at 2262 (quoting *Marbury v. Madison*, 5 U.S. 137 (1803)). In sum, Montana's religious exclusion was "odious to our Constitution" and "cannot stand." *Id.* at 2262-63 (quoting *Trinity Lutheran*, 137 S. Ct. at 2025).

*Third*, in *Carson v. Makin*, 142 S. Ct. 1987 (2022), the U.S. Supreme Court evaluated a Maine program providing tuition assistance for parents in rural school districts that lacked a secondary school. "Under the program, parents designate the secondary school they would like their child to attend—public or private—and the school district transmits payments to that school to help defray the costs of tuition." *Id.* at 1993. To receive payments, Maine required private schools to be accredited, teach Maine history, and maintain a certain student-teacher ratio, although their teachers did not need to be certified by the state or utilize Maine's curricular requirements. *Id.* at 1993-94.

In 1981, Maine began to insist that any private school receiving tuition under this program must be "nonsectarian." *Id.* at 1994 (quoting ME. REV. STAT. ANN., tit. 20-A, § 2951(2)). This route was chosen "in response to an opinion by the Maine attorney general taking the position that public funding of private religious schools violated the Establishment Clause." *Id.* Maine considered "a sectarian school to be one that is associated with a particular faith or belief system and which, in addition to teaching academic subjects, promotes the faith or belief system with which it is associated and/or presents the material taught through the lens of this faith." *Id.* (quoting *Carson v. Makin*, 979 F.3d 21, 38 (1st Cir. 2020)).

Faced with a Free Exercise challenge to this discrimination, the First Circuit upheld Maine's "nonsectarian" prohibition. *Carson*, 979 F.3d at 25-26. Per the First Circuit, *Espinoza* meant Maine could not bar schools from receiving funding "based on their religious *identity*," but it could bar funding "based on the religious *use* that they would make of it in instructing children." *Id.* at 40 (emphases added). In addition, the First Circuit found that Maine's program was distinct from *Espinoza* because Maine sought to provide "a rough equivalent of the public school education that Maine may permissibly require to be secular." *Id.* at 44.

Maine parents appealed to the U.S. Supreme Court, which ruled in their favor and held that "[t]he 'unremarkable' principles applied in *Trinity Lutheran* and *Espinoza* suffice to resolve this case." *Carson*, 142 S. Ct. at 1997. By disqualifying schools from an open benefit solely because they are religious, Maine effectively penalized the free exercise of religion. *Id.* (citing *Trinity Lutheran*, 137 S. Ct. at 2021). Maine's program was not neutral, the Court emphasized, but clearly discriminatory. *Id.* at 1998. The "strictest scrutiny" therefore applied, whereby government action is invalid unless it advances compelling "interests of the highest order" and is "narrowly tailored in pursuit of those interests." *Id.* at 1997 (citations omitted).

As it did in *Trinity Lutheran* and *Espinoza*, the U.S. Supreme Court found that an "interest in separating church and state 'more fiercely' than the Federal Constitution . . . 'cannot qualify as compelling' in the face of the infringement of free exercise." *Carson*, 142 S. Ct. at 1998 (quoting *Espinoza*, 140 S. Ct. at 2260 & *Trinity Lutheran*, 137 S. Ct. at 2024). Only an actual Establishment Clause violation could suffice, according to the Court, and "a neutral benefit program in which public funds flow to religious organizations through the independent choices of private benefit recipients does not offend the Establishment Clause." *Id.* at 1997 (citing *Zelman v. Simmons-Harris*, 536 U.S. 639, 652-53 (2002)).

It did not matter that Maine said participating schools were required to provide the "rough equivalent" of a public school education, the Court held. *Id.* at 1998-2000 (quoting *Carson*, 979 F.3d at 44). For starters, the "differences between private schools eligible to receive tuition assistance under Maine's program and a Maine public school are numerous and important." *Id.* at 1999. Maine's program did "not have to accept all students," for example, whereas "[p]ublic schools generally do," and Maine public education is free whereas private schools typically cost money. *Id.* Moreover, "the curriculum taught at participating private schools need not even resemble that taught in the Maine public schools," and "[p]articipating schools need not hire state-certified teachers." *Id.* The label "public" did not control, either, since a discriminatory condition on funding is still discrimination, no matter how much a state might claim it is part of the "definition of a particular program." *Id.* at 1999-2000 (citation omitted).

That is to say, the U.S. Supreme Court looks at the "substance of free exercise protections, not on the presence or absence of magic words" like "public." *Id.* at 2000. To hold otherwise, the Court observed, would render "our decision in *Espinoza* . . . essentially meaningless," since Montana could have just claimed that its tax credit was limited to tuition payments for the "rough equivalent" of a secular public education. *Id.* at 2000. Put differently, the Free Exercise Clause applies to express discrimination *or* to "a party's reconceptualization of the public benefit." *Id.* By allowing state funds to go to private schools—a "decision [that] was not 'forced upon' it"—Maine could not "disqualify some private schools solely because they are religious.'" *Id.* (quoting *Espinoza*, 140 S. Ct. at 2261).

*Carson* also held, importantly, that a state could not justify discrimination by claiming it was just preventing organizations from *using* state aid in religious ways. Use-based religious discrimination, the U.S. Supreme Court emphasized, is just as "offensive to the Free Exercise Clause" as status-based discrimination. *Id.* at 2001. Maine's program was unconstitutional because, "[r]egardless of how the benefit and restriction are described, the program operates to identify and exclude otherwise eligible schools on the basis of their religious exercise." *Id.* at 2002.

In sum, *Carson* stands for the principle that "[a] State's antiestablishment interest does not justify enactments that exclude some members of the community from an otherwise generally available public benefit because of their religious exercise." *Id.* at 1998.

## II.
### DISCUSSION

You ask what effect, if any, the *Trinity Lutheran, Espinoza*, and *Carson* decisions have on the validity of the non-sectarian restrictions found in Section 3-136(A)(2) of the Oklahoma Charter School Act. That passage states as follows:

> A charter school shall be nonsectarian in its programs, admission policies, employment practices, and all other operations. A sponsor may not authorize a charter school or program that is affiliated with a nonpublic sectarian school or religious institution . . . .

We believe, based on the First Amendment and the *Trinity Lutheran, Espinoza*, and *Carson* line of decisions, that the U.S. Supreme Court would likely hold these restrictions unconstitutional. Because of the significant differences between the two sentences in Section 3-136(A)(2), we will address them separately.

### A. "A sponsor may not authorize a charter school or program that is affiliated with a nonpublic sectarian school or religious institution"

The second sentence of Section 3-136(A)(2) is the most problematic, and very likely to be held unconstitutional. Under *Trinity Lutheran, Espinoza*, and *Carson*, it seems obvious that a state cannot exclude those merely "affiliated with" a religious or sectarian institution from a state-created program in which private entities are otherwise generally allowed to participate if they are qualified. And that is exactly what this provision does.

The Act expressly allows any qualified "private college or university, private person, or private organization" to establish a charter school. 70 O.S.2021, § 3-134(C). And once qualified private entities are invited into the program, Oklahoma cannot disqualify some private persons or organizations "solely because they are religious" or "sectarian." *Carson*, 142 S. Ct. at 1997 (quoting *Espinoza*, 140 S. Ct. at 2261). Even less so can the State exclude private persons or organizations that are merely "affiliated with" sectarian or religious institutions. *Cf. United States v. Brown*, 352 F.3d 654, 669 (2d Cir. 2003) ("Exercising peremptory strikes simply because a venire member affiliates herself with a certain religion is therefore a form of 'state-sponsored group stereotype[ ] rooted in, and reflective of, historical prejudice.'" (quoting *J.E.B. v. Alabama*, 511 U.S. 127, 128 (1994)). Both approaches evince clear hostility, not neutrality, to religion. Thus, the provision in question is highly likely to be found unconstitutional if the State continues to enforce it. *See Masterpiece Cakeshop, Ltd. v. Colo. Civil Rights Comm'n*, 138 S. Ct. 1719, 1731 (2018) (states have a "duty under the First Amendment not to base laws or regulations on hostility to a religion or religious viewpoint").

It is not a problem that, under this interpretation, a substantial amount of public funds could be sent to religious organizations or their affiliates. As the U.S. Supreme Court emphasized in *Carson*, "a neutral benefit program in which public funds flow to religious organizations through the independent choices of private benefit recipients does not offend the Establishment Clause." 142 S. Ct. at 1997. No student is forced to attend a charter school—it is one option among several for parents. *See, e.g.*, OKLA. STATE DEP'T OF ED., School Choice, https://sde.ok.gov/schoolchoice (last visited Nov. 29, 2022). The Establishment Clause therefore provides no cover for a clear Free Exercise Clause violation here.

The Oklahoma Constitution provides no hurdle, either. To be sure, Article II, Section 5 of the Oklahoma Constitution states that "[n]o public money or property shall ever be appropriated, applied, donated, or used, directly or indirectly, for the use, benefit, or support of any sect, church, denomination, or system of religion, or for the use, benefit, or support of any priest, preacher, minister, or other religious teacher or dignitary, or sectarian institution as such." However, the Oklahoma Supreme Court has interpreted this restriction in a way that makes it inapplicable here. *See Oliver v. Hofmeister* 2016 OK 15, 368 P.3d 1270.

Starting in 1993, the Oklahoma Legislature gave school districts the option to provide services to children with disabilities or "enter into a written agreement with a private institution to provide the mandated services." *Id.* ¶ 7, 368 P.3d at 1273 (emphasis omitted). In 2010, the Legislature crafted the Lindsey Nicole Henry Scholarships for Students with Disabilities Act, a program that "simply allowed parents and legal guardians the same right that school districts already enjoyed, the choice to use state funds to contract with an approved private institution for special education services." *Id.* (emphases omitted). Participation in the program "is entirely voluntary," as "[e]ach family independently decides without influence from the State whether to enroll their child." *Id.* ¶ 8, 368 P.3d at 1273 (emphasis omitted).

Because the Lindsey Nicole Henry scholarship program allowed "[a]ny private school, whether sectarian or non-sectarian," to participate, several taxpayers sued, arguing that the program violated Article II, Section 5. *Id.* ¶¶ 1, 11-12, 368 P.3d at 1271-72, 1274. The Oklahoma Supreme Court unanimously disagreed, reversing the district court. *Id.* ¶ 27, 368 P.3d at 1277. Relying on U.S. Supreme Court precedent pre-dating *Trinity Lutheran*, *Espinoza*, and *Carson*, the Oklahoma Supreme Court considered "the neutrality of the scholarship program" to be an important factor, as well as the "private choice exercised by the families." *Id.* ¶ 13, 368 P.3d at 1274 (citing *Zelman*, 536 U.S. at 641). "When the *parents* and not the *government* are the ones determining which private school offers the best learning environment for their child," the Oklahoma Supreme Court emphasized, "the circuit between government and religion is broken." *Id.* (emphases in original).

Utilizing those principles, the Oklahoma Supreme Court found that the Lindsey Nicole Henry scholarship program was "completely neutral with regard to religion" and therefore unobjectionable under Article II, Section 5. *Id.* ¶ 26, 368 P.3d at 1277. "Scholarship funds deposited to a private sectarian school occur only as the result of private independent choice by the parent or legal guardian." *Id.* ¶ 14, 368 P.3d at 1274. "[T]his independence of choice by the parent breaks the circuit between government and religion," the Court held. *Id.* ¶ 15, 368 P.3d at 1274. It was not unconstitutional for a public school district to "fulfill its state mandated duty to provide educational services to children by . . . entering into a written agreement with an eligible

private institution in the public school district," even a sectarian institution. *Id.* ¶¶ 23-24, 368 P.3d at 1276. This holding, the Court pointed out, flowed directly from previous decisions concerning Article II, Section 5. Those cases had "clarified that as long as the services being provided 'involve the element of substantial return to the state and do not amount to a gift, donation, or appropriation to the institution having no relevancy to the affairs of the state, there is no constitutional provision offended.'" *Id.* ¶ 19, 368 P.3d at 1275 (quoting *Murrow Indian Orphans Home v. Childers*, 1946 OK 187, ¶ 9, 171 P.3d 600, 603).[1]

Applying *Oliver*'s principles here, allowing religiously affiliated participants to "provide educational services to children by … entering into a written agreement" with a charter school sponsor would not violate the Oklahoma Constitution. *Id.* ¶ 24, 368 P.3d at 1276. This is because charter schools are entirely optional for parents, "break[ing] the circuit between government and religion." *Id.* ¶ 15, 368 P.3d at 1274. And allowing the religious or religiously affiliated to participate would make the system neutral rather than hostile to religion. *See id.* ¶ 26, 368 P.3d at 1277. Thus, the Oklahoma Constitution does not prohibit religiously affiliated charter schools.[2]

In conclusion, the second sentence of Section 3-136(A)(2) of the Oklahoma Charter Schools Act is highly likely to be found unconstitutional under the Free Exercise Clause if it is enforced. In Oklahoma, so long as the Act permits private persons and organizations to establish and operate charter schools—and assuming the private applicant is otherwise qualified pursuant to neutral rules found elsewhere in the Act—sponsors should not disqualify an applicant solely based on the applicant's religion, "sectarianism," or religious affiliation, as this would in all probability be deemed "odious" to the United States Constitution.

### B. "A charter school shall be nonsectarian in its programs, admission policies, employment practices, and all other operations"

The more complex question here is whether a religiously affiliated applicant must be allowed to establish and operate a charter school in conformance with that applicant's "sectarian" or "religious" traditions. In our view, the answer under the United States Constitution is likely yes, as well, for the following reasons.

To begin, it is helpful to remember that, when analyzing certain legal challenges under the U.S. Constitution, the U.S. Supreme Court employs various "tiers" or "levels" of scrutiny depending on the context. If "strict scrutiny" applies, the law or governmental practice in question must be "narrowly tailored to serve a compelling interest." *Williams-Yulee v. Fla. Bar*, 575 U.S. 433, 444

---

[1] The plaintiffs in *Oliver* also sued under Article I, Section 5, which states that "[p]rovisions shall be made for the establishment and maintenance of a system of public schools, which shall be open to all the children of the state and free from sectarian control …." The district court granted summary judgment to the State on this claim, *Oliver v. Barresi*, No. CV-2013-2072, 2014 WL 12531242, at *1 (Okla. Cnty. Sep. 10, 2014), and the Oklahoma Supreme Court did not, in *Oliver*, cite this provision or indicate that it would somehow change its analysis.

[2] Of course, even if *Oliver* held otherwise, the U.S. Supreme Court has clearly explained that State officials must first follow the federal Constitution in these types of cases. *See Espinoza*, 140 S. Ct. at 2253-54, 2262-63.

Rebecca L. Wilkinson, Ed.D.                                           A.G. Opinion
Executive Director, Statewide Virtual Charter School Board             Page 9

(2015). Only in "rare cases" will a law survive a court's strict scrutiny analysis. *Id.* A far less rigorous and more government-friendly approach is "rational basis review," which merely requires a law to "be rationally related to a legitimate governmental purpose." *Clark v. Jeter*, 486 U.S. 456, 461 (1988); *see also Sklar v. Byrne*, 727 F.2d 633, 640 (7th Cir. 1984) ("most legislative enactments survive the rational basis test"). Thirdly, "[b]etween these extremes of rational basis review and strict scrutiny lies a level of intermediate scrutiny." *Clark*, 486 U.S. at 461. "To withstand intermediate scrutiny, a statutory classification must be substantially related to an important governmental objective." *Id.*

In the context of the First Amendment's Free Exercise Clause, laws that "incidentally burden[] religion are ordinarily not subject to strict scrutiny ... so long as they are neutral and generally applicable." *Fulton v. City of Philadelphia*, 141 S. Ct. 1868, 1876 (2021) (citing *Emp't Div. v. Smith*, 494 U.S. 872, 878-882 (1990)). In such instances, courts apply "only ... rational-basis scrutiny." *United States v. Wilgus*, 638 F.3d 1274, 1279 (10th Cir. 2011). The U.S. Supreme Court has for many years made it clear, however, that a "law targeting religious beliefs as such is never permissible," and a law prohibiting religious *practices* is subject to strict scrutiny as well, if it "discriminate[s] on its face" or its object "is to infringe upon or restrict practices because of their religious motivation." *Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 533 (1993).

Here, the first sentence of Section 3-136(A)(2) does both—it expressly targets religion, and its object is clearly to restrict religiously motivated practices. Thus, for the same reasons already discussed, this provision lacks neutrality and "the strictest scrutiny" would be applied by a federal court. *Carson*, 142 S. Ct. at 1997. And if generic "strict scrutiny" means a law will be upheld only in "rare" circumstances, *Williams-Yulee*, 575 U.S. at 444, it would stand to reason that a law will almost never survive when it is subjected to the "strictest scrutiny."

In the wake of *Trinity Lutheran, Espinoza*, and *Carson*, the only conceivable way to show an interest compelling enough to survive the strictest judicial scrutiny in this context would be to argue that the Establishment Clause requires or at least permits Oklahoma to prohibit charter schools from being operated in accordance with religious principles. In *Locke v. Davey*, for instance, the U.S. Supreme Court held that the State of Washington did not violate the Free Exercise Clause by forbidding college students from using a state-granted scholarship "at an institution where they are pursuing a degree in devotional theology." 540 U.S. 712, 715 (2004). This prohibition, the Court held, was permissible because of the "State's antiestablishment interests," even though funding these types of degrees would not actually be a federal Establishment Clause violation. *Id.* at 718-19, 722.

Having reviewed the relevant case law, however, we see little reason to believe the Supreme Court would divert from its recent precedent and hold that Oklahoma can rely on the Establishment Clause to justify discrimination in this context. There are multiple reasons to believe otherwise.

*First*, to hold that religiously affiliated organizations must be allowed to establish and operate a charter school but may be barred from acting in any way religious or "sectarian" in doing so, would be to embrace the distinction between religious "status" and "use" that the U.S. Supreme Court just rejected in *Carson*. Use-based religious discrimination, *Carson* explained, is just as "offensive

to the Free Exercise Clause" as status-based discrimination. *Carson*, 142 S. Ct. at 2001. To convey to a religious adherent that she can participate in a government program alongside other private entities but cannot act out her religious beliefs shows hostility to religion, not neutrality. *See Fulton*, 141 S. Ct. at 1877 ("Government fails to act neutrally when it proceeds in a manner intolerant of religious beliefs or restricts *practices* because of their religious nature." (emphasis added)).

*Second,* Missouri, Montana, and Maine all attempted to rely on *Locke* and the Establishment Clause to justify their religious discrimination, and the Court rebuffed their attempts with explanations that apply here. We see no reason why the Court would change course now.

In *Trinity Lutheran,* the Court distinguished *Locke* in part because the Washington scholarship program in question "went 'a long way toward including religion in its benefits.'" 137 S. Ct. at 2023 (quoting *Locke*, 540 U.S. at 724). Indeed, "[s]tudents in the program were free to use their scholarships at 'pervasively religious schools.'" *Id.* The program at issue in Missouri, in contrast, put Trinity Lutheran "to the choice between being a church and receiving a government benefit" with a "simple" rule: "No churches need apply." *Id.* at 2024. The Oklahoma provisions in question are much more like the latter restriction than *Locke*: they tell any religious or religiously affiliated private entities that they "need [not] apply" and that there will be no benefits whatsoever bestowed on anything pertaining to religious identity or use.

Going further, in *Espinoza* the Court pointed out that *Locke* was based on a "'historic and substantial' state interest in not funding the training of clergy." 140 S. Ct. at 2257-58 (quoting *Locke*, 540 U.S. at 725). And that interest, the Court emphasized, did *not* extend to denying public funds to religious schools in general. To the contrary, "[i]n the founding era and the early 19th century, governments provided financial support to private schools, including denominational ones." *Id.* at 2258. For example, "[a]fter the Civil War, Congress spent large sums on education for emancipated freedmen, often by supporting denominational schools in the South through the Freedmen's Bureau." *Id.*

Certainly, there was a trend of "no-aid" provisions that "more than 30 states" adopted starting in the mid-to-late 1800s. *Id.* But the Supreme Court rejected reliance on this trend. "[M]any of the no-aid provisions belong to a more checkered tradition shared with the Blaine Amendment of the 1870s," the Court observed, which would "have added to the Federal Constitution a provision … prohibiting States from aiding 'sectarian' schools." *Id.* at 2259. The Court criticized the Blaine Amendment as being "born of bigotry" and having arisen "at a time of pervasive hostility to the Catholic Church and to Catholics in general." *Id.* (quoting *Mitchell v. Helms*, 530 U.S. 793, 828-29 (2000) (plurality opinion)). And, the Court observed, "[i]t was an open secret that 'sectarian' was code for 'Catholic.'" *Id.* (quoting *Mitchell*, 530 U.S. at 828). State counterparts to the Blaine Amendment were not spared the Court's ire: "many" of them "have a similarly 'shameful pedigree.'" *Id.* (quoting *Mitchell*, 530 U.S. at 828-29).[3] As a result, "[t]he no-aid provisions of the

---

[3] Several state justices have argued that Article II, Section 5 of the Oklahoma Constitution did not originate with the Blaine Amendment. *See Prescott v. Okla. Capitol Pres. Comm'n*, 2015 OK 54, ¶ 1, 373 P.3d 1032, 1036 (Edmondson, J., concurring); *id.* ¶¶ 17-20, 373 P.3d at 1040-41

19th century hardly evince a tradition that should inform our understanding of the Free Exercise Clause." *Id.* In the end, the Court emphasized, "it is clear that there is no 'historic and substantial' tradition against aiding such [religious] schools comparable to the tradition against state-supported clergy invoked by *Locke*." *Id.*

*Third*, the Supreme Court has routinely deployed broad language in this area, especially when describing basic constitutional law principles surrounding the First Amendment, schools, and school-choice programs that include private participants and operators. Even if one can discern factual distinctions between Oklahoma charter schools and the state regulations at issue in *Trinity Lutheran*, *Espinoza*, and *Carson*, the Court's expansive phrasing—*e.g.*, the "strictest scrutiny"—signals loud and clear that the Court is not willing to uphold state discrimination in this arena.

*Carson* is particularly prominent in this regard. There, the Court concluded that *Locke* "cannot be read beyond its narrow focus on vocational religious degrees to generally authorize the State to exclude religious persons from the enjoyment of public benefits on the basis of their *anticipated religious use* of the benefits." *Carson*, 142 S. Ct. at 2002 (emphasis added). *Carson* also emphasized that "a neutral benefit program in which public funds flow to religious organizations through the independent choices of private benefit recipients does not offend the Establishment Clause." *Id.* at 1997 (citing *Zelman*, 536 U.S. at 652-53). These principles apply here, clearly.

*Fourth*, that Oklahoma law considers charter schools to be public schools for various purposes does not mean that religious discrimination must be allowed. Indeed, plaintiffs may not even be able to bring a federal Establishment Clause challenge against religious charter schools, much less prevail on one. A bedrock principle of federal law is that certain statutory and constitutional claims may only be brought against the government or state. To determine whether an entity is acting "under color of" state law, 42 U.S.C. § 1983,[4] or performing a "state action" such that a lawsuit can avoid being dismissed, courts analyze whether the action in question "can fairly be attributed to the State." *Blum v. Yaretsky*, 457 U.S. 991, 1004 (1982); *see also id.* at 1009 n.20. Here, U.S. Supreme Court precedent indicates that actions taken by charter schools are unlikely to fit this bill.

Most significantly, the U.S. Supreme Court held in *Rendell-Baker v. Kohn* that a school for special needs students, operated by a private board, was not a state actor for purposes of an employment lawsuit brought under § 1983, the First Amendment, and other laws. 457 U.S. 830 (1982). The Court explained, point-by-point, why the school was not a state actor in this instance even though it had contracted with public schools, "virtually all of the school's income was derived from government funding," the school "must comply with a variety of regulations … common to all

---

(Taylor, J., concurring); *id.* ¶¶ 16-24, 373 P.3d at 1050-52 (Gurich, J., concurring); *id.* ¶¶ 11-12, 373 P.3d at 1057 (Combs, J., dissenting). One such justice conceded, however, that the language in Article I, Section 5 stating that public schools must be "free from sectarian control" does trace back to "the failed Blaine Amendment." *Id.* ¶¶ 18-19, 373 P.3d at 1051 (Gurich, J., concurring). This is an additional reason to conclude that Article I, Section 5 would not alter the analysis presented here. *See also supra* nn.1 & 2.

[4] Section 1983 is "a remedial vehicle for raising claims based on the violation of constitutional rights," and "[t]here can be no 'violation' of § 1983 separate and apart from the underlying constitutional violations." *Brown v. Buhman*, 822 F.3d 1151, 1161 n.9 (10th Cir. 2016).

Rebecca L. Wilkinson, Ed.D.                                          A.G. Opinion
Executive Director, Statewide Virtual Charter School Board                Page 12

schools," it took "nearly all" of its students from public school referrals, and it issued high school diplomas certified by nearby public schools. *Id.* at 831-33, 840-843. For state action, the Court emphasized that the State must coerce or significantly encourage the specific conduct being challenged, *id.* at 840 (citing *Blum*, 457 U.S. at 1004), and that it is not enough to show that the school merely performed a "public function." *Id.* at 842. Rather, the function must have "been 'traditionally the *exclusive* prerogative of the State.'" *Id.* (emphasis in original) (citations omitted). And serving "maladjusted high school students … who could not be served by traditional public schools" did not qualify. *Id.*

Relying on *Rendell-Baker*, the Ninth Circuit Court of Appeals has held that an Arizona charter school was not a state actor for employment law purposes. *See Caviness v. Horizon Cmty. Learning Ctr., Inc.*, 590 F.3d 806 (9th Cir. 2010). In reaching this conclusion, the Ninth Circuit found that various public aspects of Arizona charter schools—aspects that also exist in Oklahoma charter schools, such as public funding—did not mean charter schools were state actors under federal law for all purposes. *See id.* at 808-18 (citations omitted). The Ninth Circuit concluded that the school in *Rendell-Baker* was very much like the charter school in Arizona: both involved "a private entity that contracted with the state to provide students with educational services that are funded by the state." *Caviness*, 590 F.3d at 815 (citing *Rendell-Baker*, 457 U.S. 830). "The Arizona legislature chose to provide alternative learning environments at public expense, but, as in *Rendell-Baker*, that 'legislative policy choice in no way makes these services the exclusive province of the State." *Id.* (quoting *Rendell-Baker*, 457 U.S. at 842). The Ninth Circuit also held that the fact that the charter school's "sponsor has the authority to approve and review the school's charter" did not change its decision because "[a]ction taken by private entities with the mere approval or acquiescence of the State is not state action." *Id.* at 817 (quoting *Am. Mfrs. Mut. Ins. Co. v. Sullivan*, 526 U.S. 40, 52 (1999)).

Other circuits have reached similar results interpreting *Rendell-Baker*, albeit not directly in the charter school context. *See Logiodice v. Trs. of Maine Cent. Inst.*, 296 F.3d 22, 24-26 (1st Cir. 2002) (finding no state action for a privately operated school that contracted into the Maine public school system later described in *Carson*, in part because "[e]ducation is not and never has been a function reserved to the state"); *Robert S. v. Stetson Sch., Inc.*, 256 F.3d 159, 166 (3d Cir. 2001) (Alito, J., writing for the panel) (holding that a publicly funded and contract-based school for juvenile sex offenders was not a state actor in part because it did not perform "a function that has been traditionally the exclusive province of the state").

Not all courts have agreed, however, two of which deserve a mention here. The first is *Peltier v. Charter Day Sch., Inc.*, 37 F.4th 104 (4th Cir. 2022), where the Fourth Circuit held *en banc* that the operator of a North Carolina charter school performed a state action in implementing a school dress code. Without dissecting that lengthy decision in full, our view is that the Ninth Circuit and the six dissenters in *Peltier* have the better of the argument, as their reading of *Rendell-Baker* is far more faithful to that decision's facts and principles than the Fourth Circuit's. *See, e.g., Peltier*, 37 F.4th at 137, 142-43 (Quattlebaum, J., dissenting in part) ("[T]he majority misconstrues and ignores guidance from the Supreme Court and all of our sister circuits that have addressed either the same or very similar issues. … These principles the Supreme Court articulated in *Rendell-Baker* … make clear that [the charter school] is not subject to liability under § 1983."). For example, *Rendell-Baker* held that for state action to exist, the government "must compel or at least

significantly encourage the conduct" in question, a critical point the Fourth Circuit ignored in its state action analysis even though it "properly conclude[d] that North Carolina did not coerce or compel the dress code . . . ." *Id.* at 148 (Quattlebaum, J., dissenting in part) (citing *Rendell-Baker*, 457 U.S. at 840). Applied to Oklahoma, any religious practice in charter schools would *not* be compelled or even significantly encouraged by the State. *See Blum*, 457 U.S. at 1004 ("[O]ur precedents indicate that a State normally can be held responsible for a private decision only when it has exercised coercive power or has provided such significant encouragement, either overt or covert, that the choice must in law be deemed to be that of the State."). Thus, it would not be state action challengeable under the Establishment Clause.

The other decision worth mentioning is from 1982, where the Tenth Circuit Court of Appeals held that the owners and operators of a private school and detention facility for troubled boys were state actors under Section 1983. *See Milonas v. Williams*, 691 F.2d 931 (10th Cir. 1982). We agree with Justice Alito, then writing for the Third Circuit, that the "*Milonas* court's reliance on 'significant state funding of tuition' and the detailed contracts between the school and local school districts appears to us to be squarely inconsistent with *Rendell–Baker*." *Robert S.*, 256 F.3d at 168. Regardless, *Milonas* is distinguishable because the Tenth Circuit also "relied on the *involuntary* commitment of some students" to the detention facility—students sent by the state—to find state action. *Id.* at 167-68 (emphasis added); *see Milonas*, 691 F.2d at 940 ("Many of the members of the class were placed at the school involuntarily by juvenile courts and other state agencies acting alone …."). No such involuntary commitment occurs in Oklahoma charter schools, which are entirely optional for parents.

Much like *Trinity Lutheran*, *Espinoza*, and *Carson* overwhelmingly indicate that the Oklahoma provisions in question violate the Free Exercise Clause, *Rendell-Baker* and *Caviness* counsel strongly toward a federal law finding that Oklahoma charter schools are not state actors and thus not vulnerable as an initial matter to an Establishment Clause challenge. *See also* Nicole Stelle Garnett, *Religious Charter Schools: Legally Permissible? Constitutionally Required?*, MANHATTAN INSTITUTE at 4 (Dec. 2020) ("[I]n most states, charter schools ought not to be considered, for federal constitutional purposes, 'state actors'").[5] Indeed, it should not be overlooked that *Rendell-Baker* itself involved the dismissal of a challenge brought under the First Amendment. *See Rendell-Baker*, 457 U.S. at 837.

*Fifth*, the preferred method for determining state action in these cases—eschewing labels for relevant functions—dovetails with the substantive approach the U.S. Supreme Court took in *Carson*. There, the Court emphasized that a state's decision to classify or label privately operated schools as public schools does not control the Court's First Amendment analysis. "Regardless of how the benefit and restriction are described," the Court explained, "the program operates to identify and exclude otherwise eligible schools on the basis of their religious exercise." *Carson*, 142 S. Ct. at 2002. Maine's program was therefore unconstitutional. To hold otherwise would render *Espinoza* "essentially meaningless," since Montana could have claimed that its tax credit was limited to tuition payments for the "rough equivalent" of a public education. *Id.* at 2000.

---

[5] *Available at* https://www.manhattan-institute.org/religious-charter-schools-legally-permissible-constitutionally-required.

Admittedly, *Carson* walked through factors that can be used to distinguish private and public schools, and, unlike in *Carson*, those factors here would fall on both sides of the public/private ledger. *Compare, e.g., id.* at 1999 ("[P]rivate schools … do not have to accept all students. Public schools generally do."), *with* 70 O.S.2021, § 3-135(A)(9) (requiring charter schools to "be as equally free and open to all students as traditional public schools"), *and Carson*, 142 S. Ct. at 1999 ("Participating [private] schools need not hire state-certified teachers."), *with* OKLA. STATE DEP'T OF EDUC., Okla. Charter Schools Program, https://sde.ok.gov/faqs/oklahoma-charter-schools-program (last visited Nov. 30, 2022) ("[Oklahoma] charter schools are not required to employ an individual who holds a valid Oklahoma teaching certificate.").

But that is unsurprising, as it is most certainly *not* our contention that Oklahoma's description of charter schools as "public" is an empty or incorrect label. *See, e.g.*, 2012 OK AG 12 ("The Act authorized the creation of charter schools, which *are public schools* established by contract." (emphasis added)). The analysis here is limited solely to determining how the two "Religion Clauses" of the First Amendment apply to charter schools, and nothing more. And in that context *and that context alone*, the most significant factors—such as private operation and curriculum flexibility—point to a violation of the Free Exercise Clause and the inapplicability of the Establishment Clause, under current U.S. Supreme Court jurisprudence. That is as far as the reasoning in this opinion goes.

Oklahoma, in short, has decided to let private organizations establish and operate charter schools. In *Carson*, the Supreme Court treated the situation very nearly as a tautology: if schools are operated by private organizations, then the First Amendment prohibits status *and* use discrimination. And this makes sense in the First Amendment context. The State cannot outsource operation of entire schools to private entities with "critical cultural, organizational, and institutional characteristics" that the State desires to see reproduced, 70 O.S.2021, § 3-132(C)(3), allow them to innovate in terms of curriculum, and then retain the ability to discriminate against private entities who wish to exercise their religious faith. The State cannot enlist private organizations to "promote a diversity of educational choices," *id.* § 3-134(I)(3), and then decide that any and every kind of religion is the wrong kind of diversity. This is not how the First Amendment works.

\* \* \*

In sum, we do not believe the U.S. Supreme Court would accept the argument that, because charter schools are considered public for various purposes, that a state should be allowed to discriminate against religiously affiliated private participants who wish to establish and operate charter schools in accordance with their faith alongside other private participants. Almost nothing in the text or trajectory of *Trinity Lutheran, Espinoza*, or *Carson* would lead one to that conclusion, nor does the Supreme Court's Establishment Clause or state actor jurisprudence point in that direction. Thus, the limitations found in Section 3-136(A)(2) are likely to be found unconstitutional insofar as they single out religiously affiliated organizations based solely on their "sectarian" status or their anticipated use of public funds for religious purposes.

It is important to emphasize, however, that to the extent that neutral and generally applicable limitations may be found elsewhere in the Act, those limitations can likely be applied to religious

charter schools, so long as they are truly neutral and applied equally to all charter schools alike. *See Fulton*, 141 S. Ct. at 1876-77. In other words, just because the provision prohibiting charter schools from being sectarian "in its programs, admission policies, employment practices, and all other operations" is likely unconstitutional does *not* mean that religious or religiously affiliated charter schools can necessarily operate however they want in regard to "programs, admission policies, employment practices," and the like. The constitutional problem is singling out religion, not necessarily the provisions found elsewhere regulating various aspects of charter schools. For instance, as it currently stands federal law does not in all likelihood prohibit Oklahoma from enforcing requirements like those indicating that charter schools must be "as equally free and open to all students as traditional public schools," 70 O.S.2021, § 3-135(A)(9), or must not charge tuition or fees, *id.* § 3-136(A)(10), so long as hostility to religion is not present.

It is, therefore, the official Opinion of the Attorney General that:

> Pursuant to the conclusions of the United States Supreme Court in *Trinity Lutheran*, *Espinoza*, and *Carson*, the non-sectarian and non-religious requirements found in 70 O.S.2021, § 3-136(A)(2) of the Oklahoma Charter Schools Act likely violate the First Amendment to the U.S. Constitution and therefore should not be enforced.[6]

JOHN M. O'CONNOR
ATTORNEY GENERAL OF OKLAHOMA

ZACH WEST
SOLICITOR GENERAL

---

[6] It has long been recognized that an Attorney General opinion finding an "act of the legislature is unconstitutional should be considered advisory only, and thus not binding until finally so determined by an action in the District Court of this state." *State ex rel. York v. Turpen*, 1984 OK 26, ¶ 12, 681 P.2d 763, 767. Accordingly, this opinion should be deemed advisory only.

# EXHIBIT 1-B



**GENTNER DRUMMOND**
**ATTORNEY GENERAL**

February 23, 2023

Rebecca L. Wilkinson, Ed.D.
Executive Director
Statewide Virtual Charter School Board
2501 N. Lincoln Blvd., Suite 301
Oklahoma City, OK 73105

      RE: Attorney General Opinion 2022-7

Dear Executive Director Wilkinson,

This letter is to notify you that I am withdrawing Attorney General Opinion 2022-7 issued by former Attorney General John O'Connor. As a preliminary matter, your prior request should have been rejected because it was not "accompanied by affirmation that such request was approved by vote of the governing board" of the Statewide Virtual Charter School Board. *See* STATEMENT OF POLICY OF THE ATTORNEY GENERAL REGARDING ISSUING FORMAL OPINIONS, ¶ 4. Therefore, Attorney General Opinion 2022-7 should not have been issued by my predecessor, and this office is not in receipt of a request for Opinion from an authorized requestor. *Id.*

Even if the prior request were procedurally proper, this office would still withdraw Attorney General Opinion 2022-7. The cases identified in your request: *Trinity Lutheran Church of Columbia, Inc. v. Comer*, 137 S. Ct. 2012 (2017), *Espinoza v. Montana Dep't of Revenue*, 140 S. Ct. 2246 (2020), and *Carson v. Makin*, 142 S. Ct. 1987 (2022), involve private schools, not charter schools. This office has previously recognized that charter schools "are public schools established by contract." 2012 OK AG 12, ¶ 1, *see also* 70 O.S. § 3-132(D) (defining a "charter school" as "a public school established by contract"). Consequently, the cases cited in your request concerning private schools have little precedential value as it relates to charter schools.

This office recognizes that the law is currently unsettled as to whether charter schools are state actors. I am hopeful that the U.S. Supreme Court will definitively rule on this unsettled issue next term. *See Peltier v. Charter Day Sch., Inc.*, 37 F.4th 104 (4th Cir. 2022), *petition for cert. filed*, Sept. 14, 2022 (No. 22-238). Unfortunately, presently, there is no binding precedent applicable to Oklahoma discussing whether charter schools are state actors. At most, the Tenth Circuit Court of Appeals has previously assumed, without analysis, that charter schools are state actors. *See Brammer-Hoelter v. Twin Peaks Charter Acad.*, 602 F.3d 1175, 1188 (10th Cir. 2010) ("That is, because the Academy is a local governmental entity, it cannot be held liable for the acts of its employees on a theory of *respondeat superior*."); and *Coleman v. Utah State Charter Sch. Bd.*, 673 F. App'x 822, 830 (10th Cir. 2016) (unpublished) (stating "charter schools are public schools using public funds to educate school children" and "charter schools are not free-floating entities unmoored from state governmental oversight and control").

Rebecca L. Wilkinson, Ed.D.                                                        A.G. Opinion
Executive Director, Statewide Virtual Charter School Board                              Page 2

Without binding precedent definitively addressing whether charter schools are state actors, this office is not currently comfortable advising your board members to violate the Oklahoma Constitution's clear directive: "Provisions shall be made for the establishment and maintenance of a system of public schools, which shall be open to all the children of the state and *free from sectarian control* . . . ." OKLA. CONST. art. I, § 5 (emphasis added). Likewise, without clear precedent, this office is not comfortable advising you to violate the Legislature's clear directive that "[a] charter school shall be *nonsectarian* in its programs, admission policies, employment practices, and all other operations." 70 O.S. § 3-136(A)(2) (emphasis added). Therefore, even if your prior request were procedurally proper, this office would still be compelled to withdraw Attorney General Opinion 2022-7.

I am aware that your request to this office was made in anticipation of the St. Isidore of Seville Catholic Virtual School ("SISCVS") application currently before the Statewide Virtual Charter School Board. As it relates to this specific application, the executive director of the Catholic Conference of Oklahoma has said that the SISCVS intends to "be a fully Catholic school — Catholic in every way: Catholic in teaching, Catholic in employment . . . ."[1] Assuming a charter school is a state actor, it would clearly violate the First Amendment and Oklahoma Constitution for a public school (i.e., a state actor) to be "Catholic in every way." *Id.*

This previous point relates to a much broader aspect of the issue at hand. As a strong supporter of religious liberty, I am obliged to note that the Opinion does nothing to advance that worthy cause. Religious liberty is one of our most fundamental freedoms. It allows us to worship according to our faith, and to be free from any duty that may conflict with our faith. The Opinion, as issued by my predecessor, misuses the concept of religious liberty by employing it as a means to justify state-funded religion. If allowed to remain in force, I fear the Opinion will be used as a basis for taxpayer-funded religious schools, which is precisely what SISCVS seeks to become.

Further, this office is obliged to point out that the approval of the SISCVS application will create a slippery slope. While many Oklahomans undoubtedly support charter schools sponsored by various Christian faiths, the precedent created by approval of the SISCVS application will compel approval of similar applications by all faiths. I doubt most Oklahomans would want their tax dollars to fund a religious school whose tenets are diametrically opposed to their own faith. Unfortunately, the approval of a charter school by one faith will compel the approval of charter schools by all faiths, even those most Oklahomans would consider reprehensible and unworthy of public funding. Consequently, I urge your board members to use caution in reviewing the SISCVS application.

Please feel free to contact the Office if you any further questions.

Sincerely,

GENTNER DRUMMOND
ATTORNEY GENERAL OF OKLAHOMA

---

[1] https://tulsaworld.com/news/local/catholic-church-in-oklahoma-seeking-government-sanctioning-taxpayer-funding-for-first-religious-charter-school-in/article_1141db0a-a98e-11ed-b87c-f7ae31ee167e.html?utm_medium=social&utm_source=email&utm_campaign=user-share

**EXHIBIT 1-C**





**IN THE SUPREME COURT OF THE STATE OF OKLAHOMA**

GENTNER DRUMMOND, Attorney General for the State of Oklahoma, ex rel. STATE OF OKLAHOMA,

    *Petitioner,*

v.

OKLAHOMA STATEWIDE VIRTUAL CHARTER SCHOOL BOARD; ROBERT FRANKLIN, Chairman of the Oklahoma Statewide Virtual Charter School Board for the First Congressional District; WILLIAM PEARSON, Member of the Oklahoma Statewide Charter School Board for the Second Congressional District; NELLIE TAYLOE SANDERS, Member of the Oklahoma Statewide Charter School Board for the Third Congressional District; BRIAN BOBEK, Member of the Oklahoma Statewide Charter School Board for the Fourth Congressional District; and SCOTT STRAWN, Member of the Oklahoma Statewide Charter School Board for the Fifth Congressional District,

    *Respondents,*

ST. ISIDORE OF SEVILLE CATHOLIC VIRTUAL SCHOOL,

    *Intervenor.*

)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)

Case No.: MA-121694

**FILED**
SUPREME COURT
STATE OF OKLAHOMA

**NOV 21 2023**

**JOHN D. HADDEN**
**CLERK**

**RESPONDENTS' BRIEF IN RESPONSE TO**
**PETITIONER'S APPLICATION AND PETITION**

Cheryl Plaxico, OBA #4499
PLAXICO LAW FIRM, PLLC
923 N. Robinson Ave., 5th Floor
Oklahoma City, OK 73102
T: (405) 400-9609
cplaxico@plaxico.law

*Attorneys for Statewide Virtual Charter School Board and its members in their official capacity, Robert Franklin, William Pearson, Nellie Tayloe Sanders, Brian Bobek, and Scott Strawn*

*Pro Hac Vice Application filed concurrently
**Pro Hac Vice Application forthcoming

Philip A. Sechler, DC Bar #26358*
J. Caleb Dalton, VA Bar #83790**
ALLIANCE DEFENDING FREEDOM
44180 Riverside Parkway
Lansdowne, VA 20176
T: (571) 707-4655
psechler@adflegal.org
cdalton@adflegal.org

Mark Lippelmann, AZ Bar #036553**
ALLIANCE DEFENDING FREEDOM
15100 N. 90th St.
Scottsdale, AZ 85260
T: (480) 444-0020
mlippelmann@adflegal.org

## INDEX

**INTRODUCTION**.................................................................................................1

### Cases

*Carson v. Makin,*
   142 S. Ct. 1987 (2022)........................................................................1

*Espinoza v. Montana Department of Revenue,*
   140 S. Ct. 2246 (2020)........................................................................1

*Masterpiece Cakeshop, Ltd. v. Colorado Civil Rights Commission,*
   138 S.Ct. 1719 (2018).........................................................................1

*Rendall-Baker v. Kohn,*
   457 U.S. 830 (1982)............................................................................2

*Trinity Lutheran Church of Columbia Inc. v. Comer,*
   582 U.S. 449 (2017)............................................................................1

### Oklahoma Statutes

70 O.S. § 3-136(A)(2)........................................................................1

**BACKGROUND** ..................................................................................2

   I.   **Oklahoma Charter Schools and the Statewide Virtual Charter**
      **School Board**....................................................................2

### Oklahoma Statutes

70 O.S. § 3-131 ....................................................................................2
70 O.S. § 3-131(A)(4) ........................................................................3
70 O.S. § 3-134(C)..............................................................................2
70 O.S. § 3-134(I) ...............................................................................2
70 O.S. § 3-135(A)(9)..........................................................................2
70 O.S. § 3-136(A)(2)..........................................................................2
70 O.S. § 3-136(A)(3)..........................................................................2
70 O.S. § 3-136(A)(5)..........................................................................2
70 O.S. § 3-136(A)(8)..........................................................................2
70 O.S. § 3-136(A)(10) ........................................................................2
70 O.S. § 3-136(B)...............................................................................2

### Rules and Regulations

OAC § 777:10-3-3(a)(8) .......................................................................2
OAC § 777:10-3-4(a) ...........................................................................2

II.    St. Isidore of Seville Catholic Virtual School, Inc. ..............................................3

**Statutes**

20 U.S.C. § 7221i(2)(E) .......................................................................................4

**Rules and Regulations**

88 Federal Register 65980, 65984 (Sept. 26, 2023) ...........................................4

ARGUMENT .........................................................................................................4

I.    The Court Should Assume Original Jurisdiction of this Matter .........................4

**Cases**

*Salatka v. Oklahoma Alcoholic Beverage Control Board,*
    1980 OK 34, 607 P.2d 1355 ..........................................................................5

*Tulsa Area Hospital Council, Inc. v. Oral Roberts University,*
    1981 OK 29, 626 P.2d 316 .............................................................................4

II.    The Board's Approval of St. Isidore Does Not Offend the
       Establishment Clause ......................................................................................5

**Cases**

*Carson v. Makin,*
    142 S. Ct. 1987 (2022) ...................................................................................5

*Everson v. Board of Education,*
    330 U.S. 1 (1947) ...........................................................................................5

*Jackson v. Metro. Edison Co.,*
    419 U.S. 345 (1974) .......................................................................................5

*Zelman v. Simmons-Harris,*
    536 U.S. 639 (2002) .......................................................................................5

A.    There is No "Sufficiently Close Nexus" Between the State and St.
      Isidore's Religious Character ..........................................................................6

**Cases**

*Blum v. Yaretsky,*
    457 U.S. 991 (1982) .......................................................................................6

*Jackson v. Metro. Edison Co.,*
    419 U.S. 345 (1974) .......................................................................................6

*San Francisco Arts & Athletics, Inc. v. U.S. Olympic Committee,*
    483 U.S. 522 (1987) .......................................................................................6

**B.    Schools Operating Under Contract with the State Are Not State Actors** .......................................................................................................**6**

### Cases

*Blum v. Yaretsky,*
   457 U.S. 991 (1982)..........................................................................................8

*Caviness v. Horizon County Learning Center, Inc.,*
   590 F.3d 806 (9th Cir. 2010) ..........................................................................7

*I.H. ex rel. Hunter v. Oakland School for Arts,*
   234 F. Supp. 3d 987 (N.D. Cal. 2017) ............................................................7

*Jackson v. Metro. Edison Co.,*
   419 U.S. 345 (1974)..........................................................................................8

*Logiodice v. Trustees of Maine Central Institute,*
   296 F.3d 22 (1st Cir. 2002) .............................................................................7

*Peltier v. Charter Day School, Inc.,*
   37 F.4th 104 (4th Cir. 2022)............................................................................8

*Rendell-Baker v. Kohn,*
   457 U.S. 830 (1982)..........................................................................................7

*Robert S. v. Stetson School, Inc.,*
   256 F.3d 159 (3d Cir. 2001)............................................................................7

*West v. Atkins,*
   487 U.S. 42 (1988) ...........................................................................................8

**C.    The Legislature's Use of the Term "Public School" Does Not Make St. Isidore a State Actor.** ....................................................................**8**

### Cases

*Carson v. Makin,*
   142 S. Ct. 1987 (2022) ...................................................................................10

*Caviness v. Horizon County Learning Center, Inc.,*
   590 F.3d 806 (9th Cir. 2010) ..........................................................................9

*Coleman v. Utah State Charter School Board,*
   673 F. App'x 822 (10th Cir. 2016) .................................................................9

*Espinoza v. Montana Department of Revenue,*
   140 S. Ct. 2246 (2020)...................................................................................10

*I.H. ex rel. Hunter v. Oakland School for Arts,*
   234 F. Supp. 3d 987 (N.D. Cal. 2017) ...........................................................9

*Jackson v. Metro. Edison Co.,*
   419 U.S. 345 (1974)..........................................................................................9

*Kennedy v. Bremerton School District,*
   142 S. Ct. 2407 (2022)...................................................................................10

*Lebron v. National Railroad Passenger Corp.,*
  513 U.S. 374 (1995) ............................................................................................9

*Manhattan Community Access Corporation v. Halleck,*
  139 S. Ct. 1921 (2019) .......................................................................................8

*Peltier v. Charter Day School, Inc.,*
  37 F.4th 104 (4th Cir. 2022)...............................................................................9

*Polk County v. Dodson,*
  454 U.S. 312 (1981).............................................................................................9

### Statutes

25 O.S. § 1401...........................................................................................................9

70 O.S. § 3-132(D)....................................................................................................8

70 O.S. § 3-136(A)(1)...............................................................................................9

70 O.S. § 3-140(D)....................................................................................................9

**III.    The First Amendment Compelled the Board to Treat Religious
          Applicants Equally to Secular Applicants** ........................................................**10**

### Cases

*Carson v. Makin,*
  142 S. Ct. 1987 (2022)........................................................................................10

*Church of Lukumi Babalu Aye, Inc. v. Hialeah,*
  508 U.S. 520 (1993).............................................................................................10

*Espinoza v. Montana Department of Revenue,*
  140 S. Ct. 2246 (2020) ........................................................................................10

### Statutes

70 O.S. § 3-134(C)....................................................................................................10

70 O.S. § 3-136(A)(2) ..............................................................................................10

**A.    The Free Exercise Clause Requires that the Act Satisfy Strict
        Scrutiny** .....................................................................................................................**10**

### Cases

*Carson v. Makin,*
  142 S. Ct. 1987 (2022).....................................................................................10, 11

*Espinoza v. Montana Department of Revenue,*
  140 S. Ct. 2246 (2020) ....................................................................................10, 11

*Fellowship of Christian Athletes v. San Jose Unified School District Board of
  Education,* 82 F.4th 664 (9th Cir. 2023).............................................................11

*McDaniel v. Paty,*
  435 U.S. 618 (1978)..............................................................................................11

*Trinity Lutheran Church of Columbia Inc. v. Comer,*
  582 U.S. 449 (2017) ..........................................................................................10, 11

#### Statutes

70 O.S. § 3-134(C) .........................................................................................................11

### B.    The Oklahoma Religious Freedom Act Trigger Strict Scrutiny ..........10

#### Cases

*Elrod v. Burns,*
  427 U.S. 347 (1976) ...............................................................................................12

*State ex rel. Oklahoma Bar Association v. Porter,*
  1988 OK 114, 766 P.2d 958....................................................................................12

#### Statutes

51 O.S. § 251 *et seq* ....................................................................................................11
51 O.S. § 253(B) .........................................................................................................12
51 O.S. § 255(B) .........................................................................................................12
OK S.B. No. 404 *(effective November 1, 2023)*.........................................................12

### C.    The Act's Religious Exclusion Cannot Survive Strict Scrutiny .........12

#### Cases

*Carson v. Makin,*
  142 S. Ct. 1987 (2022) ......................................................................................12, 13

*Kennedy v. Bremerton School District,*
  142 S. Ct. 2407 (2022) ...........................................................................................12

*Rosenberger v. Rector & Visitors of University of Virginia,*
  515 U.S. 819 (1995)................................................................................................13

### IV.    The Oklahoma Constitution Did Not Require the Board to
###        Reject St. Isidore ................................................................................13

### A.    The Board Did Not Violate Article I § 5 ...........................................13

#### Cases

*Fair School Finance Council of Oklahoma, Inc. v. State,*
  1987 OK 114, 746 P.2d 1135..................................................................................13

*Oliver v. Hofmeister,*
  2016 OK 15, 368 P.3d 1270....................................................................................14

*Oliver, Jr. v. Barresi,*
  No. CV-2013-2072, 2014 WL 12531242 (Okla. Cnty. Dist. Ct. Sep. 10, 2014) .........14

*Pitco Production Co. v. Chaparral Energy, Inc.,*
   2003 OK 5, 63 P.3d 541 ............................................................................ 13

### Oklahoma Constitution

ARTICLE I § 5 .......................................................................................... 13

### Statutes

70 O.S. § 1-113 ......................................................................................... 14

70 O.S. § 1-114 ......................................................................................... 14

70 O.S. § 8-101.2 ...................................................................................... 14

**B.    The Board Did Not Violate Article II § 5** ........................................ **14**

### Cases

*Burkhardt v. City of Enid,*
   1989 OK 45, 171 P.2d 608 ....................................................................... 15

*Gurney v. Ferguson,*
   1941 OK 397, 122 P.2d 1002 ................................................................... 14

*Murrow Indian Orphans Home v. Childers,*
   1946 OK 187, 171 P.2d 600 ..................................................................... 14

*Oliver v. Hofmeister,*
   2016 OK 15, 368 P.3d 1270 ............................................................... 14, 15

### Oklahoma Constitution

ARTICLE II § 5 ......................................................................................... 14

### Statutes

70 O.S. § 142(B)(2) .................................................................................. 15

**CONCLUSION** ............................................................................................ **15**

In the name of "protect[ing] religious liberty," Petitioner asks the Court to cancel the contract that the Statewide Virtual Charter School Board (the "Board") entered with St. Isidore of Seville Catholic Virtual School *solely because* St. Isidore is Catholic. Pet. Br. 1. Far from displaying religious tolerance, Petitioner also singles out "sects of the Muslim faith" as groups who could establish charter schools with tenets "diametrically opposed by most Oklahomans." *Id.* Petitioner grievously misunderstands religious liberty. "[A] State violates the Free Exercise Clause when it excludes religious observers from otherwise available public benefits." *Carson v. Makin*, 142 S. Ct. 1987, 1996 (2022). And "official expressions of hostility to religion" are "inconsistent with what the Free Exercise Clause requires." *Masterpiece Cakeshop, Ltd. v. Colo. Civil Rights Comm.*, 138 S. Ct. 1719, 1732 (2018).

To be sure, the Oklahoma Charter Schools Act (the "Act") requires charter schools to be "nonsectarian" in their "operations" and prohibits them from "affiliat[ing] with a ... religious institution." 70 O.S. §3-136(A)(2). But the Board members took an oath to "obey ... the Constitution of the United States." RA030.[1] And that oath prompted their decision *not* to discriminate against St. Isidore based on religion. Petitioner's predecessor advised the Board that these parts of the Act "likely violate the First Amendment ... and therefore should not be enforced." AG Op. 2022-7, RA020. It is troubling that Petitioner, who withdrew this opinion after taking office, accuses the Board of "intentional violation of their oath of office," Pet. Br. 1, without mentioning that the Board acted according to advice his office earlier provided.

Because the Act disqualifies charter-school applicants "solely because of their religious character," it "imposes a penalty on the free exercise of religion that triggers the most exacting scrutiny." *Espinoza v. Mont. Dep't of Revenue*, 140 S. Ct. 2246, 2249 (2020) (quoting *Trinity Lutheran Church of Columbia Inc. v. Comer*, 582 U.S. 449, 462 (2017)). And "an interest in separating church and state more fiercely than the Federal Constitution" cannot suffice. *Carson*, 142 S. Ct. at 1998 (cleaned up). While Petitioner argues that the Board's approval of St. Isidore violates the Establishment Clause, St. Isidore is a privately organized and operated school whose religious mission is not "even influenced by any state regulation." *Rendall-Baker*

---

[1] "RA" is used to refer to Respondents' Appendix, whereas "PA" refers to Petitioner's Appendix.

1

*v. Kohn*, 457 U.S. 830, 841 (1982). Because St. Isidore's religious character is not "fairly attributable to the State," *id.* at 840, it is not a state actor for Establishment Clause purposes. The Board properly refused to disqualify St. Isidore solely because it is Catholic.

## BACKGROUND

### I.   Oklahoma Charter Schools and the Statewide Virtual Charter School Board

The Act authorizes "private organization[s]" to operate charter schools by contracting with a public sponsor. 70 O.S. § 3-134(C). Its purposes include "[i]ncreas[ing] learning opportunities," encouraging "different and innovative teaching methods," and "[p]rovid[ing] additional academic choices for parents and students." § 3-131. But the Act categorically excludes one group in its push for diversity: all charter schools must be "nonsectarian in [their] programs, admission policies, employment practices, and all other operations" and cannot "affiliate[] with a nonpublic sectarian school or religious institution." § 3-136(A)(2).

Each charter school must have a governing body "responsible for [its] policies and operational decisions." § 3-136(A)(8). It "may offer a curriculum which emphasizes a specific learning philosophy or style," § 3-136(A)(3), and adopt its own "personnel policies, personnel qualifications, and method of school governance." § 3-136(B). Charter schools must be "free and open to all students," § 3-135(A)(9), and "may not charge tuition or fees." § 3-136(A)(10). The state funding they receive is tied directly to enrollment. Lusnia Aff. ¶ 8, RA003.

In 2012, the legislature created the Board, giving it "sole authority to authorize and sponsor statewide virtual charter schools." § 3-145.1(A). The Act authorizes the Board to "[a]pprove quality charter applications that ... promote a diversity of educational choices." § 3-134(I). After approving an application, the Board enters a "contract for sponsorship" with the applicant. OAC § 777:10-3-3(a)(8). The Board then "provide[s] ongoing oversight of the charter schools through data and evidence collection, site visits, attendance of governing board meetings, compliance checks, and school performance reviews." *Id.* § 777:10-3-4(a). But except as otherwise provided in the Act, charter schools are "exempt from all statutes and rules relating to schools, boards of education, and school districts." § 3-136(A)(5).

In the 2022-23 school year, Oklahoma had 32 charter schools educating over 50,000

students. www.okcharters.org/our-schools (last visited Nov. 20, 2023). This included 26 physical charters sponsored by public entities and Indian tribes, and six virtual charters sponsored by the Board. Furthering the goal to "[p]rovide additional academic choices for parents and students," § 3-131(A)(4), each of the virtual charters advances a different mission. Lusnia Aff. ¶ 4, RA002.

## II.   St. Isidore of Seville Catholic Virtual School, Inc.

St. Isidore is a privately organized and operated non-profit corporation with two members—the Archbishop of Oklahoma City and the Bishop of Tulsa. PA314. Its privately appointed board of directors "manage and direct [its] business and affairs." *Id.* The board adopted bylaws setting forth its purpose to operate an Oklahoma virtual charter school "as a Catholic School." PA310. St. Isidore's application "envision[ed] a learning opportunity for students who want and desire a quality Catholic education, but for reasons of accessibility ... or due to cost cannot currently make it a reality." PA094. It projected initial enrollment of 500 students, half of whom would be economically disadvantaged. Lusnia Aff. ¶ 13, RA004.[2]

In June 2023, the Board (in a 3-to-2 vote) approved St. Isidore's application. The Board determined that, *but for* its religious character, St. Isidore was qualified. And the Board concluded that disqualifying St. Isidore *because of* its religious character would violate the federal Free Exercise Clause, which all Board members took an oath to uphold. Tr., RA031. As Board member Brian Bobek explained, relying on St. Isidore's religious nature "to justify a denial of the application ... would require [him] to ignore the U.S. Constitution and relevant U.S. Supreme Court cases applying it." *Id.*, RA031–32.[3] The Board based this conclusion on AG Opinion 2022-7, which the former Attorney General issued in December 2022. That opinion advised that "[t]he State cannot enlist private organizations to 'promote a diversity of educational choices,' and then decide that any and every kind of religion is the wrong kind of diversity. This is not how the First Amendment works." AG Op. 2022-7, RA019. After taking office, Petitioner withdrew AG Opinion 2022-7. Drummond Ltr. to Wilkinson (Feb. 23, 2023),

---

[2] The Board rejected St. Isidore's initial application, citing eight areas of deficiency. Wilkinson Ltr. to Schuler (Apr. 13, 2023), RA023–24. On May 24, St. Isidore submitted a revised application. PA026.

[3] Respondents Brian Bobek and Scott Strawn have both since resigned from the Board.

RA021.[4]

In October 2023, the Board and St. Isidore executed a charter contract, setting forth the terms and conditions of the Board's sponsorship. The contract recognizes that St. Isidore "is a privately operated religious non-profit organization" authorized to "provide a comprehensive program of instruction for grades K through 12." PA002, 004. The contract permits St. Isidore to retain an educational management group to "provide management, administration and/or educational program implementation services," PA003, requires the school's private board to "retain oversight authority over the [school]," PA008, and allows St. Isidore to maintain its own "student conduct, discipline, and due process policies and procedures." PA016.

The contract also provides that "no student shall be denied admission ... on the basis of race, color, national origin, sex, sexual orientation, gender identity, gender expression, disability, age, proficiency in the English language, religious preference or lack thereof, income, aptitude, or academic ability." PA015. While St. Isidore may not charge tuition, it may "accept private donations." PA011, 15. The five-year contract begins on July 1, 2024. PA004.[5]

## ARGUMENT

### I.   The Court Should Assume Original Jurisdiction of This Matter.

The Court should assume original jurisdiction over this matter to ensure that the State remains "neutral in its relations with groups of religious believers and non-believers." *Tulsa Area Hosp. Council, Inc. v. Oral Roberts Univ.*, 1981 OK 29, ¶ 13, 626 P.2d 316, 320 (holding that Health Planning Commission's approval of construction for religiously affiliated hospital did not violate Establishment Clause). The Board here has acted with neutrality toward religion, as demanded by the U.S. Constitution. Petitioner's request that this Court cancel the

---

[4] Petitioner's withdrawal prompted the Governor to issue a letter expressing his view that AG Opinion 2022-7 correctly interpreted the Constitution. Stitt Ltr. to Drummond (Feb. 27, 2023), [https://perma.cc/PFS5-6X7M], https://oklahoma.gov/content/dam/ok/en/governor/documents/23-02-27%20JKS%20Letter%20to%20AG%20Drummond%20re_Opinion%202022-7.pdf.

[5] Petitioner wrongly claims that "the Board has put at risk the billion plus dollars in federal education funds the State receives on a yearly basis." Pet. Br. 5–6. While 20 U.S.C. § 7221i(2)(E) requires charter schools to be "nonsectarian," it does so *only* for federal grants made under the Charter Schools Program. In any event, the U.S. Department of Education recently issued a Notice advising that it will "apply [the nonsectarian] element of the definition of 'charter school' consistent with applicable U.S. Supreme Court precedent, including *Trinity Lutheran, Espinoza,* and *Carson.*" 88 Fed. Reg. 65980, 65984 (Sept. 26, 2023) (citations shortened).

contract because of St. Isidore's religious character signals religious hostility. The Court has previously assumed original jurisdiction to protect religious liberty. *Salatka v. Okla. Alcoholic Bev. Control Bd.*, 1980 OK 34, ¶ 1, 607 P.2d 1355, 1356 (assuming original jurisdiction to restrain alcoholic beverage control board from requiring Catholic Church to purchase sacramental wine from licensed liquor stores). It should do the same here.

## II.    The Board's Approval of St. Isidore Does Not Offend the Establishment Clause.

Petitioner claims that the Board's approval of St. Isidore violates the Establishment Clause because that approval authorizes "[g]overnment spending in direct support of religious education." Pet. Br. 10. But "a neutral benefit program in which public funds flow to religious organizations through the independent choices of private benefit recipients does not offend the Establishment Clause." *Carson*, 142 S. Ct. at 1997. As in *Carson*, St. Isidore will receive funds from the State *only if* parents choose to enroll their children in the school. Lusnia Aff. ¶ 8, RA003. ("With no students, State Aid [to St. Isidore] would be zero."). St. Isidore is merely one school choice among many for parents in the State to consider. Offering parents a "program of true private choice" that is "entirely neutral with respect to religion" does not offend the Establishment Clause. *Zelman v. Simmons-Harris*, 536 U.S. 639, 662 (2002).[6]

Because of this, Petitioner stakes his Establishment Clause claim on a single theory: that St. Isidore—a private corporation under contract to provide education—is a state actor that cannot run a religious school. Pet. Br. 10–14.[7] This theory is flawed. First, no "sufficiently close nexus" exists "between the State and the challenged action." *Jackson v. Metro. Edison Co.*, 419 U.S. 345, 351 (1974). Second, many courts, including the U.S. Supreme Court, have held that schools operating under contract with and funded by the state are *not* state actors. *See infra* Part II.B. Third, though the Act refers to a charter school as "a public school," the

---

[6] Petitioner cites *Everson v. Bd. of Educ.*, 330 U.S. 1 (1947), to argue that spending in support of religious education violates the Establishment Clause. But that case *upheld* the use of taxpayer dollars to bus students to religious schools. *Id.* at 18. Indeed, *Everson* "held that the 'First Amendment requires the state to be a neutral in its relations with groups of religious believers and non-believers; it does not require the state to be their adversary." *Zelman*, 536 U.S. at 669 (O'Connor, J., concurring). And regardless of what *Everson* said, the Supreme Court in *Carson* recently confirmed that direct funding to religious schools does not violate the Establishment Clause. 142 S. Ct. at 1997.

[7] *See* Pet. Br. 15 (acknowledging "[t]here are already numerous public funds St. Isidore is eligible to receive ... as a Catholic private school" and "issue here is not the public funds going to St. Isidore").

5

Supreme Court analyzes substance, not labels. The substance here reveals that St. Isidore is not a state actor; and treating a religious applicant equally to a secular one in a neutral program of private choice does not offend the Establishment Clause.

A.    There is No "Sufficiently Close Nexus" Between the State and St. Isidore's Religious Character.

Acts of a private entity do not constitute state action unless "there is a sufficiently close nexus between the State and the challenged action of the regulated entity *so that the action of the latter may be fairly treated as that of the State itself.*" *Jackson*, 419 U.S. at 351 (emphasis added). This requirement ensures "that constitutional standards are invoked only when it can be said that the State is responsible for the specific conduct of which the plaintiff complains." *Blum v. Yaretsky*, 457 U.S. 991, 1004 (1982). In *Jackson*, the Court held that no "sufficient[] nexus" existed between the state and a public utility. 419 U.S. at 351. In *Blum,* the Court recognized the same lack of nexus for nursing-home transfers. And in *San Francisco Arts & Athletics, Inc. v. U.S. Olympic Committee*, the Court held the U.S. Olympic Committee was "not a governmental actor" because its "choice of how to enforce its exclusive right to use the word 'Olympic' simply is not a governmental decision." 483 U.S. 522, 522, 547 (1987).

Petitioner complains about St. Isidore's religious affiliation and activity. Yet "a practice initiated by [a contracted entity] and approved by the [state]" but not "order[ed]" by the state is not "state action." *Jackson*, 419 U.S. at 357. The Board has not ordered or encouraged St. Isidore to engage in any religious affiliation or activity; it has merely treated St. Isidore's application neutrally under the law. St. Isidore's choice of its own curriculum, pedagogy, and affiliation, "where the initiative comes from it and not from the State, does not make its action ... 'state action' for purposes of the Fourteenth Amendment." *Id.*

B.    Schools Operating Under Contract with the State Are Not State Actors.

In *Rendell-Baker v. Kohn*, the Supreme Court held that a school under contract with the state to educate maladjusted students was *not* a state actor when making employment decisions. 457 U.S. 830, 841 (1982). "Acts of such private contractors do not become acts of the government by reason of their significant or even total engagement in performing public contracts."

*Id.* Applying *Rendell-Baker*, numerous federal courts have held that schools operating under contract with the state are *not* state actors. In *Caviness v. Horizon County Learning Center, Inc.*, the Ninth Circuit held that an Arizona "public" charter school was not a state actor when making employment decisions. 590 F.3d 806, 818 (9th Cir. 2010). In *Logiodice v. Trustees of Maine Central Institute*, the First Circuit held that a high school contracting with the state to fulfill the role of a public school was not a state actor when administering student discipline. 296 F.3d 22, 26–28 (1st Cir. 2002). In *Robert S. v. Stetson Sch., Inc.*, 256 F.3d 159 (3d Cir. 2001), the Third Circuit (in an opinion written by then-Judge Alito) concluded that a school for juvenile sex offenders was not a state actor when its staff were accused of abusive behavior. Similarly, in *I.H. ex rel. Hunter v. Oakland School for Arts*, the court held that a "public" charter school was not a state actor for its staffer's wrongdoing. 234 F. Supp. 3d 987, 992 (N.D. Cal. 2017). This line of cases is directly at odds with Petitioner's claim.

Moreover, in *Rendall-Baker*, the Supreme Court rejected three of the arguments that Petitioner invokes here:

First, the Court concluded that the school was not a state actor simply because it performed a "public function." 457 U.S. at 842. Instead, the Court said, "the question is whether the function performed [is] the *exclusive* prerogative of the state." *Id.* But education is "in no way . . . the exclusive province of the State.*" Id.* As the First and Ninth Circuits have observed, *Rendell-Baker* "foreclosed" the argument that "'public educational services' are traditionally and exclusively the province of the state." *Caviness*, 590 F.3d at 815; *Logiodice*, 296 F.3d at 26 (same). Indeed, education has never been the exclusive work of the state, considering that "10% of American schoolchildren are educated in private schools." Nicole Garnett, Manhattan Inst., *Religious Charter Schs.: Legally Permissible? Const. Required?* 9 (2020), https://media4.manhattan-institute.org/sites/default/files/religious-charter-schools-legally-permissible-NSG.pdf, [https://perma.cc/6EFA-QC57]. Oklahoma itself has its own impressive history of private education. Louise Scrivens, *Private School Primer* (Mar. 6,

7

2017), https://www.405magazine.com/private-school-primer/.[8]

Second, the Court rejected that the state's "extensive regulation of the school" made the school a state actor. 457 U.S. at 841. The Court noted that in *Blum*, regulations that "encouraged the nursing homes to transfer patients to less expensive facilities" did not make them state actors, and in *Jackson*, regulations that were "extensive and detailed" did not make a utility's actions state action. 419 U.S. at 350. Because the school's challenged actions in *Rendell-Baker* "were not compelled or even influenced" by state regulations, extensive regulation was insufficient to make the school a state actor. 457 U.S. at 841. Similarly, here, because the regulations Petitioner cites (e.g., accreditation, health and safety) did not "compel[] or even influence[]" St. Isidore's religious character, they do not render the school a state actor.[9]

Third, "virtually all of the school's income" in *Rendell-Baker* "was derived from government funding." 457 U.S. at 840–41. The Court nevertheless concluded "that the school's receipt of public funds does not make [its actions or decisions] acts of the State." *Id.*; *accord Blum*, 457 U.S. at 1011 (nursing homes that "depended on the State for funds" were not state actors). Here, too, the fact that St. Isidore will have the "direct financial backing" of the State, Pet. Br. 4, is insufficient to render it a state actor.

### C.     The Legislature's Use of the Term "Public School" Does Not Make St. Isidore a State Actor.

Petitioner contends that the "analysis [is] easy" because the legislature considers a charter school to be "a public school." Pet. Br. 11 (citing § 3-132(D)). But nowhere did the legislature indicate it used that term to turn charter schools into state actors subject to constitutional constraints. The term "public" can be explained simply as recognizing that charter schools are open to all, § 3-140(D), in the same manner as a "place of public accommodation."

---

[8] Petitioner cites *West v. Atkins*, in which state reliance on a contract doctor for all prison medical care clothed the doctor with "authority of state law." 487 U.S. 42, 55 (1988). But unlike the state there, Oklahoma here has not "abdicated its constitutional obligation through a private contract"—its traditional public schools remain an option, and "students at [St. Isidore] have a choice that the inmate in *West* never had." *Peltier v. Charter Day Sch., Inc.*, 37 F.4th 104, 146–47 (4th Cir. 2022) (Quattlebaum, J., dissenting in part).

[9] Even regulations that require contractors to provide "free" and "first-come, first-serve" services to the public "do not render [a private corporation] a state actor." *Manhattan Cmty. Access Corp. v. Halleck*, 139 S. Ct. 1921, 1932 (2019).

8

25 O.S. § 1401; *see* PA003 ("'Public School' shall mean a school that is free and supported by funds appropriated by the Legislature"). Notably, in declaring that "[a] charter school shall comply with all federal regulations and state and local rules and statutes relating to ... civil rights," § 3-136(A)(1), the legislature did not mention *constitutional* obligations, suggesting it did not intend charter schools to bear that burden.

Moreover, the Supreme Court has repeatedly held that a legislature's characterization of an entity does not control its "state actor" status for constitutional purposes. In *Jackson*, the statutory term "public utilities" was insufficient to make the utility a state actor. 419 U.S. at 350 & n.7. In *Polk Cnty. v. Dodson*, "public" defenders, though employed by the state to meet constitutional obligations, were not state actors when acting as attorneys. 454 U.S. 312, 325 (1981). And in *Lebron v. Nat'l R.R. Passenger Corp.*, a "congressional label" did not control whether Amtrak was a state actor. 513 U.S. 374, 392–93 (1995). Following these cases, other courts have held that charter schools *are not* state actors despite being called "public." *Caviness*, 590 F.3d at 818; *Hunter*, 234 F. Supp. 3d at 992.

Disregarding that authority, Petitioner cites one case relying on a state's designation of charter schools as "public" to find state action. Pet. Br. 11 (citing *Peltier*, 37 F.4th at 121).[10] But *Peltier*, a 10-to-6 en banc decision, is an outlier. The majority there "misconstrue[d] and ignore[d] guidance from the Supreme Court and all of our sister circuits that have addressed either the same or very similar issues." *Id.* at 137 (Quattlebaum, J., joined by five judges, dissenting in part). The *Peltier* majority did not mention *Jackson* or *Dodson,* both of which "undermine [its] reliance on [the school's] public designation." *Id.* at 146. And one week after *Peltier*, the Supreme Court held that the constitutionality of excluding religious groups from public-benefit programs "turn[s] on the substance of free exercise protections, not on the presence or absence of magic words," or else the First Amendment could be "reduced to a

---

[10] Petitioner also cites a Tenth Circuit case, *Coleman v. Utah State Charter Sch. Bd.*, 673 F. App'x 822, 834 (10th Cir. 2016), but that court did not in any way address whether state action was present.

simple semantic exercise." *Carson*, 142 S. Ct. at 1999.[11]

### III.    The First Amendment Compelled the Board to Treat Religious Applicants Equally to Secular Applicants.

Decades of U.S. Supreme Court precedent hold that states may not exclude religious groups from public benefits and programs available to secular groups. Under the Act, any "private college or university, private person, or private organization may contract with a sponsor to establish a charter school," § 3-134(C), *unless the private person or organization is religiously affiliated or engages in religious practices.* § 3-136(A)(2). This discrimination against religion is "subject[] to the strictest scrutiny." *Carson,* 142 S. Ct. at 1989. "A law that targets religious conduct ... will survive strict scrutiny only in rare cases." *Church of Lukumi Babalu Aye, Inc. v. Hialeah*, 508 U.S. 520, 546 (1993). Because there is no compelling state interest "in separating church and State more fiercely than the Federal Constitution," *Espinoza,* 140 S. Ct. at 2260, the Act's exclusion of religious applicants fails strict scrutiny.

### A.    The Free Exercise Clause Requires that the Act Satisfy Strict Scrutiny.

The Supreme Court has "repeatedly held that a State violates the Free Exercise Clause when it excludes religious observers from otherwise available public benefits." *Carson*, 142 S. Ct. at 1996. The Court applied that rule to defeat three "state efforts to withhold otherwise available public benefits from religious organizations," *id.,* including religious schools.

First, in *Trinity Lutheran*, the Court struck down a Missouri program that provided grants to nonprofit organizations to install cushioned playground surfaces but denied those grants to religious organizations. 582 U.S. at 454. The Free Exercise Clause did not allow Missouri to "expressly discriminate[] against otherwise eligible recipients by disqualifying them from a public benefit solely because of their religious character." *Id.* at 462.

Second, *Espinoza* held that "the Free Exercise Clause precluded the Montana Supreme Court from applying Montana's no-aid provision to bar religious schools from [a] scholarship program" "solely because of the religious character of the schools." 140 S. Ct. at 2254–55. "A

---

[11] Another flaw in Petitioner's claim is "that the Establishment Clause must be interpreted by reference to historical practices and understandings," *Kennedy v. Bremerton Sch. Dist.,* 142 S. Ct. 2407, 2428 (2022), and "there is no 'historical and substantial' tradition against aiding [religious] schools comparable to the tradition against state-supported clergy." *Espinoza,* 140 S. Ct. at 2259.

10

State need not subsidize private education. But once a State decides to do so, it cannot disqualify some private schools solely because they are religious." *Id.* at 2261. States cannot put "school[s] to a choice between being religious or receiving government benefits." *Id.* at 2257.[12]

Third, in *Carson*, the Court invalidated a Maine program that paid tuition directly to private secular schools, but not private religious schools, for students whose school district did not include a public secondary school. 142 S. Ct. at 1997. Disqualifying religious schools "from this generally available benefit 'solely because of their religious character'" "'penalize[d] the free exercise' of religion." *Id.* The Free Exercise Clause prohibits discrimination against a school's religious conduct—not just its religious status—because "use-based discrimination is [no] less offensive." *Id.* at 2001.

Here, the Act allows any qualified "private person" or "private organization ... to establish a charter school." § 3-134(C). Were the Board to reject St. Isidore because of its religious character, it would violate the Free Exercise Clause in the same way the states did in *Trinity Lutheran, Espinoza,* and *Carson.* Once the State opened its charter school program to private organizations, the Board may not "disqualify some private [organizations from participating] because they are religious." *Espinoza,* 140 S. Ct. at 2261.

Petitioner's efforts to distinguish these cases are unavailing. Pet. Br. 14–15. First, Petitioner argues that St. Isidore is a state actor rather than a private school protected by the First Amendment. As explained, that is wrong as a matter of fact and law. Second, Petitioner argues that excluding St. Isidore from the charter program is permissible because there "are already numerous public funds St. Isidore is eligible to receive." *Id.* But the availability of other benefits does not justify religious discrimination in *this* program. *See Fellowship of Christian Athletes v. San Jose Unified Sch. Dist. Bd. of Educ.*, 82 F.4th 664, 694 (9th Cir. 2023) (exclusion of religious student group violated First Amendment notwithstanding alternatives).

### B.    The Oklahoma Religious Freedom Act Triggers Strict Scrutiny.

As a state agency, the Board is subject to the Oklahoma Religious Freedom Act

---

[12] In *McDaniel v. Paty*, the Supreme Court struck down a law disqualifying ministers from public office, because "[t]o condition the availability of benefits [on] ... surrendering ... religiously impelled ministry effectively penalizes the free exercise [of religion]." 435 U.S. 618, 626 (1978).

11

("ORFA"), 51 O.S. § 251 *et seq.*, which provides that "[n]o governmental entity shall substantially burden a person's free exercise of religion" unless the burden is "[e]ssential to further a compelling governmental interest" and the "least restrictive means of furthering that compelling governmental interest." *Id.* § 253(B). After a recent amendment, ORFA now states that "it shall be deemed a substantial burden to exclude any person or entity from participation in or receipt of governmental funds, benefits, programs, or exemptions *based solely on the religious character of the person or entity.*" OK S.B. No. 404 (adding 51 O.S. § 253(D)).[13]

It is undeniable that Petitioner seeks to exclude St. Isidore from participating in the State's virtual charter school program *based on its religious character.* Under ORFA, any such exclusion must pass strict scrutiny and be justified by a "compelling [governmental] interest" of "vital importance." *State ex rel. Oklahoma Bar Ass'n v. Porter*, 1988 OK 114, ¶ 25, 766 P.2d 958, 968 (citing *Elrod v. Burns*, 427 U.S. 347, 362–63 (1976)).

### C.    The Act's Religious Exclusion Cannot Survive Strict Scrutiny.

"To satisfy strict scrutiny, government action 'must advance interests of the highest order and must be narrowly tailored in pursuit of those interests.'" *Carson*, 142 S. Ct. at 1997 (citation omitted). Here, the Board had no compelling interest in rejecting St. Isidore's application based on St. Isidore's religious character. Again, "an interest in separating church and state more fiercely than the [Establishment Clause] ... cannot qualify as compelling in the face of the infringement of free exercise." *Id.* at 1998 (citations omitted). And "a neutral benefit program in which public funds flow to religious organizations through the independent choices of private benefit recipients does not offend the Establishment Clause." *Id.* at 1997. "[I]n no world may a government entity's concerns about phantom constitutional violations justify actual violations of an individual's First Amendment rights." *Kennedy*, 142 S. Ct. at 2432. Simply put, the Board has no "antiestablishment interest" that would "justify ... exclud[ing] some members of the community from an otherwise generally available public benefit because of their religious exercise." *Carson*, 142 S. Ct. at 1998. Because applying the Act's religious

---

[13]    Because St. Isidore's contract "commence[s] on July 1, 2024," PA004, this amendment, which took effect November 1, 2023, applies. Even before this amendment, ORFA would have triggered strict scrutiny because the prior version excluded "the denial of government funding" from the "[g]ranting governmental funds" exception in 51 O.S. § 255(B), subjecting a funding denial to strict scrutiny.

exclusion to deny St. Isidore's application would have violated the Free Exercise Clause, the Board's actions were not only proper, but mandated.[14]

## IV.   The Oklahoma Constitution Did Not Require the Board to Reject St. Isidore.

Petitioner claims that the Board's sponsorship of St. Isidore violates the "freedom from sectarian control" (Art. I § 5) and no-aid provisions (Art. II § 5) of the Oklahoma Constitution. These arguments stumble out of the gate because the Oklahoma Constitution declares the U.S. Constitution to be "the supreme law of the land" (Art. I § 1); and the Free Exercise Clause prohibited the Board from disqualifying St. Isidore because of its religious character. In any event, neither state constitutional provision prevented the Board from sponsoring St. Isidore.

### A.   The Board Did Not Violate Art. I § 5.

Art. I § 5 states that "[p]rovisions shall be made for the establishment and maintenance of a system of public schools, which shall be open to all the children of the state and free from sectarian control." This requires that the "system of public schools"—not each individual charter school—must be "free from sectarian control."

The text supports this reading. The clause "free from sectarian control" modifies a single object: "a system of public schools," not each individual school in isolation. *See Fair Sch. Fin. Council of Okla., Inc. v. State*, 1987 OK 114, ¶ 59, 746 P.2d 1135, 1149 (Art. I § 5 "merely mandate[s] actions by the Legislature to establish and maintain a system of free public schools" and does not impose obligations at the level of each district). Notably, the framers used the singular form of the word "system" and a singular article—"a"—to describe the object. *See Pitco Prod. Co. v. Chaparral Energy, Inc.*, 2003 OK 5, ¶ 16, 63 P.3d 541, 546 (singular word and modifying article show intent to refer to singular entity). And the other clause modifying that object—"shall be open to all the children of the state"—proves that both clauses modify the singular "system of public schools," because each individual school is clearly not "open to all the children of the state." *See, e.g.*, 70 O.S. § 1-113 (limiting enrollment by residency), § 1-114 (age), § 8-101.2 (capacity). It is the *system* that must be "free from

---

[14] The First Amendment's Free Speech Clause also prohibited the Board from discriminating against St. Isidore because of its expression of its Catholic views. *See Rosenberger v. Rector & Visitors of Univ. of Va.*, 515 U.S. 819, 843 (1995) (holding that the Free Speech Clause required university to fund religious college newspaper on same terms as secular student groups).

13

sectarian control," and Petitioner makes no plausible allegation that St. Isidore somehow exercises "control" over Oklahoma's entire "system of public schools."

*Oliver v. Hofmeister* is instructive. 2016 OK 15, ¶ 27, 368 P.3d 1270, 1277. The plaintiffs there argued that a scholarship program violated Art. I § 5 by allowing disabled students to use state funds to attend religious schools, but the trial court rejected that argument, and this Court did not overturn its ruling. *See Oliver, Jr. v. Barresi*, No. CV-2013-2072, 2014 WL 12531242, at *1 (Okla. Cnty. Dist. Ct. Sep. 10, 2014) (unpublished). As in *Oliver*, Art. I § 5 is not offended here simply because state funds are flowing to a religious school.

**B.    The Board Did Not Violate Art. II § 5.**

Art. II § 5 provides that "[n]o public money or property shall ever be appropriated, applied, donated, or used, directly or indirectly, for the use, benefit, of support of any sect, church, denomination or system of religion." The Board did not violate this for three reasons:

First, the State does not violate the "no aid" provision when *the State* benefits from a payment to a religious organization. Petitioner relies upon *Gurney v. Ferguson*, which banned public buses to transport students to parochial schools. 1941 OK 397, ¶ 16, 122 P.2d 1002, 1005. But this Court has confined *Gurney* to situations where "public money was being spent to furnish a service to a parochial school *for which no corresponding value was received."* *Murrow Indian Orphans Home v. Childers*, 1946 OK 187, ¶ 5, 171 P.2d 600, 602 (emphasis added). *Murrow* held that state payments to a Baptist orphanage did *not* violate the "no-aid" provision because the State was required to provide such services and thus benefited from the orphanage's work. *Id.* at 601–03; *accord Burkhardt v. City of Enid*, 1989 OK 45, ¶¶ 15–16, 171 P.2d 608, 612 (key in applying "no-aid" provision is whether state receives benefit).

*Oliver* again provides guidance. The Court there found no constitutional violation because the scholarship program discharged obligations of the State. 2016 OK 15, ¶ 27, 368 P.3d at 1277. "Oklahoma public school districts are required to provide education ... to all children with disabilities." *Id.* at ¶ 7, 1272–73. The State was "simply contracting with private schools to perform a service (education of children with special needs) for a fee. The State receive[d] great benefit from this arrangement." *Id.* at ¶ 5, 1278 (Taylor, J., concurring).

14

Similarly, here, the Board is contracting with St. Isidore to provide education to Oklahoma children, an "element of substantial return to the state." *Id.* at ¶ 19, 1275.

Second, any public money that flows to St. Isidore will result from the voluntary choices of parents. When a funding program is "*entirely voluntary* with respect to eligible students and their families" and "[w]hen the *parents* and not the *government* are the ones determining which private school offers the best learning environment for their child, the circuit bet-ween government and religion is broken." *Oliver*, 2016 OK 15, ¶¶ 8, 13, 368 P.3d at 1273–74. "Because the *parent* receive[d] and direct[ed] the funds to the private school, *sectarian* or *non-sectarian*, ... the State [wa]s not actively involved in the adoption of sectarian principles or directing monetary support to a sectarian institution." *Id.* at ¶ 22, 1276. Likewise, any state funding for St. Isidore will depend entirely on parents' voluntary decisions to enroll their children, *see* § 142(B)(2); Lusnia Aff. ¶ 7, RA003, and "the circuit between government and religion is broken." *Oliver*, 2016 OK 15, ¶ 13, 368 P.3d at 1274.

Third, the Board's criteria for determining whether to approve St. Isidore are "void of any suggestion or inference to favor religion or any particular sect." *Id.* at ¶ 26, 1277. If a statute or decision is "void of any preference between a *sectarian* or *non-sectarian* private school," "there is no influence being exerted by the State for any sectarian purpose." *Id.* at ¶ 11, 1274. Approval "without regard to religious affiliation" "based on statewide educational standards, health and safety regulations" is permissible. *Id.* at ¶ 21, 1276. The Board approves virtual charter schools "without regard to religious affiliation," and the standards for approving them are "void of any suggestion or inference to favor religion or any particular sect." *Id.* at ¶¶ 21, 26, 1276–77. Accordingly, the Board's approval of St. Isidore did not violate the "no aid" provision.

## CONCLUSION

Protecting religious liberty requires placing religious organizations on equal footing with their secular counterparts and not treating religious organizations with hostility. Petitioner would have the Board violate both requirements. This Court should assume original jurisdiction and deny Petitioner the relief requested.

15

Dated:    November 21, 2023                Respectfully submitted,

Mark Lippelmann**                          Cheryl Plaxico, OBA No. 4499
AZ Bar No.: 036553                         PLAXICO LAW FIRM, PLLC
ALLIANCE DEFENDING FREEDOM                 923 N. Robinson Ave., 5th Floor
15100 N. 90th St.                          Oklahoma City, OK 73102
Scottsdale, AZ 85260                       T: (405) 400-9609
T: (480) 444-0020                          cplaxico@plaxico.law
mlippelmann@adflegal.org
                                           Philip A. Sechler*
*Attorneys for Statewide Virtual Charter*  DC Bar No.: 426358
*School Board and its members in their*    J. Caleb Dalton**
*official capacity, Robert Franklin, William*  VA Bar No.: 83790
*Pearson, Nellie Tayloe Sanders, Brian*    ALLIANCE DEFENDING FREEDOM
*Bobek, and Scott Strawn*                  44180 Riverside Parkway
                                           Lansdowne, VA 20176
*Pro Hac Vice* Application filed           T: (571) 707-4655
concurrently                               psechler@adflegal.org
**Pro Hac Vice* Application forthcoming    cdalton@adflegal.org

## CERTIFICATE OF SERVICE

Pursuant to Rule 1.11(h), this is to certify that a true and correct copy of the foregoing was mailed by USPS, postage prepaid on November 21, 2023 to the following:

Michael H. McGinley
Steven A. Engel
M. Scott Proctor, OBA #33590
DECHERT LLP
1900 K Street, NW
Washington, DC 20006
T (202) 261-3308
michael.mcginley@dechert.com
steven.engel@dechert.com
scott.proctor@dechert.com

Michael R. Perri, OBA #11954
Socorro Adams Dooley, OBA #32716
PERRI DUNN, PLLC
100 N. Broadway, Suite 3280
Oklahoma City, OK 73102
T: (405) 724-8543
mrperri@perrridunn.com

John A. Meiser
NOTRE DAME LAW SCHOOL
RELIGIOUS LIBERTY CLINIC
1338 Biolchini Hall of Law
Notre Dame, IN 46556
T: (574) 631-3880
jmeiser@nd.edu

**Attorneys for Intervenor St. Isidore
of Seville Catholic Virtual School**

Gentner Drummond, OBA #16645
*Attorney General*
Garry M. Gaskins, II, OBA #20212
*Solicitor General*
Brad Clark, OBA #22525
*Deputy General Counsel*
Kyle Peppler, OBA #31681
William Flanagan, OBA #35110
*Assistant Solicitors General*
OFFICE OF ATTORNEY GENERAL
STATE OF OKLAHOMA
313 N.E. 21st Street
Oklahoma City, OK 73105
T: (405) 521-3921
garry.gaskins@oag.ok.gov

**Attorneys for Petitioner**

Dated:    November 21, 2023

Cheryl Plaxico

**EXHIBIT 1-D**

**ORIGINAL**

## IN THE SUPREME COURT OF THE STATE OF OKLAHOMA

GENTNER DRUMMOND, Attorney General for the State of Oklahoma, ex rel. STATE OF OKLAHOMA,

*Petitioner,*

v.

OKLAHOMA STATEWIDE VIRTUAL CHARTER SCHOOL BOARD; ROBERT FRANKLIN, Chairman of the Oklahoma Statewide Virtual Charter School Board for the First Congressional District; WILLIAM PEARSON, Member of the Oklahoma Statewide Charter School Board for the Second Congressional District; NELLIE TAYLOE SANDERS, Member of the Oklahoma Statewide Charter School Board for the Third Congressional District; BRIAN BOBEK, Member of the Oklahoma Statewide Charter School Board for the Fourth Congressional District; and SCOTT STRAWN, Member of the Oklahoma Statewide Charter School Board for the Fifth Congressional District,

*Respondents.*

FILED
SUPREME COURT
STATE OF OKLAHOMA

**OCT 20 2023**

**JOHN D. HADDEN**
**CLERK**

Case No. **#121694**



## PETITIONER'S APPLICATION TO ASSUME ORIGINAL JURISDICTION AND PETITION FOR WRIT OF MANDAMUS AND DECLARATORY JUDGMENT

Petitioner, Gentner Drummond, Attorney General for the State of Oklahoma, on behalf of and in the interests of the State of Oklahoma, respectfully requests this Court assume original jurisdiction and issue a writ of mandamus compelling the Oklahoma Statewide Virtual Charter School Board (the "Board"); Robert Franklin, chairman of the Board; William Pearson, Nellie Tayloe Sanders, Brian Bobek, and Scott Strawn, members of the Board, to fulfill their legal duties and cancel the Board's illegal contract with St. Isidore of Seville Virtual Charter School ("St. Isidore") executed on October 16, 2023. Moreover, Petitioner respectfully requests this Court

1

issue any and all other relief it deems appropriate, including a declaratory judgment, to ensure the unlawful behavior of the Board desists.

In support of the Petitioner's Application and Petition, it shows this Court as follows.

## PARTIES

1.    Gentner Drummond, duly elected Attorney General for the State of Oklahoma, brings this original jurisdiction action on behalf of the State of Oklahoma pursuant to his authority to "initiate . . . any action in which the interests of the state or the people of the state are at issue . . . ." OKLA. STAT. tit. 74, § 18b(A)(3). The Attorney General, being the chief law officer of the State, is generally "the proper party to maintain litigation to enforce a matter of public interest." *State ex rel. Howard v. Okla. Corp. Comm'n*, 1980 OK 96, ¶ 35, 614 P.2d 45, 52.

2.    Respondent Oklahoma Statewide Virtual Charter School Board, having the "sole authority to authorize and sponsor statewide virtual charter schools" in Oklahoma, is comprised of five voting members. OKLA. STAT. tit. 70, § 3-145.1(A).

3.    Respondent Robert Franklin serves as Chairman and voting member of the Oklahoma Statewide Virtual Charter School Board and is named in his official capacity.

4.    Respondent William Pearson serves as a voting member of the Oklahoma Statewide Virtual Charter School Board and is named in his official capacity.

5.    Respondent Nellie Tayloe Sanders serves as a voting member of the Oklahoma Statewide Virtual Charter School Board and is named in her official capacity.

6.    Respondent Brian Bobek serves as a voting member of the Oklahoma Statewide Virtual Charter School Board and is named in his official capacity.

7.    Respondent Scott Strawn serves as a voting member of the Oklahoma Statewide Virtual Charter School Board and is named in his official capacity. Scott Strawn claimed to have

2

resigned from the Board at the conclusion of the October 9, 2023 meeting. However, despite this public statement, he signed the unlawful contract on October 15, 2023. *See* Pet. App. Vol. I at 21.

8.    The unlawful contract with St. Isidore is void *ab initio*. As a result, a writ a mandamus has not been sought against this illegitimate state actor.

## THE COURT'S JURISDICTION

9.    The Petitioner seeks relief against the Board, which is created by law. *See* OKLA. STAT. tit. 70, § 3-145.1. Petitioner's requested relief is within this Court's original jurisdiction, discretionary authority, and superintending control, OKLA. CONST. art. VII, § 4 ("The original jurisdiction of the Supreme Court shall extend to a general superintending control over all inferior courts and all Agencies, Commissions and Boards created by law.").

10.    Petitioner seeks a writ of mandamus to compel the Board to rescind its virtual charter school contract ("the Contract") with St. Isidore—executed on October 16, 2023— because such a contract is in violation of the U.S. Constitution as well as Oklahoma's Constitution, laws and regulations. The Oklahoma Constitution and Oklahoma Statutes grant this Court power to issue writs of mandamus to compel a board's performance of an act specifically enjoined by law as a duty, resulting from an office, trust, or station. *See id.*; OKLA. STAT. tit. 12, § 1451.

11.    Petitioner additionally seeks declaratory relief to establish that the Board's approval of a sectarian virtual charter school is unlawful and violates Board Members' oath of office. This Court's "[j]urisdiction to grant declaratory relief may be assumed (1) in matters of public interest where there is (2) an element of urgency or a pressing need for an early decision." *Fent v. Contingency Rev. Bd.*, 2007 OK 27, ¶ 11, 163 P.3d 512, 521 (citations omitted). The necessary prongs for this Court's exercise of declaratory relief in this matter are certainly met here.

12.    It is self-evident that the funding of public schools, and importantly here, the illegal funding of a sectarian public school is a matter of *publici juris*. Moreover, the Contract commences

3

July 1, 2024. *See* Pet. App. Vol. I at 4; § 3.2. State appropriations, which will imminently be allocated to the sponsored school, would derive from the FY 2025 budget passed mere months from the filing of the above-entitled cause. These appropriations will undoubtedly be shifted or redistributed from legitimate public schools to St. Isidore.

13.    Even more concerning, the Board's unlawful action puts at risk the billion plus dollars in federal education funds the State receives on a yearly basis. *See e.g.,* 20 U.S.C. §§ 1234c, 6311, 7221i, and 7842.

14.    Although an Oklahoma County District Court case—CV-2023-1857—is also challenging the Board's actions relevant to this matter, the urgency with which this Court may act cannot be mirrored by the district court. *See Edmondson v. Pearce,* 2004 OK 23, ¶ 12, 91 P.3d 605, 614, *as corrected* (July 28, 2004) (This Court, addressing the difficulty to detect the immediacy theme that runs through most of its original jurisdiction actions, still assumed original jurisdiction to determine the constitutionality of an act banning cockfighting based, in part, on the "nature of the controversy" before it.). Moreover, the district court matter will not address this conflict between the Oklahoma Attorney General and the Board. This Court has previously provided declaratory relief to resolve "inter-governmental legal claims" such as those relevant here. *See Ethics Comm'n of State of Okla. v. Cullison,* 1993 OK 37, ¶ 7, 850 P.2d 1069, 1073–74 ("We conclude that providing a form of declaratory relief to resolve a claimed intolerable conflict between the Ethics Commission and the Legislature is consistent with those situations where this court has provided a remedy to resolve inter-governmental legal claims within the discretionary superintending jurisdiction of this court.").

15.    Aside from the extreme public interest associated with the nature of this controversy—public money being directly applied to a sectarian school—the Board's action of sponsoring St. Isidore paves the way for an onslaught of sectarian applicants for charters in

4

violation of Oklahoma law. *See e.g., Prescott v. Okla. Capitol Pres. Comm'n*, 2015 OK 54, ¶ 3, 373 P.3d 1032, 1045 (Gurich, J., concurring) (after installation of the Ten Commandments on Capitol grounds, "the Oklahoma Capitol Preservation Commission was forced to put a moratorium on monument requests because numerous groups either applied to have their own symbols erected or threatened litigation."). This Court's assumption of jurisdiction in this matter is necessary to address this serious concern.

16.    Thus, jurisdiction in this Court is proper.

## PETITION FOR WRIT OF MANDAMUS AND DECLARATORY JUDGMENT

17.    "St. Isidore of Seville Catholic Virtual School" is an illegally state-sponsored virtual charter school. It executed the contract for sponsorship with the Board on October 16, 2023 (the "Contract"). *See* Pet. App. Vol. I at 2–22. St. Isidore, in its eventually approved revised application for initial authorization as an Oklahoma virtual charter school, expressed its vision to "create, establish, and operate the [charter school] as a Catholic School." Pet. App. Vol. I at 92. Moreover, the intended charter school would "participate[] in the evangelizing mission of the Church . . . ." *Id.* The Contract specifies that it commences on July 1, 2024. *See* Pet. App. Vol. I at 4, § 3.2. Therefore, St. Isidore will begin receiving public money imminently if this Court does not assume original jurisdiction and compel the Board to follow its plain legal duty and rescind its illegal contract with St. Isidore.

18.    On June 5, 2023, after rejecting its first application, the Board approved by a 3–2 vote the St. Isidore of Seville Catholic Virtual School's revised application for initial authorization against the advice of the Oklahoma Attorney General. *See* Pet. App. Vol. II at 452. This action, however, did not complete the Board's sponsorship "application cycle" process set forth in OKLA. ADMIN. CODE 777: 10-3-3(a)(1–8). Specifically, Subsection 8 of that regulation requires the "[n]egotiation and execution of a contract for sponsorship." *Id.*

5

19.    On October 9, 2023, the Board by a 3–2 vote approved the St. Isidore of Seville Catholic Virtual Schools' contract for sponsorship. The votes in favor of the Contract are evidenced by the signatures of the sponsoring Board members on the signature page of the Contract. *See* Pet. App. Vol. I at 21. Pursuant to OKLA. STAT. tit. 70, § 3-135, the Contract fully incorporates the Application.

20.    The Contract was subsequently executed on October 16, 2023.

21.    The executed Contract did not take the form of the Board-approved "model contract," meaning the Board "negotiat[ed] [] contract terms or add[ed] [] terms to the contract for sponsorship." OKLA. ADMIN. CODE 777: 10-3-3(g). To do so, according to the Board's rules, the added terms must be "in compliance with applicable state, federal, local, and/or tribal law . . . ." *Id.* They are not.

22.    Oklahoma law requires the Board to "[e]stablish a procedure for accepting, approving and disapproving statewide virtual charter school applications . . . which minimally meet the procedures set forth in the Oklahoma Charter Schools Act . . . ." OKLA. STAT. tit. 70, § 3-145.3(A)(2). Relevant here, the Oklahoma Charter Schools Act prescribes that a "charter school shall be nonsectarian in its programs, admission policies, employment practices, and all other operations. A sponsor may not authorize a charter school or program that is affiliated with a nonpublic sectarian school or religious institution . . . ." *Id.* at § 3-136(A)(2). Thus, the Board's decision to sponsor St. Isidore, which will "participate[] in the evangelizing mission of the Church," violates state law.

23.    Concomitant Oklahoma Constitutional provisions further support the invalidity of the Board's action to sponsor St. Isidore. *See e.g.,* OKLA. CONST. art. I, § 5 ("a system of public schools . . . shall be open to all the children of the state and free from sectarian control . . . ."); *see also id.* at art. II, § 5 ("No public money . . . shall ever be appropriated . . . or used, directly or

6

indirectly, for the use, benefit, or support of any sect, church, denomination, or system of religion . . . or sectarian institution . . . .). Justices of this Court have noted that while the framers of Oklahoma's Constitution were men of faith, the structural organization of the preceding Sections was no coincidence in the framers' calculus of providing for a strong separation of church and state. *See Prescott*, 2015 OK 54, ¶¶ 4, 6, 373 P.3d 1032, 1037–38 (Taylor, J. concurring, with whom Gurich, J. joins).

24.    The framers' intent to maintain Oklahoma public schools that are nonsectarian was carried forward by the Oklahoma Legislature when it, in the Oklahoma Charter Schools Act, defined "charter school[s]" as "public school[s] . . . ." OKLA. STAT. tit. 70, § 3-132(D). This makes sense because the Oklahoma Charter Schools Act does not upend OKLA. CONST. art. I, § 5 and its mandate for a system of public schools free from sectarian control. The Act's purpose supplements the State's constitutional mandate. *See e.g.,* OKLA. STAT. tit. 70, § 3-131.

25.    The Board's failure to fulfill its plain legal duty to follow Oklahoma law by sponsoring a sectarian virtual charter school applicant cannot be permitted. Thus, a writ of mandamus compelling the Board to rescind its illegal contract for sponsorship of St. Isidore and declaratory relief establishing that such sponsorship was unlawful are necessary and within this Court's discretion.

## CONCLUSION

Petitioner respectfully requests this Court assume original jurisdiction of this matter and, for reasons more fully set forth in Petitioner's Brief in Support of Application to Assume Original Jurisdiction and Petition for Writ of Mandamus and Declaratory Judgment, filed contemporaneously herewith, issue a writ of mandamus to command the Board to fulfill its plain legal duties by cancelling the illegal contract for sponsorship of St. Isidore of Seville, and issue a declaratory judgment consistent therewith. In the alternative, Petitioner respectfully requests this

7

Court issue any other relief it deems appropriate in order to ensure that the Board's illegal contract with St. Isidore of Seville is rightfully cancelled.

Respectfully Submitted,

GENTNER DRUMMOND, OBA #16645
  *Attorney General*
GARRY M. GASKINS, II, OBA #20212
  *Solicitor General*
BRAD CLARK, OBA #22525
  *Deputy General Counsel*
KYLE PEPPLER, OBA #31681
WILLIAM FLANAGAN, OBA #35110
  *Assistant Solicitors General*
OFFICE OF ATTORNEY GENERAL
  STATE OF OKLAHOMA
313 N.E. 21st Street
Oklahoma City, OK 73105
Phone: (405) 521-3921
Garry.Gaskins@oag.ok.gov
*Counsel for Petitioner*

8

## CERTIFICATE OF SERVICE

I hereby certify that on this 20th day of October 2023 a true and correct copy of the foregoing instrument was mailed by depositing it in the U.S. Mail, postage prepaid to the following:

Robert Franklin
William Pearson
Nellie Tayloe Sanders
Brian Bobek
Scott Strawn
Oklahoma Statewide Virtual
Charter School Board
M.C. Connors Building
2501 N. Lincoln Blvd., Suite 301
Oklahoma City, OK 73105

GARRY M. GASKINS, II

**EXHIBIT 1-E**



ORIGINAL

# IN THE SUPREME COURT OF THE STATE OF OKLAHOMA

GENTNER DRUMMOND, Attorney General for the State of Oklahoma, ex rel. STATE OF OKLAHOMA,

    *Petitioner,*

v.

OKLAHOMA STATEWIDE CHARTER SCHOOL BOARD; BRIAN T. SHELLEM, ANGIE THOMAS, KATHLEEN WHITE, DAMON GARDENHIRE, BECKY GOOCH, JARED BUSWELL, BEN LEPAK, RYAN WALTERS, and DR. KITTY CAMPBELL, Members of the Oklahoma Statewide Charter School Board,

    *Respondents,*

ST. ISIDORE OF SEVILLE CATHOLIC VIRTUAL SCHOOL,

    *Intervenor.*

FILED
SUPREME COURT
STATE OF OKLAHOMA

JUL 30 2024

JOHN D. HADDEN
CLERK

Case No. 121,694

## PETITIONER'S NOTICE OF AUTOMATIC SUBSTITUTION OF PARTIES AND REQUEST FOR THIS COURT TO REQUIRE SUBSTITUTED PARTIES TO COMPLY WITH ITS WRIT OF MANDAMUS OR FACE A CONTEMPT CITATION

Petitioner, Gentner Drummond, Attorney General for the State of Oklahoma, on behalf of the interests of the State of Oklahoma, respectfully provides notice to this Court of automatic substitution of parties and additionally requests this Court to require compliance with its June 25, 2024, Order, which, by writ of mandamus, directed the Oklahoma Statewide Virtual Charter School Board to rescind the St. Isidore charter school contract. In support of this notice and request, the Petitioner shows as follows.

Received: _____
Docketed: 7·30·24
Marshal: _____ JM
COA/OKC: _____
COA/TUL: _____

## A. NOTICE OF AUTOMATIC SUBSTITUTION OF PARTIES

Pursuant to 12 O.S. §§ 2025(C)–(D), Petitioner provides notice to this Court of the automatic substitution of parties. "Effective July 1, 2024, the Statewide Virtual Charter School Board shall be abolished and the Statewide Charter School Board shall succeed to any contractual rights and responsibilities . . . incurred by the Statewide Virtual Charter School Board in a virtual charter school sponsorship contract executed prior to July 1, 2024." 70 O.S. § 3-132.1(I). When an interest is transferred, "the action may be continued by or against the original party." 12 O.S. § 2025(C). Moreover, "[w]hen a public officer is a party to an action in the official capacity of the public officer and" the officer "ceases to hold office, the action does not abate and the successor of the public officer is automatically substituted as a party." *Id.* at § 2025(D)(1).

The Oklahoma Legislature transferred an interest—the St. Isidore of Seville Catholic Charter School charter contract—from the abolished Oklahoma Statewide Virtual Charter School Board to the newly-formed Oklahoma Statewide Charter School Board. *See* 70 O.S. § 3-132.1(I). The contract at issue was executed on October 16, 2023, *see* Pet. App. Vol. I at 21, and was therefore "executed prior to July 1, 2024." *See* 70 O.S. § 3-132.1(I). The new Oklahoma Statewide Charter School Board is composed of nine members,[1] *id.* at § 3-132.1(A), taking the place of the members of the abolished Oklahoma Statewide Virtual Charter School Board. By operation of law, on July 1, 2024, the new Oklahoma Statewide Charter School Board and its nine members, in their official capacities, succeeded to the rights and responsibilities associated with the St. Isidore contract. Thus, this Court's    Order—including the issuance of a writ of mandamus and granting of declaratory judgment—issued June 25, 2024, "direct[s] the [newly created] Charter School Board to rescind the contract with St. Isidore," *Drummond ex. rel. State v. Okla. Statewide Virtual*

---

[1] The nine members are as follows: Brian T. Shellem, Angie Thomas, Kathleen White, Damon Gardenhire, Becky Gooch, Jared Buswell, Ben Lepak, Ryan Walters, and Dr. Kitty Campbell.

*Charter Sch. Bd.*, 2024 OK 53, ¶ 45, 2024 WL 3155937, *10, due to the automatic substitution of the parties.

Accordingly, the Oklahoma Statewide Charter School Board and its members are automatically substituted as parties to this action and the style of the case in this Notice and Request reflects that substitution. *See* 12 O.S. § 2025(D) ("Proceedings following the substitution shall be in the name of the substituted party . . . .").

## B. REQUEST FOR THIS COURT TO REQUIRE THE SUBSTITUTED PARTIES TO COMPLY WITH ITS ORDER ISSUING A WRIT OF MANDAMUS.

As of the filing of this Notice and Request, the Oklahoma Statewide Charter School Board and its members have not complied with this Court's Order issued and filed with the clerk on June 25, 2024. In this original jurisdiction proceeding, "the decision of this Court, unless it is stayed . . . shall become effective when its opinion or order is filed with the clerk." Okla.Sup.Ct.R. 1.193. This Court required "[a]ny petition for rehearing regarding this matter shall be filed within (10) days of the date of this opinion." *Drummond ex. rel. State*, 2024 OK 53, § 45. But orders issued in original jurisdiction matters are "*not* stayed during the time for filing and consideration of a petition for rehearing." *Chronic Pain Assocs., Inc. v. Bubenik*, 1994 OK 127, ¶ 31, 885 P.2d 1358, 1364. While a concurring Justice once noted that the "*immediate effect* of [an order in an original jurisdiction matter] *may be stayed*," *Morgan v. Daxon*, 2001 OK 104, ¶ 4, 49 P.3d 687, 687, (Opala, J., concurring), no such stay has been entered in this matter. Yet for nearly a month, the Oklahoma Statewide Charter School Board has ignored this Court's patently clear Order requiring rescission of the unlawful contract. Every day the Oklahoma Statewide Charter School Board refuses to comply with this Court's Order is another day that a state-established religious school persists. That is repugnant to Oklahoma and federal law and must be immediately remediated.

3

The Petitioner has informed the Oklahoma Statewide Charter School Board and its members of their obligation to follow this Court's June 25, 2024, Order.[2] Inexplicably, they failed to follow their oath of office by ignoring this Court's Order to rescind the unlawful contract. Consequently, Petitioner believes that he currently has grounds to seek a contempt citation. But in the spirit of comity, Petitioner requests that this Court provide the Oklahoma Statewide Charter School Board and its members one last opportunity to comply with this Court's Order. Moreover, Petitioner requests the Court make it clear that any further refusal to follow this Court's Order will be grounds for the issuance of a contempt citation. 21 O.S. §§ 565 and 567; *In re J.H.*, 2008 OK 104, ¶ 16, 213 P.3d 545, 549.

## CONCLUSION

Wherefore, upon notice of automatic substitution of parties, Petitioner respectfully requests this Court compel the Oklahoma Statewide Charter School Board, Brian T. Shellem, Angie Thomas, Kathleen White, Damon Gardenhire, Becky Gooch, Jared Buswell, Ben Lepak, Ryan Walters, and Dr. Kitty Campbell to comply with its June 25, 2024, Order, by writ of mandamus, requiring recission of the unlawful charter school contract with St. Isidore. Further, Petitioner requests that the Court make clear that further refusal to follow the June 25, 2024, Order will be grounds for the issuance of a contempt citation.

---

[2] *See* July 11, 2024, letter from Oklahoma Attorney General Gentner Drummond to Oklahoma Statewide Charter School Board, attached hereto as "Exhibit A."

4

Respectfully Submitted,

GENTNER DRUMMOND, OBA #16645
 *Attorney General*
GARRY M. GASKINS, II, OBA #20212
 *Solicitor General*
BRAD CLARK, OBA #22525
 *Deputy General Counsel*
KYLE PEPPLER, OBA #31681
WILLIAM FLANAGAN, OBA #35110
 *Assistant Solicitors General*
OFFICE OF THE ATTORNEY GENERAL
STATE OF OKLAHOMA
313 N.E. 21st Street
Oklahoma City, OK 73105
Phone: (405) 521-3921
garry.gaskins@oag.ok.gov
*Counsel for Petitioner*

5

## CERTIFICATE OF SERVICE

I hereby certify that on this 30th day of July 2024 a true and correct copy of the foregoing instrument was mailed by depositing it in the U.S. Mail, postage prepaid to the following:

Brian T. Shellem
Angie Thomas
Kathleen White
Damon Gardenhire
Becky Gooch
Jared Buswell
Ben Lepak
Ryan Walters
Dr. Kitty Campbell
Oklahoma Statewide
Charter School Board
M.C. Connors Building
2501 N. Lincoln Blvd., Suite 301
Oklahoma City, OK 73105
*Respondents*

Cheryl Plaxico
Plaxico Law Firm, PLLC
923 N. Robinson Ave., 5th Floor
Oklahoma City, OK 73102
*Counsel for Respondents*

Philip A. Sechler
Alliance Defending Freedom
44180 Riverside Pkwy.
Lansdowne, VA 20176
*Counsel for Respondents*

Michael H. McGinley
Steven A. Engel
M. Scott Proctor
Dechert LLP
1900 K Street, NW
Washington, DC 20006
*Counsel for Intervenor*

John A. Meiser
Notre Dame Law School
Religious Liberty Clinic
1338 Biolchini Hall of Law
Notre Dame, IN 46556
*Counsel for Intervenor*

Michael R. Perri
Socorro Adams Dooley
Perri Dunn, PLLC
100 N. Broadway, Suite 3280
Oklahoma City, OK 73102
*Counsel for Intervenor*

Mark A. Lippelmann
Alliance Defending Freedom
15100 N 90th Street
Scottsdale, AZ 85260
*Counsel for Respondents*

J. Caleb Dalton
Alliance Defending Freedom
44180 Riverside PKWY
Lansdowne, VA 20176
*Counsel for Respondents*

6

GARRY M. GASKINS, II

7

A

# Exhibit A



## GENTNER DRUMMOND
## ATTORNEY GENERAL

July 11, 2024

*Via Interagency Mail and Email*

Statewide Charter School Board
M.C. Connors Building
2501 N. Lincoln Blvd., Ste. 301
Oklahoma City, OK 73105
rebecca.wilkinson@scsb.ok.gov

Director Wilkinson and Board Members,

Effective immediately, my office will serve as counsel to the Statewide Charter School Board ("SCSB" or "Board") consistent with title 74, section 20i.

Title 74, section 20i requires the Attorney General to serve as counsel to all state agencies, boards, and commissions unless the agency possesses legal authority to employ an attorney or, if the Attorney General is unable to represent the agency, board, or commission, contract with a private attorney.

At the Board's inaugural meeting, my office observed that counsel for the Board's predecessor, the Statewide Virtual Charter School Board ("SVCSB"), attended, provided counsel, and joined board members in executive session. Despite informing you, Dr. Wilkinson, on June 28, 2024, that Mr. Carsey's representation of the Board was denied, Mr. Carsey was invited to serve as counsel *without* the Board's approval. Giving you the benefit of the doubt, my office will not oppose the SCSB paying for Mr. Carsey's legal services regarding the Monday, July 8, 2024, meeting.

Of greater importance, you must know and accept that no state agency, board, or commission may willfully ignore an order from Oklahoma's highest court. Under Mr. Carsey's counsel, the SCSB and SVCSB have *twice* failed to rescind the contract as *unequivocally* ordered by the Oklahoma Supreme Court. In the first instance, it appeared as though Mr. Carsey did not understand the SVCSB needed three (3) votes to rescind the contract. *See* 70 O.S.2021, § 3-145.2(B) (repealed as of Jul. 1, 2024). Two of three board members voted to rescind the contract, while another abstained. In the second instance, Mr. Carsey again failed to counsel the SCSB about its obligations under the Supreme Court's *writ of mandamus. Drummond v. Okla. Statewide Virtual Charter Sch. Bd., et al.,* 2024 OK 53, ¶ 45. Title 70, section 3-102.1(I)(1) of the Oklahoma Statutes transferred the SVCSB's obligations to the SCSB. Rather than abiding by the Supreme Court's order, the Board has disregarded its duties by deferring to the Intervenor's litigation whims. Accordingly, and immediately, the SCSB must obey the Court's *writ of mandamus* and

recycled paper

rescind the St. Isidore contract by (1) calling a special meeting or (2) moving the next regularly scheduled board meeting to no later than the last day of this month as permitted by section 311(A)(8) of the Open Meeting Act.

My office and I are ready and able to represent the Board, and we will do so. Coordinate with my General Counsel, Rob Johnson, to negotiate and finalize a legal services contract between my office and the Board. Mr. Johnson can be contacted by email at rob.johnson@oag.ok.gov or by phone at (405) 521-3921.

GENTNER DRUMMOND
*Oklahoma Attorney General*

cc:    Daniel V. Carsey
       Hall Estill
       dcarsey@hallestill.com

       Deputy Attorney General Niki Batt
       niki.batt@oag.ok.gov

2

**EXHIBIT 1-F**



\* 1 0 6 5 1 7 1 4 5 1 \*

IN THE DISTRICT COURT OF OKLAHOMA COUNTY
STATE OF OKLAHOMA

FILED IN DISTRICT COURT
OKLAHOMA COUNTY

APR - 2 2026

RICK WARREN
COURT CLERK

114 _____

| | |
|---|---|
| GENTNER DRUMMOND, in his official capacity as ATTORNEY GENERAL OF THE STATE OF OKLAHOMA,<br><br>*Petitioner,*<br><br>v.<br><br>OKLAHOMA STATEWIDE CHARTER SCHOOL BOARD, et al.,<br><br>*Respondents.* | Case No. CV-2026-649 |

## BRIEF IN OPPOSITION TO PETITION FOR WRIT OF MANDAMUS

# INDEX

**FACTUAL BACKGROUND** ..................................................................................................... 1

*Drummond v. Okla. Statewide Virtual Charter Sch.*,
    2024 OK 53, 558 P.3d 1 ............................................................................................ 2

*Okla. Statewide Charter Sch. Bd. v. Drummond*,
    605 U.S. 165 (2025) .................................................................................................. 2

70 O.S. § 3-130 *et seq.* ........................................................................................................ 2

70 O.S. § 3-132.1 ................................................................................................................. 2

70 O.S. § 3-132.2 ................................................................................................................. 2

70 O.S. § 3-134 .................................................................................................................... 3

70 O.S. § 3-136 ................................................................................................................. 2, 4

OAC § 777:10-3-3 ................................................................................................................ 3

2022 OK AG 7 ...................................................................................................................... 2

Brief of Amici Curiae Former Oklahoma Attorneys General John M. O'Connor &
Scott E. Pruitt in Support of Petitioners, Oklahoma Statewide Charter School Board
v. Drummond, 605 U.S. 165 (2025) (Nos. 24-394, 24-396), 2025 WL 836651 ..................... 2

Oklahoma Statewide Charter School Board, OKSCB Meeting 03/09/2026
(YouTube, Mar. 9, 2026) ................................................................................................... 3, 4

**ARGUMENT AND AUTHORITIES** .......................................................................................... 4

*Bd. of Cnty. Comm'rs of Muskogee Cnty. v. City of Muskogee*,
    1991 OK 115, 820 P.2d 797 ..................................................................................... 5

*Chandler (U.S.A.), Inc. v. Tyree*,
    2004 OK 16, 87 P.3d 598 ......................................................................................... 5

*Ryburn v. Bd. of Pharm. of State*,
    1960 OK 161, 354 P.2d 423 ..................................................................................... 4

*State v. Okla. Pub. Welfare Comm'n*,
    1946 OK 95, 167 P.2d 71 ......................................................................................... 4

12 O.S. § 1451 ................................................................................................................... 4, 5

I.  PETITIONER DOES NOT POSSESS A CLEAR LEGAL RIGHT TO THE RELIEF SOUGHT. ......... 5

*Collett v. Allison,*
    1890 OK 3, 1 Okla. 42, 25 P. 515 .......................................................................... 5, 6

*Hawkins v. Potter,*
    1972 OK 139, 503 P.2d 192 .................................................................................. 5, 6

12 O.S. § 1455 ...................................................................................................... 5

12 O.S. § 2011 ...................................................................................................... 5

70 O.S. § 3-134 .................................................................................................. 6, 7

74 O.S. § 18b ........................................................................................................ 6

II.  THE BOARD COMPLIED WITH ITS LEGAL DUTIES UNDER §§ 3-134(E)(3)
    AND 3-134(I)(4). ................................................................................................ 7

*Drummond v. Okla. Statewide Virtual Charter Sch.,*
    2024 OK 53, 558 P.3d 1 ........................................................................................ 7

70 O.S. § 3-134 ...................................................................................................... 7

Oklahoma Statewide Charter School Board, OKSCB Meeting 03/09/2026
(YouTube, Mar. 9, 2026) ...................................................................................... 7, 8

    A.  Differences in enrollment numbers did not make Ben Gamla's
        revised application weak or inadequate. ...................................................... 8

70 O.S. § 3-134 ...................................................................................................... 9

70 O.S. § 18-200.1 .................................................................................................. 9

OAC § 777:10-3-3 ............................................................................................... 8, 9

2023 O.S.L. 323 ................................................................................................... 10

    B.  Ben Gamla's governing board composition was legally compliant. .................... 11

*Mahmoud v. Taylor,*
    606 U.S. 522 (2025) ........................................................................................... 12

*Okla. Annual Conf. of the United Methodist Church, Inc. v. Timmons,*
   2023 OK 101, 538 P.3d 163 .................................................................................. 11, 12

12 O.S. § 2610 .................................................................................................................... 13

OAC § 777:10-1-3 ......................................................................................................... 12, 13

OAC § 777:10-3-3 ................................................................................................................ 13

**C.  Deciding which grounds warrant denial of an application is an act
of Board discretion.** ................................................................................................. 13

*Champlin v. Carter,*
   1920 OK 231, 78 Okla. 300, 190 P. 679 ..................................................................... 15

*Chandler (U.S.A.), Inc. v. Tyree,*
   2004 OK 16, 87 P.3d 598 ............................................................................................ 13

70 O.S. § 3-134 .............................................................................................................. 13, 14

OAC § 777:10-3-3 ................................................................................................................ 14

**III. EVEN IF THE ENROLLMENT DISCREPANCY OR GOVERNING BOARD COMPOSITION
COULD PLAUSIBLY BE CONSIDERED REASONS FOR DENIAL, THE PLAIN TEXT OF
70 O.S. § 3-134 DOES NOT IMPOSE A DUTY ON THE BOARD TO LIST EVERY REASON
FOR DENIAL.** ........................................................................................................... 16

*Champlin v. Carter,*
   1920 OK 231, 78 Okla. 300, 190 P. 679 ..................................................................... 18

*Frank Bartel Trans., Inc. v. State,*
   2023 OK 121, 540 P.3d 480 .................................................................................... 17, 18

*Head v. McCraken,*
   2004 OK 84, 102 P.3d 670 .......................................................................................... 17

*Hilfiger v. Hilfiger,*
   2023 OK CIV APP 15, 530 P.3d 879 .......................................................................... 17

*St. Anthony S. Behav. Health v. Goodwin,*
   2026 OK 3, 584 P.3d 184 ............................................................................................ 17

70 O.S. § 3-134 .............................................................................................................. 16, 18

OAC § 777:10-1-3 ................................................................................................................ 17

iii

OAC § 777:10-3-3 .............................................................................................................. 17

**IV. BECAUSE THE BOARD COMPLIED WITH ALL OF ITS LEGAL DUTIES,**
**NO LEGAL REMEDY IS NEEDED.** .................................................................................. 18

*Champlin v. Carter,*
1920 OK 231, 78 Okla. 300, 190 P. 679 ................................................................. 18

*Drummond v. Okla. Statewide Virtual Charter Sch.,*
2024 OK 53, 558 P.3d 1 ........................................................................................... 18

12 O.S. § 1452 .................................................................................................................... 18

**V. EVEN IF THE COURT DETERMINES THAT PETITIONER CARRIED HIS BURDEN**
**TO PROVE MANDAMUS IS PROPER, IT SHOULD DECLINE TO ISSUE THE WRIT.** ................. 19

*Fent v. Okla. Capitol Improvement Auth.,*
1999 OK 64, 984 P.2d 200 ....................................................................................... 19

*Miller Dollarhide, P.C. v. Tal,*
2006 OK 27, 174 P.3d 559 ....................................................................................... 19

*State v. Okla. Pub. Welfare Comm'n,*
1946 OK 95, 167 P.2d 71 ......................................................................................... 19

70 O.S. § 3-132.1 ............................................................................................................... 19

Complaint, The National Ben Gamla Charter Sch. Found., Inc. v. Drummond,
No. 5:26-CV-582 (W.D. Okla. Mar. 24, 2026). ...................................................... 19

CONCLUSION ...................................................................................................................... 20

12 O.S. § 1457 .................................................................................................................... 20

CERTIFICATE OF MAILING .................................................................................................. 22

iv

Three years ago, Oklahoma Attorney General Gentner Drummond sought a writ of mandamus against the Oklahoma Statewide Virtual Charter School Board for *approving* the application of a proposed religious charter school. The Oklahoma Supreme Court held that charter schools in Oklahoma cannot be religious and issued the writ. General Drummond now returns—as Petitioner in this action—seeking a writ against the Oklahoma Statewide Charter School Board for *denying* the application of a proposed religious charter school. But the Board did exactly what Oklahoma statutes and common law require. Petitioner's disagreement with how the Board, in its discretion, denied that application is not something this Court can remedy.

Mandamus is an extraordinary remedy that requires a petitioner to follow a strict set of statutory rules and common law elements. Petitioner failed to do so. Instead of pleading actionable facts and arguing authoritative law, the Petition relies on irrelevant accusations about Board Members' motives, inappropriate assumptions about a private individual's religious beliefs, and improper additions to a statute's text. The Court should decline to issue a writ of mandamus.

## FACTUAL BACKGROUND

The Oklahoma Statewide Charter School Board exists to "support and expand education choice for Oklahoma families by authorizing and overseeing high-quality charter schools and implementing supplementary learning opportunities, ensuring access to innovative educational environments that promote academic excellence and that prepare students for successful lives." Decl. of Brian Thomas Shellem (Shellem Decl.) at ¶ 6. As a statutorily-created state board, its nine Board Members supervise the operation of virtual and brick-and-mortar charter schools across the state; ensure charter school compliance with state law; and maintain the procedure for accepting, approving, and disapproving proposed charter school

1

applications; among other duties. *See* 70 O.S. §§ 3-132.1–132.2.  Board Members hire an Executive Director and other staff (Board Staff) to serve at the Board's direction.  70 O.S. § 3-132.2.

The Oklahoma Charter School Act governs the establishment and operation of charter schools. *See* 70 O.S. § 3-130 *et seq.*  Section 3-136(A)(2) requires that a "charter school shall be nonsectarian . . . [and a] sponsor may not authorize a charter school . . . that is affiliated with a nonpublic sectarian school or religious institution."  Former Oklahoma Attorney General John O'Connor concluded in an opinion that this religious prohibition likely violated the First Amendment of the United States Constitution.  *See* Brief of Amici Curiae Former Oklahoma Attorneys General John M. O'Connor & Scott E. Pruitt in Support of Petitioners at 1, Oklahoma Statewide Charter Sch. Bd. v. Drummond, 605 U.S. 165 (2025) (Nos. 24-394, 24-396), 2025 WL 836651, at *1.  General Drummond withdrew this opinion. *See* 2022 OK AG 7.

In 2023, the Board approved St. Isidore of Seville Virtual Catholic School's application for authorization of a charter school and entered a contract for sponsorship.  *Drummond v. Okla. Statewide Virtual Charter Sch.*, 2024 OK 53, ¶ 5, 558 P.3d 1, 6–7.  General Drummond sought a writ of mandamus at the Oklahoma Supreme Court directing the Board to rescind the contract for violating 70 O.S. § 3-136(A)(2).  *Id.* at ¶ 1, 558 P.3d at 6.  The Oklahoma Supreme Court issued the writ and held that because a charter school must be nonsectarian, the St. Isidore contract violated the law.  *Id.* at ¶ 45, 558 P.3d at 15.  That decision remains binding on the Board.  *Okla. Statewide Charter Sch. Bd. v. Drummond*, 605 U.S. 165 (2025) (affirming the Oklahoma Supreme Court decision by an equally divided Court).

In November 2025, The National Ben Gamla Jewish Charter School Foundation submitted a letter of intent to apply for authorization of Ben Gamla Jewish Charter School. Decl. of Rebecca Lee Wilkinson, Ed. D. (Wilkinson Decl.), Ex. A. The letter anticipated that Ben Gamla would serve forty students across grades 9–12. Wilkinson Decl., Ex. A.

Ben Gamla followed its letter of intent with an application in December 2025. *See* Wilkinson Decl. at ¶ 30. The lengthy application indicated that Ben Gamla would target enrollment across grades K–12. Pet. Ex. 1. And the charter school governing board member statements of assurance required by OAC § 777:10-3-3(b)(8)(L) were modified and qualified to include specific mention of religious protections under state and Federal law. *See, e.g.*, Wilkinson Decl., Ex. C. At the February 2026 meeting, the Board voted 8-0 to reject Ben Gamla's initial application. Pet. Ex. 1. Board Staff promptly sent a rejection letter to Ben Gamla, providing ten reasons for rejection. Pet. Ex. 1. Three reasons are relevant to this litigation: (7) the qualifying language in the governing board members' statements of assurance, (9) the differences in grades served and projected enrollment between the letter of intent and application, and (10) Ben Gamla's religious character. Pet. Ex. 1.

Pursuant to 70 O.S. 3-134(E)(3), Ben Gamla submitted a revised application. *See* Wilkinson Decl., Ex. B. At the March 2026 meeting, Board Staff presented Ben Gamla's revised application and stated that it remedied nine of the ten reasons for rejection—all but the religious tenets. Oklahoma Statewide Charter School Board, *OKSCSB Meeting 03/09/2026*, at 1:10:08–11:25 (YouTube, Mar. 9, 2026), https://www.youtube.com/live/6hd17f_Kolw; *see also* Wilkinson Decl. at ¶ 33. The revised application explained the projected enrollment increase and grades served expansion, and it contained new statements of assurance from the governing board members, free of any qualifications. Wilkinson Decl., Ex. B.

3

During discussion on the revised application, the Board's counsel—an attorney assigned to the Board from the Office of the Oklahoma Attorney General—voiced concern about the projected enrollment. *OKSCSB Meeting 03/09/2026,* at 1:11:55–12:25, 1:12:28–12:55; Shellem Decl. at ¶ 20; Wilkinson Decl. at ¶ 36. Chairman Shellem disagreed. *OKSCSB Meeting 03/09/2026* at 1:12:55–13:15. Board Member Pearson then moved to deny the revised application "for the reasons stated on the record by Board Staff and counsel." *Id.* at 1:15:50–16:06. Member Gardenhire seconded. *Id.* at 1:16:06. Chairman Shellem clarified that he would not support the motion, because it included reasons raised by counsel, namely, the projected enrollment—a reason he did not believe warranted denial. *Id.* at 1:16:20–17:07. Member Gardenhire withdrew his second, *id.* at 1:16:37 & 1:16:42, and Member Pearson amended his motion for rejection to only Ben Gamla's religious character, *id.* at 1:18:11–41. The motion passed unanimously, and Board Staff promptly sent a rejection letter to Ben Gamla citing 70 O.S. § 3-136(A)(2) and the *Drummond* decision as the reason for rejection. Pet. Ex. 2.

Attorney General Drummond again seeks a writ of mandamus—this time against the Board for *complying* with 70 O.S. § 3-136(A)—directing the Board to rewrite its rejection letter to include alleged additional reasons for rejection of Ben Gamla's revised application.

## ARGUMENT AND AUTHORITIES

Mandamus is an extraordinary form of legal relief. *See State v. Okla. Pub. Welfare Comm'n,* 1946 OK 95, ¶ 3, 167 P.2d 71, 72. It is not a writ of right—but a function of the court's discretion—and "will not be granted if the relief sought is not clear and free from doubt." *Ryburn v. Bd. of Pharm. of State,* 1960 OK 161, ¶ 4, 354 P.2d 423, 424. It "may be issued by . . . the district court . . . to any . . . board or person[] to compel the performance of

4

any act which the law specially enjoins as a duty, resulting from an office." 12 O.S. § 1451. "Before a writ may issue there must be found (1) a clear legal right in the petitioner, (2) the respondent's refusal to perform a plain non-discretionary legal duty and the (3) writ's appropriateness as a legal remedy and the inadequacy of other relief." *Bd of Cnty. Comm'rs of Muskogee Cnty. v. City of Muskogee*, 1991 OK 115, ¶ 9, 820 P.2d 797, 803. The party seeking mandamus has the burden of proving the elements of mandamus. *Chandler (U.S.A), Inc. v. Tyree*, 2004 OK 16, ¶ 25, 87 P.3d 598, 605. Petitioner fails to meet this heavy burden. No writ should issue.

## I.    PETITIONER DOES NOT POSSESS A CLEAR LEGAL RIGHT TO THE RELIEF SOUGHT.

Petitioner has the burden of "proving the clear legal right in himself," *id.*, but the Petition fails to do so.

First, the Petition lacks any form of affidavit. The Oklahoma statute governing mandamus procedure states that "[t]he motion for the writ *must* be made upon affidavit." 12 O.S. § 1455 (emphasis added). *Compare id., with* 12 O.S. § 2011(A) (*"Except when otherwise specifically provided by rule or statute*, pleadings need not be verified or accompanied by affidavit." (emphasis added)). Absent from the Petition is any verification made under oath. In *Hawkins v. Potter*, the Oklahoma Supreme Court found it "unnecessary" to consider the merits of a petition for writ of mandamus, because the petitioner's "pleading [was] not verified, nor [was] there attached thereto, an affidavit." 1972 OK 139, ¶¶ 7–9, 503 P.2d 192, 194. This requirement is longstanding. The Oklahoma Supreme Court—sitting pre-statehood and applying a Nebraska law that "require[d] that the motion for a writ must be based upon an affidavit"—denied a petition for an alternative writ of mandamus for lacking an affidavit of the petitioner's personal knowledge. *Collett v. Allison*, 1890 OK 3, ¶¶ 6, 8, 1 Okla. 42, 25 P.

5

515. The petition was "verified by the plaintiff's attorney," but the Court found that insufficient to "be treated as an affidavit." *Id.* at ¶¶ 3, 6, 1 Okla. 42, 25 P. 515.

Here the Attorney General signed the Petition as an Oklahoma Bar Association licensed lawyer, but it lacks any affidavit attesting to Petitioner's personal knowledge and truth of the alleged facts. So it is "unnecessary" for this court to proceed any further—Petitioner cannot assert a clear legal right to relief sought when there is a "defect in the petition." *Hawkins*, 1972 OK 139, ¶¶ 7–9, 12, 503 P.2d at 194.

Second, Petitioner lacks authority to request this relief. The Petition refers vaguely to the Attorney General's statutory authority under 74 O.S. § 18b and his "common-law authority" without citation. Pet. ¶¶ 1, 30. These vague assertions of authority do not carry Petitioner's burden to prove a "clear legal right" to this extraordinary relief.

Under 74 O.S. § 18b(A)(17), the Attorney General is permitted to "institute civil actions against members of any state board . . . for failure of such members to perform their duties as prescribed" by the Oklahoma Constitution and statutes. In this action, Petitioner alleges that the Board violated 70 O.S. §§ 3-134(E)(3) and 3-134(I)(4). Pet. ¶¶ 20–22. But as discussed below, the Board complied with all its statutory duties. So § 18b(A)(17) provides Petitioner with no authority to bring this lawsuit.

Under the common-law, Petitioner cites no case law giving him authority to seek this writ. His only citation is to *Drummond v. Oklahoma Statewide Virtual Charter School Board*, 2004 OK 53, 558 P.3d 1. Pet. ¶ 31. *Drummond* is unhelpful here. *Drummond* only requires the Board to deny an application for a religious charter school—a ruling with which it dutifully complied. *See* Pet. Ex. 2.

6

Petitioner alleges that 70 O.S. §§ 3-134(E)(3) and 3-134(I)(4) require the Board to "identify[] and incorporat[e] into the record all valid, independent, non-constitutional grounds for rejection" of Ben Gamla's application. Pet. 1. Not so. The Board complied with all of its legal duties.

## II.  THE BOARD COMPLIED WITH ITS LEGAL DUTIES UNDER §§ 3-134(E)(3) AND 3-134(I)(4).

The Oklahoma Charter Schools Act requires the Board—acting as a proposed sponsor—to "[d]ecline to approve weak or inadequate charter applications." 70 O.S. § 3-134(I)(4). And when an application is rejected, the Board must "notify the applicant in writing of the reasons for the rejection." 70 O.S. § 3-134(E)(3). The Board complied with both duties.

As stated in the Board's second rejection letter to Ben Gamla, the Board rejected the revised application exclusively because of Ben Gamla's religious character. *See* Pet. Ex. 2. It was clear to the Board and Board Staff that Ben Gamla's revised application had one inadequacy worthy of rejection: its religious character violated 70 O.S. § 3-136(A)(2) and the Oklahoma Supreme Court's decision in *Drummond*, 2024 OK 53, 558 P.3d 1. Shellem Decl. at ¶ 15; Wilkinson Decl. at ¶ 32.

Chairman Shellem's efforts to clarify the record make this fact evident. Shellem Decl. at ¶ 16. At the Board meeting he stated that: "I personally don't think [the] reasons that our counsel stated for the number--the number of students from their LOI versus what they potentially would enroll would be enough for us to reject that application. I think there's enough to simply on the religious teaching aspect of it." *OKSCSB Meeting 03/09/2026*, at 1:16:51–1:17:07. And he declined to support a motion that incorporated other grounds as additional reasons for the rejection. *Id.* at 1:16:20–25 (referencing the original motion to deny Ben Gamla's revised application "for the reasons stated on the record by Board Staff and

7

counsel" and stating "I'm gonna tell you why I'm gonna vote no on the motion"). Chairman Shellem did not require that Member Gardenhire withdraw his second, nor did he require that Member Pearson amend his motion. *Id.* at 1:17:07–19 (stating "I [want to] make sure we get our motions right for the record, so if somebody would like to or if you would like to amend the motion, I don't know if you want to or not" and "If you want to [amend the motion], you can."). Had Members Gardenhire, Pearson, or any other member believed that the revised application should be rejected for reasons other than the proposed charter school's religious character, they remained free to pursue the motion as originally made. Shellem Decl. at ¶ 17. They did not. Shellem Decl. at ¶ 17. The amended motion therefore reflects what a quorum of Board Members view as the reason Ben Gamla's revised application was inadequate— religion. *OKSCSB Meeting 03/09/2026,* at 1:18:11–41 ("I move to deny . . . for the reasons stated on the record by the Board Staff, the mandamus order from the courts, and the secular clause that is contained within title 70 of state law for schools.").

### A.    Differences in enrollment numbers did not make Ben Gamla's revised application weak or inadequate.

Petitioner argues that differences in projected enrollment and grades served between Ben Gamla's letter of intent and application "constituted a material deficiency" such that the revised application must be denied on this ground.

First, the letter of intent is only that—a preliminary step to establish communications between the Board and the applicant in anticipation of applying for authorization of a charter school within the statutorily defined timeline. *See* OAC § 777:10-3-3(a)(3); Wilkinson Decl. at ¶ 12. It serves as a trigger for Board Staff to provide "guidance for application submission." OAC § 777:10-3-3(a)(3); *see also* Wilkinson Decl. at ¶ 13. There are no substantive requirements for a letter of intent. Wilkinson Decl. at ¶ 14; *see generally* OAC § 777:10-3-3.

8

Rather, the application is the document upon which the Board bases its decision, and it must include specific, delineated information—including "grade level(s) to be served" and "[p]roposed minimum and maximum enrollment." OAC § 777:10-3-3(b)(2); *see also* Shellem Decl. at ¶ 9; Wilkinson Decl. at ¶¶ 16–17.

Second, Ben Gamla's application projected a target enrollment of 400 students and service of grades K–12. Pet. Ex. 1. The revised application reaffirmed its commitment to K–12 schools. Wilkinson Decl., Ex. B. Just as the process of filing a letter of intent before applying contemplates, changes may occur as potential charter school's applications develop. Wilkinson Decl. at ¶ 15. Such is the case here. The revised application explains that amidst internal discussions after submitting its letter of intent, but before submitting its application, Ben Gamla "resolved that providing a fuller offering for grades K-12 represents a more robust and meaningful education program." Wilkinson Decl., Ex. B. And "offering a fuller educational system that exposes students to rigor and academic standards of excellence in the earlier years better prepares them for performance in grades 9-12." Wilkinson Decl., Ex. B. Petitioner offers no argument as to why this explanation makes Ben Gamla's revised application weak or inadequate.

The Petition correctly points out that an applicant must demonstrate financial viability, Pet. ¶ 24, done by submitting a "financial plan for . . . the operation of the charter school," 70 O.S. § 3-134(B)(3). But it makes no argument that the financial plan in Ben Gamla's revised application is unsupportive of its projected enrollment numbers. Because it cannot. *See* Wilkinson Decl. at ¶¶ 18, 34. And the Petition ignores that State Aid is per pupil, directly tied to student enrollment. *See* 70 O.S. § 18-200.1; Wilkinson Decl. at ¶ 20. Instead, the Petition relies on unsupported assumptions about a religious community in Oklahoma and the

9

educational intentions of its members. Pet. ¶ 24. But community support is irrelevant, since it is no longer an application requirement. *See* 2023 O.S.L. 323 (amending 70 O.S § 3-134 to remove community support as an application requirement).

Third, Petitioner asserts that Chairman Shellem's statement that enrollment numbers were not a reason for denial of Ben Gamla's revised application was both "legally incorrect and contrary to the Board's own prior actions." Pet. ¶ 25. Not so. There is no legal requirement that an application be denied for differences between the letter of intent and application. And the factual record offers no indication that Ben Gamla's explanation in its revised application did not adequately remedy the Board's concerns identified in the initial rejection letter.

Petitioner's argument ignores a reality familiar to the Board—charter school enrollment numbers are historically volatile and hard to predict. Shellem Decl. at ¶ 10; *see also* Wilkinson Decl. at ¶ 22. Recently, the Board approved Tempo Montessori's application for a brick-and-mortar charter school. Wilkinson Decl. at ¶ 21. Tempo's letter of intent did not include an enrollment number, but its application projected an enrollment of 150 students in its first year. Wilkinson Decl. at ¶ 21. Another recent applicant, Southwest Academy Charter School, projected an enrollment of 160 students across four grades in its application, but nothing in the application indicated a guarantee it would meet this goal. Wilkinson Decl. at ¶ 21. Nevertheless, the Board approved Southwest Academy's application. Wilkinson Decl. at ¶ 21. ThrivePoint Academy, a recent virtual charter school applicant, projected a minimum enrollment of 400 and maximum enrollment of 500 for its first year. Wilkinson Decl. at ¶ 21. During its capacity interview, ThrivePoint was questioned about whether the school would still open should first-year enrollment be low. Wilkinson Decl. at ¶ 21. The school committed to

10

opening regardless of first-year enrollment, and the application was approved. Wilkinson Decl. at ¶ 21. Petitioner did not object to any of these approvals. Wilkinson Decl. at ¶ 25.

In fact, actual enrollment is often significantly lower than projected enrollment for many charter schools. Wilkinson Decl. at ¶ 19, 22. Virtual Preparatory Academy of Oklahoma—which projected 500 students and enrolled 140—or Dove Virtual Academy— which projected 420–480 students and enrolled only 89—both experienced significant enrollment volatility during their first year and beyond. Wilkinson Decl. at ¶ 22.

And enrollment numbers are not the only turbulent factor for a new charter school— grades served change, too. Wilkinson Decl. at ¶ 23. Dove Virtual Academy was initially approved to serve only grades six and seven in its first year; after approval, it requested and was granted permission to serve an additional grade in year two. Wilkinson Decl. at ¶ 23. Petitioner did not object. Wilkinson Decl. at ¶ 25.

Petitioner bears the burden to prove other instances where a charter school application was denied because the applicant's letter of intent had a different projected enrollment than the submitted application or other instances where Petitioner challenged the Board's approval of a charter school application in spite of such differences. He has not met that burden.

### B.    Ben Gamla's governing board composition was legally compliant.

Petitioner also claims that Mr. Brett Anthony Farley's membership on the Ben Gamla governing board is an independent reason for denial. Pet. ¶¶ 26–27. But his arguments rest entirely on inappropriate assumptions about a religious individual and the educational choices he makes for his family. This Court should decline Petitioner's invitation to inquire into the sincerely held religious beliefs of a private citizen. *See Okla. Annual Conf. of the United Methodist Church, Inc. v. Timmons*, 2023 OK 101, ¶ 9, 538 P.3d 163, 167 (stating that courts

11

"have no subject matter jurisdiction over matters of theological controversy" (quotation omitted)).

Petitioner first asserts that because Mr. Farley works for a Catholic organization, he is unable to serve as the required parent member of Ben Gamla's governing board. Pet. ¶ 26. It is true that OAC § 777:10-1-3(c) requires one member of a charter school's governing board to be a "parent, grandparent, or guardian of currently or previously enrolled student(s)." Ben Gamla's revised application lists Mr. Farley as the required parent board member. Wilkinson Decl., Ex. B.

But the Petition is devoid of any real evidence that Mr. Farley will not or cannot serve as the parent board member—other than the fact that Mr. Farley is the Executive Director of the Catholic Conference of Oklahoma. Pet. ¶ 26. Petitioner asks the Court to analyze Mr. Farley's intentions for his daughter's education and religious upbringing, which is one of the most sacred—and constitutionally protected—acts of parenthood. *See Mahmoud v. Taylor*, 606 U.S. 522, 547 (2025) ("And for many people of faith across the country, there are few religious acts more important than the religious education of their children" which "receives a generous measure of protection from our Constitution.").

Setting Mr. Farley's religious beliefs and intentions for his children's education aside, when considering applications, the Board typically presumes that a proposed charter school will eventually designate a parent or grandparent member on its governing board. Shellem Decl. at ¶ 11; *see also* Wilkinson Decl. at ¶ 26. This makes logical sense. Delineating a parent "of currently or previously enrolled student(s)" to serve as a governing board member is impossible because a child cannot be enrolled in a nonexistent school. OAC § 777:10-1-3(c)(3); *see also* Wilkinson Decl. at ¶ 27. That is why this requirement is historically discussed

12

during an applicant's capacity interview, when Board Staff make the applicant aware that, as the school formalizes, a parent must serve on the governing board.  Wilkinson Decl. at ¶ 28. And that is why the Board regularly offers grace as to this requirement at the application approval stage, often approving applications for proposed charter schools lacking a designated parent governing board member.  Shellem Decl. at ¶ 12.  In those instances, Petitioner did not object.  Shellem Decl. at ¶ 13.

Petitioner also argues Mr. Farley's statement of assurance in the revised application is an independent reason for denial of Ben Gamla's revised application—despite matching the required language in OAC § 777:10-3-3(b)(8)(L).  Pet. ¶ 27.  In its initial rejection letter, the Board cited qualifying language in Mr. Farley's and other governing board members' statements of assurance.  Pet. Ex. 1.  In Ben Gamla's revised application, Mr. Farley and other board members submitted statements of assurance free from such qualifications.  Wilkinson Decl., Ex. B.  But Mr. Farley's compliance with the required regulation is not enough for Petitioner—whose doubts again rest on unfounded assumptions about Mr. Farley because of his position with the Catholic Conference of Oklahoma.  Pet. ¶ 27.  The Court should not accept Petitioner's invitation to agree with such inappropriate assumptions about a private citizen's religious beliefs.  *Cf.* 12 O.S. § 2610 ("Evidence of the beliefs or opinions of a witness on matters of religion is not admissible for the purpose of showing that by reason of their nature the witness's credibility is impaired or enhanced.").

### C.    Deciding which grounds warrant denial of an application is an act of Board discretion.

Mandamus is typically inappropriate where the respondent's duty involves an act of discretion.  *Chandler*, 2004 OK 16, ¶ 24, 87 P.3d at 604–05.  It may only be used to "correct an official's arbitrary abuse of discretion."  *Id.*  Because the Board's duty to "[d]ecline to

13

approve weak or inadequate charter applications" is discretionary, and its denial of Ben Gamla's revised application was not an arbitrary abuse of that discretion, mandamus is improper. 70 O.S. § 3-134(I)(4).

Sections 3-134(I)(3)–(4) require the Board—when acting as sponsor—to "[a]pprove quality charter applications that meet identified educational needs and promote a diversity of educational choices" and "[d]ecline to approve weak or inadequate charter applications." The Oklahoma Charter School Act or implementing regulations do not define the words "quality," "weak," and "inadequate." Instead, Board Members draw on their experience and judgment, while working with Board Staff, to determine which applications are "quality" and which are "weak or inadequate." Shellem Decl. at ¶ 14; Wilkinson Decl. at ¶¶ 10–11. Board Staff—professionals committed to improving educational outcomes for Oklahoma students—advise on weakness that are irrecoverable in a charter school application and weaknesses that can be remedied through time and working with Board Staff. Wilkinson Decl. at ¶ 11. The regulation detailing "application review criteria" states that the Board shall determine compliance with relevant law and regulations, but that it may also "consider other factors demonstrating the applicant's capacity to successfully comply with the goals set forth in its vision and mission statements and applicable state, federal, tribal, and/or local statutes and regulations." OAC § 777:10-3-3(c)(2). Use of the word "factors" necessarily contemplates that Board Members use their best judgment when evaluating an application. *Id.*

In its revised application, Ben Gamla corrected or explained each of the reasons for rejection in the Board's initial letter, except for the school's religious nature. At the second meeting, the Board, exercising its discretion, voted to deny only because of Ben Gamla's religious character. There is no evidence—in the record or the Petition—that Board Members

14

felt Ben Gamla's explanations regarding projected enrollment or governing board composition warranted denial on those grounds. Just because the Board's counsel expressed concern does not mean that the Board could not exercise its discretion otherwise. Chairman Shellem's efforts to clarify the record about why Ben Gamla's revised application was denied demonstrates that Board Members possess discretion to define the contours of a denial.

And it cannot be said that excluding the projected enrollment and governing board composition as reasons for denial was an arbitrary abuse of discretion. The evidence reflects that it is not standard practice to deny a charter school application for uncertain enrollment numbers or lack of a prospective parent board member. *See* Wilkinson Decl. at ¶ 21–24. Petitioner, prior to now, has never challenged this reality. *See* Shellem Decl. at ¶ 13; Wilkinson Decl. at ¶ 25.

Instead, Petitioner asks this Court to supplant the Board's sound exercise of discretion by ordering the Board to determine that the projected enrollment and governing board composition are reasons that Ben Gamla's revised application is "weak or inadequate," warranting denial. But our constitutional system separating powers of the judicial and executive branches cautions against such judicial activism. *See Champlin v. Carter*, 1920 OK 231, ¶ 13, 78 Okla. 300, 190 P. 679, 681 ("The court cannot supplant [an executive officer] in determination of questions of fact or of law required by the statute to be determined by him, nor direct in whose favor this decision shall be.").

In sum, the Board complied with its legal duty to reject "weak or inadequate" applications by denying Ben Gamla's revised application only because of its religious character. And it sent Ben Gamla, in writing, a letter detailing the reason for that denial.

15

Petitioner's speculation about the Board's reasons for its rejection is irrelevant. Because the Board complied with its legal duty, there is nothing here for this Court to correct via mandamus.

**III.    EVEN IF THE ENROLLMENT DISCREPANCY OR GOVERNING BOARD COMPOSITION COULD PLAUSIBLY BE CONSIDERED REASONS FOR DENIAL, THE PLAIN TEXT OF 70 O.S. § 3-134 DOES NOT IMPOSE A DUTY ON THE BOARD TO LIST EVERY REASON FOR DENIAL.**

Petitioner argues that the Board's duty is to list "all valid, independent, non-constitutional grounds for rejection" of Ben Gamla's revised application. Pet. 1. As discussed above, Ben Gamla's revised application suffered from one inadequacy: its religious character. However, even if this Court decides that other reasons merited denial, mandamus would still be improper, because the Board is under no duty to list every reason for rejection in its letter.

Section 3-134(E)(3) requires that "[i]f the application is rejected, the Statewide Charter School Board shall notify the applicant in writing of the reasons for the rejection." This twenty-two word sentence represents the whole of the Board's duty to notify the rejected application—nothing more, nothing less. Petitioner's theory invents words—all, every, each—that aren't in the plain text. The statutory text simply states "reasons"—plural—to contemplate that there could be more than one reason for rejection that the Board might include in the letter.

In fact, the Board's practice is to list all reasons for rejection in its initial letter—just like it did for Ben Gamla. Pet. Ex. 1. Doing so gives the applicant the opportunity to correct the identified reasons for rejection in a revised application—just like Ben Gamla did, aside from its religious character. *See* Wilkinson Decl., Ex. B. But the Board does so in the interest of fairness, not because the statute requires that the letter list all reasons, every reason, or each reason. Petitioner's theory that the Board's "duty to decline extends to each such deficiency" that could potentially serve as a reason for denial is without any textual support. Pet. ¶ 21.

16

A court "may not add words that are not there. If a statute omits a word or phrase, [the court] will presume that is what the Legislature intended." *Frank Bartel Trans., Inc. v. State*, 2023 OK 121, ¶ 5, 540 P.3d 480, 483–84 (internal citations omitted). Statutory drafting is the role of the Legislature: "courts 'may not change, modify, amend, or restrict the plain language of a statute under the guise of statutory interpretation.'" *Hilfiger v. Hilfiger*, 2023 OK CIV APP 15, ¶ 22, 530 P.3d 879, 886 (quoting *Okla. Alcoholic Beverage Control Bd. v. Cent. Liquor Co.*, 1966 OK 243, ¶ 0, 421 P.2d 244, 245). The court must "presume the Legislature expressed its intent and intended what it expressed." *St. Anthony S. Behav. Health v. Goodwin*, 2026 OK 3, ¶ 8, 584 P.3d 184, 187 (quotation omitted).

The Petition asks this Court to add words to a clear and unambiguous statute. But doing so is an improper act of judicial activism—"the court has no authority to rewrite [a legislative] enactment" upon the request of a petitioner. *Head v. McCraken*, 2004 OK 84, ¶ 13, 102 P.3d 670, 680.

Neither do the regulations offer any textual support for Petitioner's assertions. *See* Pet. ¶ 21. Oklahoma Administrative Code § 777:10-1-3 offers only the requirements for establishing a charter school and § 777:10-3-3 governs the application requirements. The plain text of the regulations is devoid of any command to the Board to send "all reasons" for rejection in its letter.

Moreover, the Petition only references the first part of 70 O.S. § 3-134(E)(3), which precedes the language allowing a rejected applicant to submit a "revised application for reconsideration." The statute continues, the Board "shall accept or reject the revised application within thirty (30) days of its receipt." *Id.* The plain text of the statute makes clear that there is no statutory requirement to list every reason for rejection of a revised application—

let alone send a letter detailing the same. See *Frank Bartel Trans.*, 2023 OK 121, ¶ 5, 540 P.3d at 483–84.

So even if the projected enrollment and governing board composition could reasonably be considered reasons for rejection—and they cannot—there is no duty here to list "all reasons," "each reason," or "every reason." So mandamus is improper: "[b]efore the writ of mandamus should issue in any case, it must be shown that the duty sought to be enforced is clear and indisputable." *Champlin*, 1920 OK 231, ¶ 11, 78 Okla. 300, 190 P. at 681. Petitioner failed to carry his burden of showing that § 3-134(E)(3) charges the Board with a "clear and indisputable" duty. And without any duty, there is no failure on the Board's part to perform that duty.

## IV.    BECAUSE THE BOARD COMPLIED WITH ALL OF ITS LEGAL DUTIES, NO LEGAL REMEDY IS NEEDED.

Mandamus is only proper when the petitioning party has no "adequate remedy at law." *Champlin*, 1920 OK 231, ¶ 4, 78 Okla. 300, 190 P. at 680; *see also* 12 O.S. § 1452. The Petition argues that "[t]here is no plain, speedy, or adequate remedy at law available to cure the harm cause by the Board's incomplete discharge of its statutory duty." Pet. ¶ 32.

The Oklahoma Supreme Court held in *Drummond* that charter schools cannot be religious. 2024 OK 53, ¶ 45, 558 P.3d at 15. The Board denied Ben Gamla's revised application for being religious. Petitioner is not asking the Court to change the outcome—he agrees that the revised application must be denied. He disagrees only with how the Board chose to exercise its discretion in doing so. That is not something for this Court to remedy. There is nothing else for any court to do—the Board's denial is final either way.

18

## V.    EVEN IF THE COURT DETERMINES THAT PETITIONER CARRIED HIS BURDEN TO PROVE MANDAMUS IS PROPER, IT SHOULD DECLINE TO ISSUE THE WRIT.

"[T]he grant of mandamus relief is discretionary and . . . the writ is not issued of right." *Miller Dollarhide, P.C. v. Tal*, 2006 OK 27 ¶ 10, 174 P.3d 559, 564.  So "even if the underlying legal claims raised in the petition have merit, [the Court is] not required to grant the writ, if, in [its] exercise of discretion, [it] believe[s] that issuance of mandamus is not prudent." *Id.*

This case presents serious reasons for this Court to decline to issue such "extraordinary" relief.  *Okla. Pub Welfare Comm'n*, 1946 OK 95, ¶ 3, 167 P.2d at 72.  Petitioner takes issue with the actions of the Board and its Members—three appointed by the Governor, two by the President Pro Tempore of the Oklahoma Senate, two by the Oklahoma Speaker of the House of Representatives, the State Superintendent of Public Instruction (or his designee), and the State Auditor and Inspector (or her designee). *See* 70 O.S. § 3-132.1(A).  Serious concerns about separation of powers arise when the judicial department begins interfering with the manner in which a state board and its Members perform their duly-appointed roles.  *Cf. Fent v. Okla. Capitol Improvement Auth.*, 1999 OK 64, ¶ 4, 984 P.2d 200, 204 ("Respect for the integrity of our tripartite scheme for distribution of governmental powers commands that the judiciary abstain from intrusion into legislative policymaking.").

Moreover, state charter school administration is a specialized and specific niche—with a web of governing statutes and regulations.  This Court should not use its discretion to dictate how the Board performs its duties or writes its letters.

Finally, since the filing of this Petition, Ben Gamla sued Petitioner, the Board, and Board Staff over the denial of its revised application. *See* Complaint, The National Ben Gamla Jewish Charter Sch. Found., Inc. v. Drummond, No. 5:26-CV-582 (W.D. Okla. Mar. 24, 2026).

19

It would be imprudent for this Court to exercise its extraordinary powers of mandamus in a manner that affects pending litigation in another jurisdiction.

## CONCLUSION

Using its sound discretion, the Board decided that Ben Gamla's revised application was inadequate for one reason—its religious character. So the Board did exactly what the law commands: deny Ben Gamla's revised application and send a letter explaining the reason for rejection. Petitioner does not carry his burden to prove otherwise. The Petition fails to show that Petitioner has a clear legal right to mandamus relief, the Board refused to perform a plain non-discretionary legal duty, or that a writ of mandamus is the appropriate legal remedy. The Petition should be denied and dismissed with prejudice.

Should the Court issue a writ to the Board, nothing in this response should be construed to waive the Board's right to Answer or show cause under 12 O.S. § 1457.

Respectfully submitted this **2ᴰ** day of April, 2026.

Anthony J. Ferate, OBA No. 21171
SPENCER FANE LLP
9400 North Broadway Extension, Suite 600
Oklahoma City, Oklahoma 73114
(405) 844-9900
ajferate@spencerfane.com

Hiram Sasser, OBA No. 19557
Holly M. Randall, OBA No. 34763
Erin E. Smith, OBA No. 35232
FIRST LIBERTY INSTITUTE
2001 W. Plano Parkway, Suite 1600
Plano, Texas 75075
(972) 941-4444
hsasser@firstliberty.org
hrandall@firstliberty.org
esmith@firstliberty.org

*Attorneys for Respondents*

21

## CERTIFICATE OF MAILING

I hereby certify that on the 2ᵖ day of April, 2026, a true and correct copy of the above and foregoing document was sent by U.S. first class mail, postage prepaid to:

Gentner F. Drummond,
*Attorney General*
Office of the Attorney General
State of Oklahoma
313 N.E. 21st Street
Oklahoma City, OK 73105
(405) 521-3921
Gentner.drummond@oag.ok.gov

Anthony J. Ferate, OBA No. 21171
SPENCER FANE LLP
9400 North Broadway Extension, Suite 600
Oklahoma City, Oklahoma 73114
(405) 844-9900
ajferate@spencerfane.com

22

**IN THE DISTRICT COURT OF OKLAHOMA COUNTY**
**STATE OF OKLAHOMA**

| | |
|---|---|
| GENTNER DRUMMOND, in his official capacity as ATTORNEY GENERAL OF THE STATE OF OKLAHOMA, | |
| *Petitioner*, | |
| v. | Case No. CV-2026-649 |
| OKLAHOMA STATEWIDE CHARTER SCHOOL BOARD, et al., | |
| *Respondents*. | |

**DECLARATION OF BRIAN THOMAS SHELLEM**

STATE OF TEXAS
COUNTY OF COLLIN COUNTY

I, Brian Thomas Shellem, being of lawful age, hereby state under oath as follows:

1. My name is Brian Thomas Shellem. I am of competent age to make this Declaration.

2. I reside in Oklahoma County, Oklahoma. My office address, as a Member of the Oklahoma Statewide Charter School Board, is 2501 N. Lincoln Blvd., Suite 201, Oklahoma City, Oklahoma, 73105.

3. I am competent to testify to the facts set forth in this Declaration. I make this Declaration voluntarily and under oath. I understand that making a false statement in this Declaration may subject me to penalties for perjury under Oklahoma law.

4. I submit this Declaration in support of the Brief in Opposition to Petition for Writ of Mandamus in the above-captioned matter, and specifically to provide factual support regarding the Board's charter school application practices, including treatment of enrollment projections, grade configurations, governing board composition

1

expectations at the application approval stage, and the Board's consideration of the National Ben Gamla Jewish Charter School Foundation's charter school application.

5. I am the Chairman of the Oklahoma Statewide Charter School Board. I was duly appointed as a member of the Board by Oklahoma Governor J. Kevin Stitt, and I was elected by my fellow Members as Chairman. I have personal knowledge of the matters stated in this Declaration, except where stated on information and belief, and as to those matters I believe them to be true.

6. The mission of the Oklahoma Statewide Charter School Board is to support and expand education choice for Oklahoma families by authorizing and overseeing high-quality charter schools and implementing supplementary learning opportunities, ensuring access to innovative educational environments that promote academic excellence and that prepare students for successful lives.

7. I have held the position of Board Chairman since July 2024.

8. As Chairman, I regularly preside over the review and approval or disapproval of proposed charter school applications.

9. The proposed charter school's application, not the letter of intent, is the document upon which the Board bases its decision to approve or deny a proposed charter school.

10. In my experience, charter school enrollment numbers are volatile and hard to predict, and actual enrollment is often significantly lower than projected enrollment for many charter schools.

11. In my experience, when considering an application, the Board typically presumes that a proposed charter school will eventually designate a parent or grandparent member on its governing board.

12. In my experience, the Board regularly offers grace concerning the requirement that a parent of a currently or previously enrolled student serve on the governing board at the application approval stage. We often approve applications for proposed charter schools lacking a designated parent governing board member.

13. To my knowledge, Petitioner in the above captioned matter has never objected to or sued over any applications that were granted in spite of uncertainty about future enrollment or parent members of a governing board.

14. It is my understanding that Board Members possess discretion when reviewing applications for authorization of a charter school. Our role is to draw on experience and judgment, while working with Board Staff, to determine which applications are "quality" and which are "weak or inadequate."

15. Based on my knowledge and review of the relevant record and proceedings, Ben Gamla's revised charter school application had one inadequacy that was presented as worthy of rejection: its religious character violated 70 O.S. § 3-136(A)(2) and the Oklahoma Supreme Court's decision in *Drummond v. Oklahoma Statewide Virtual Charter School Board*, 2004 OK 53, 558 P.3d 1.

16. This issue was sufficiently central that I made efforts to clarify the record concerning the basis for rejection.

17. Had Members Gardenhire, Pearson, or any other member believed that the revised application should be rejected for reasons other than the proposed charter school's religious character, they remained free to pursue the motion as originally made. They did not.

18. Member Gardenhire withdrew his second to Member Pearson's original motion that referenced "reasons stated by counsel."

19. Member Pearson. amended the motion to remove reference to "reasons stated by counsel."

20. At the Board meeting on March 9, 2026, in connection with Ben Gamla's application, enrollment was only raised by counsel from the Oklahoma Attorney General's Office, not any Board Member or Board Staff.

I, Brian Thomas Shellem, state under penalty of perjury under the laws of Oklahoma that the foregoing is true and correct:

Executed on April 1, 2026, at Plano, Texas.

Brian Thomas Shellem

5

**IN THE DISTRICT COURT OF OKLAHOMA COUNTY**
**STATE OF OKLAHOMA**

GENTNER DRUMMOND, in his official
capacity as ATTORNEY GENERAL OF
THE STATE OF OKLAHOMA,

      *Petitioner,*

v.

      Case No. CV-2026-649

OKLAHOMA STATEWIDE CHARTER
SCHOOL BOARD, et al.,

      *Respondents.*

---

**DECLARATION OF REBECCA LEE WILKINSON, Ed. D.**

STATE OF OKLAHOMA
COUNTY OF OKLAHOMA COUNTY

I, Rebecca Lee Wilkinson, being of lawful age, hereby state under oath as follows:

1. My name is Rebecca Lee Wilkinson. I am of competent age to make this Declaration.

2. I reside in Oklahoma County, Oklahoma. My office address is 2501 N. Lincoln Blvd., Suite 201, Oklahoma City, Oklahoma, 73105.

3. I am competent to testify to the facts set forth in this Declaration. I make this Declaration voluntarily and under oath. I understand that making a false statement in this Declaration may subject me to penalties for perjury under Oklahoma law.

4. I submit this Declaration in support of the Brief in Opposition to Petition for Writ of Mandamus in the above-captioned matter, and specifically to provide factual support regarding the Board's charter school application practices, including treatment of enrollment projections, grade configurations, governing board composition

1

expectations at the application approval stage, and the Board's consideration of the National Ben Gamla Jewish Charter School Foundation's charter school application.

5. I am the Executive Director of the Oklahoma Statewide Charter School Board, and I have personal knowledge of the matters stated in this Declaration, except where stated on information and belief, and as to those matters I believe them to be true.

6. The Oklahoma Statewide Charter School Board was established on July 1, 2024. It is the successor-in-interest to the Oklahoma Statewide Virtual Charter School Board. *See* 70 O.S. § 3-132.1(I).

7. I have been the Executive Director of the Oklahoma Statewide Charter School Board since July 1, 2024. I was hired as the Executive Director of the Oklahoma Statewide Virtual Charter School Board on January 1, 2015. In total, I have eleven consecutive years of experience in this role, which Board Members hired me for.

8. I have a doctorate in Education Leadership from Oklahoma State University and extensive history as an educational professional. My experience includes serving as a teacher, principal, district-level administrator, district superintendent of schools, adjunct professor in OSU's Education Leadership doctoral program, and consultant to multiple Oklahoma school districts.

9. As Executive Director, I regularly oversee the process for review and approval of proposed charter school applications.

10. At my direction, Board Staff presents and advises Board Members at public meetings on the strengths and weaknesses of a proposed charter school's application. This process assists the Board in exercising its discretion when determining whether to approve or deny an application.

2

11. Board Staff and I are professionals committed to improving educational outcomes for Oklahoma students. We advise on weaknesses that are irrecoverable in a proposed charter school's application and weaknesses that can be remedied through time and work with Board Staff.

12. In my experience and based on my review of OAC § 777:10-3-3(a)(3), a letter of intent is the preliminary step that begins an applicant's communication with the Board in anticipation of applying for authorization of a proposed charter school within the statutorily defined timeline.

13. In my experience and based on my review of OAC § 777:10-3-3(a)(3), the letter of intent serves as a trigger for Board Staff to provide "guidance for application submission" to the applicant.

14. To my knowledge, there are no substantive requirements for a letter of intent beyond its function in initiating the process described in OAC § 777:10-3-3(a)(3).

15. In my experience, changes may occur as proposed charter schools are developed between the applicant's letter of intent and its application.

16. The proposed charter school's application, not the letter of intent, is the document upon which Board Staff makes its presentation and recommendation to the Board as to whether to approve or deny a proposed charter school's application.

17. Based on my review of OAC § 777:10-3-3(b)(2), the application must include specific, delineated information, including "grade level(s) to be served" and "proposed minimum and maximum enrollment."

18. Board Staff uses a school's projected enrollment numbers to determine the financial viability of a proposed charter school, when compared with the school's financial resources.

19. In my experience, actual enrollment is historically significantly lower than projected enrollment for many charter schools in their inaugural years.

20. Based on my review and understanding of relevant statutes and regulations, State Aid, or state funding for charter schools, is calculated on a per-pupil basis and is directly tied to student enrollment.

21. As Executive Director, I am aware of recent examples when the Board has approved a proposed charter school's application despite projected enrollment numbers.

   a. Tempo Montessori's letter of intent did not include an enrollment number. Its application projected an enrollment of 150 students in its first year. The Board approved Tempo Montessori's application for a brick-and-mortar charter school.

   b. Southwest Academy Charter School's application projected an enrollment of 160 students across four grades. Nothing in Southwest Academy Charter School's application indicated a guarantee that it would meet its projected enrollment goal. The Board approved Southwest Academy Charter School's application for a brick-and-mortar charter school.

   c. ThrivePoint Academy projected a minimum enrollment of 400 and a maximum enrollment of 500 for its first year. During ThrivePoint Academy's capacity interview, it was questioned about whether the school would still open if first-year enrollment was low. ThrivePoint Academy committed to opening

4

regardless of first-year enrollment. The Board approved the application for a virtual charter school.

22. As Executive Director, I am aware of recent examples where the actual enrollment of a charter school was lower than the projected enrollment. In my experience, significant enrollment volatility often occurs for the first year of a charter school and beyond.

   a. Virtual Preparatory Academy of Oklahoma projected 500 students and enrolled 140 students.

   b. Dove Virtual Academy projected 420 to 480 students and enrolled 89 students.

23. In my experience, enrollment projections are not the only factor that may change for a new charter school; grade configurations may also change.

   a. Dove Virtual Academy was initially approved to serve only grades six and seven in its first year. After approval, it requested and was granted permission to serve an additional grade in its second year.

24. To my knowledge, in none of the instances described in this Declaration did the Board treat volatile enrollment projections or shifting grades served as a reason for denial.

25. To my knowledge, in none of the instances described in this Declaration did Petitioner object to or legally challenge the approvals.

26. In my experience, at the application approval stage, Board Staff typically presumes that a proposed charter school will eventually designate a parent or grandparent member on its governing board.

27. Board Staff understand that applicants often cannot designate a parent, grandparent, or guardian "of currently or previously enrolled student(s)" to serve as a governing board member until the school develops further or begins enrollment.

5

28. In my experience, this requirement is discussed with Board Staff during an applicant's capacity interview, where Board Staff make the applicant aware that, as the school formalizes, a parent, grandparent, or guardian must serve on the governing board.

29. A true and correct copy of Ben Gamla's letter of intent to apply for authorization as a virtual charter school as submitted to my office on November 3, 2025, is attached as Exhibit A to this Declaration.

30. On December 30, 2025, Ben Gamla submitted its application for authorization.

31. On February 27, 2026, Ben Gamla submitted a revised application. A true and correct copy of the revised application is attached as Exhibit B to this Declaration.

32. Based on my knowledge and review of the relevant record and proceedings, Ben Gamla's revised charter school application had one inadequacy that was presented as worthy of rejection: its religious character violated 70 O.S. § 3-136(A)(2) and the Oklahoma Supreme Court's decision in *Drummond v. Oklahoma Statewide Virtual Charter School Board*, 2004 OK 53, 558 P.3d 1.

33. Currently, it is standard practice for the Director of School Performance, Skyler Lusnia, to present proposed charter school applications to the Board. Mr. Lusnia presented Ben Gamla's application on February 9, 2026, and its revised application on March 9, 2026.

34. Ben Gamla's financial resources supported the projected enrollment in its revised application.

35. A true and correct copy of Mr. Farley's signed statement of assurance included in the initial application is attached as Exhibit C to this Declaration.

6

36. At the Board meeting on March 9, 2025, in connection with Ben Gamla's application, the projected enrollment was only raised as an issue by counsel from the Oklahoma Attorney General's Office, not any Board Member.

I, Rebecca Lee Wilkinson, state under penalty of perjury under the laws of Oklahoma that the

foregoing is true and correct.

Executed on April 2, 2026, at Oklahoma City,
Oklahoma.

Rebecca Lee Wilkinson

Rebecca Lee Wilkinson

8

EXHIBIT A

November 3, 2025

Oklahoma Statewide Charter School Board
M.C. Connors Building
2501 N. Lincoln Blvd., Suite 301
Oklahoma City, OK 73105

Dear Members of the Statewide Charter School Board,

On behalf of The National Ben Gamla Jewish Charter School Foundation, Inc. (the "Applicant"), I am pleased to submit this Letter of Intent to Apply for Authorization to establish Ben Gamla Jewish Charter School, a virtual public charter high school serving students across the State of Oklahoma beginning in the 2026–27 school year.

Vision. Ben Gamla envisions Oklahoma students gaining a rigorous, values-based education that integrates general academic excellence with Jewish religious learning and ethical development.

Mission. Ben Gamla will provide an online grades 9–12 program delivering Oklahoma's state-approved academic standards alongside Jewish religious studies, enabling students to achieve college readiness while developing deep Jewish knowledge, faith, and values within a supportive learning community.

Grades to be Served & Growth. The school will open as a high school (grades 9–12) and will remain a high school. We anticipate an initial enrollment of approximately 40 students across grades 9–12, with growth expected as awareness of the program expands.

Instructional Emphasis. Ben Gamla's virtual program will blend synchronous and asynchronous instruction, featuring:
- College-preparatory coursework aligned to Oklahoma Academic Standards;
- Daily Jewish religious studies (text, practice, ethics) delivered by qualified instructors;
- Individualized supports, advising, and co-curricular enrichment accessible online;
- Robust student attendance, engagement, and assessment systems appropriate to a statewide virtual high school.

Applicant Information & Organizational Readiness.
- Applicant/Operator: The National Ben Gamla Jewish Charter School Foundation, Inc.
- Incorporation: Filed with the Oklahoma Secretary of State on June 5, 2025; nonprofit entity in good standing (EIN pending; the Foundation will pursue 501(c)(3) recognition).
- Training: A member of the founding team will complete the required Charter School Applicant Training prior to submission of the full application.
- Board/Founding Team (initial):
- Peter Deutsch — Yale Law graduate; former Member of the U.S. House of Representatives; founder of Ben Gamla Hebrew language and culture charter schools in Florida.
- Brett Farley — Executive Director, Catholic Conference of Oklahoma; background in policy, advocacy, and organizational leadership.
- Ezra Husney — Yale Law graduate; experience in religious-freedom law (including federal clerkship).

In submitting this Letter of Intent, the Applicant affirms its capacity and commitment to develop a complete application that details governance, academics, operations, finance, virtual-school compliance (attendance, accountability, and student services), and all other requirements of the Oklahoma Statewide Charter School Board.

Thank you for your consideration. We look forward to engaging with the Board and staff during the upcoming authorization cycle.

Sincerely,

Peter Deutsch
For The National Ben Gamla Jewish Charter School Foundation, Inc.
P.O. Box 817689 • Hollywood, FL 33081
Email: prdeutsch1@gmail.com • Phone: 954-232-9579

EXHIBIT B

February 27, 2026


Oklahoma Statewide Charter School Board
M.C. Connors Building
2501 N. Lincoln Blvd., Suite 201
Oklahoma City, OK 73105


Dear Members of the Oklahoma Statewide Charter School Board:

On behalf of The National Ben Gamla Jewish Charter School Foundation, Inc. (the "Applicant"), we respectfully submit the attached Addendum for your consideration as a revision to the original charter application for Ben Gamla Jewish Charter School, pursuant to Title 70, Section 3-134(E)(3) of the Oklahoma Statutes. This submission is intended to satisfy the concerns outlined in the Board's February 13 rejection letter and to provide clarification and additional documentation responsive to the issues identified therein.

As set forth in our Letter of Intent, Ben Gamla Jewish Charter School seeks authorization to establish a virtual public charter school serving students statewide. The school's vision is that Oklahoma students will gain a rigorous, values-based education that integrates general academic excellence with Jewish religious learning and ethical development. Its mission is to provide an online program for grades K–12 delivering Oklahoma's state-approved academic standards alongside Jewish religious studies, enabling students to achieve college readiness while developing deep Jewish knowledge, faith, and values within a supportive learning community. The attached Addendum reaffirms and clarifies how this mission will be implemented in full compliance with Oklahoma and federal laws.

While it is our aim in the attached Addendum to fully satisfy the concerns identified by the Board and staff, we also wish to reiterate our clear intent to pursue approval and launch of Ben Gamla Jewish Charter School consistent with the mission detailed in our Letter of Intent. We remain committed to delivering a high-quality virtual instructional model that blends synchronous and asynchronous learning; aligns college-preparatory coursework with Oklahoma Academic Standards; provides structured systems for attendance, engagement, and accountability; and offers appropriate student services across a statewide platform. We further affirm our commitment to governance, fiscal transparency, and operational readiness consistent with all statutory and regulatory requirements governing statewide charter schools.

We appreciate the Board's careful review of our application and its stated concerns, and we welcome continued engagement to ensure that all statutory and compliance standards are fully met. We remain prepared to provide any additional information or clarification the Board may require during this reconsideration process. Further, should the Board desire a full revised application, we are prepared to make this available upon request.

Thank you for your time and thoughtful consideration.
Respectfully submitted,

Peter Deutsch
For The National Ben Gamla Jewish Charter School Foundation, Inc.
P.O. Box 817689
Hollywood, FL 33081
Email: prdeutsch1@gmail.com
Phone: 954-232-9579

**Addendum to Ben Gamla Jewish Charter School**
**Revised Application for Initial Authorization**

The following are offered in response to the ten reasons for rejection of the Ben Gamla Charter School Application for Initial Authorization:

*1.The application refers to the governing board holding virtual meetings which does not comply with the Open Meeting Act, 25 O.S. §§ 301–314, as required in under title 70, section § 3-136(A)(15).*

**Response**

The Board affirms that, upon authorization by the Oklahoma Statewide Charter Board, the Governing Board for Ben Gamla Jewish Charter School will cease all virtual meetings and commence public meetings in compliance with Oklahoma's Open Meetings Act pursuant to all provisions in 25 O.S. §§ 301–314, as required in under title 70, section § 3-136(A)(15).

*2. The school's governing board structure does not comply with title 70, section 3-136(A)(7) of the Oklahoma Statutes because two board members reside outside of Oklahoma. Section 3-136(A)(7) requires all board members to be Oklahoma residents.*

**Response**

In compliance with 70, section 3-136(A)(7), the following Oklahoma residents are the current members of the Ben Gamla Jewish Charter School and additional Oklahoma members will be added:

1. Brett Farley (parent)
2. James Timberlake
3. Brandy Belding
4. Robert Ruiz
5. Kandice Jeske
6. Mike Lapolla
7. Tzvi Meth

3

*3. The governing board of the school is currently comprised of three (3) board members, and there is no indication that these board members will have a child or grandchild attend the school. School governing boards are required to include five (5) members, with 1 being a parent, grandparent, or guardian of a student attending or who previously attended the charter school under OKLA. ADMIN. CODE § 777:10-1-3(c)(3).*

**Response**

See above indication for "parent".

*4. The description of the relationship between the foundation and the school indicates concerning overlap similar to that of an Educational Management Organization that operates and manages a school without a clear separation between the organizations such as contractor and vendor as required under OKLA. ADMIN. CODE § 777:10-1-4(1).*

**Response**

The Board attests that The National Ben Gamla Jewish Charter School Foundation, Inc. maintains clear separation from the Governing Board for the Ben Gamla Jewish Charter School. Further, we affirm that upon authorization, the Governing Board will engage an approved Educational Management Organization as required by OKLA. ADMIN. CODE § 777:10-1-4(1) and the draft contract for that proposed engagement will be submitted to the SCSB for approval in advance of execution as required by Oklahoma statute and in accordance with the Oklahoma Charter School contract template provision 6.1.6.

*5. The application states that the Board has not adopted a formal disciplinary policy and, as a result, did not include a discipline policy in its application as required by title 70, section 3-134(B)(18) of the Oklahoma Statutes.*

**Response**

See disciplinary policy attachment #1.

*6. Without an approved disciplinary policy included in the application, the Board cannot verify that the school will follow student suspension requirements set forth in title 70, sections 24-101.3 and 3-136(A)(11) of the Oklahoma Statutes.*

**Response**

4

See suspension requirements attachment #2.

*7. The statement of assurances required of governing board members by OKLA. ADMIN. CODE § 777:10-3-3(b)(8)(L) (requiring governing board members to assure full compliance with federal and Oklahoma law) were modified to caveat compliance and afford legal latitude.*

**Response**

See attached Statements of Assurance for the members of the Governing Board pursuant to OKLA. ADMIN. CODE § 777:10-3-3(b)(8)(L).

*8. The special education component of the application caveats compliance by disclaiming "so long as compliance does not compromise Ben Gamla's religious tenets and instructional model. " This does not comply with title 70, section 3-136(A)(6) of the Oklahoma Statutes.*

**Response**

The Board attests that Ben Gamla Jewish Charter School will comply with all federal and state laws relating the education of children with disabilities in the same manner and instructional model as an Oklahoma public school district including, but not limited to: The Individuals with Disability Education Act (IDEA), 20 USC §§ 1400-1482; Section 504 of the Rehabilitation Act of 1973 [29 USC § 794]; Title II of the Americans with Disabilities Act; and Policies and Procedures of the Oklahoma State Department of Education for Special Education in Oklahoma.

*9. Between the letter of intent and application, material discrepancies in grades served and projected enrollment exist. Specifically, these are:*

*a. In the letter of intent submitted on November 3, 2025, you indicated that the school would serve grades 9–12 and anticipated a 40-student enrollment initially.*

*b. In the application submitted on December 30, 2025, you stated that the school would serve grades K–12 (adding a total of nine other grades) and anticipated a target enrollment of 400—10 times the amount set forth in the letter of counsel. For grades 9–12, the target enrollment was 160—four times the amount set forth in the letter of intent.*

**Response**

Our Letter of Intent (see attachment #3) indicated a plan to provide online education for grades 9-12. In the course of preparation of our application and after significant internal discussion, the Board resolved that providing a fuller offering for grades K-12 represents a more robust and meaningful education program for Ben Gamla Jewish Charter School. Moreover, offering a fuller educational system that exposes students to rigor and academic standards of excellence in the earlier years better prepares them for performance in grades 9-12.

*10. Title 70, section 3-136(A)(2) of the Oklahoma Statutes states, "A charter school shall be nonsectarian in its programs, admission policies, employment practices, and all other operations. A sponsor may not authorize a charter school or program that is affiliated with a nonpublic sectarian school or religious institution." The Oklahoma Supreme Court issued an opinion in 2024, Drummond.vj.Oklahoma.Statewide.Virtual.Charter.Schj.Bdj?.2024 OK 53, 558 P.3d 1, holding, "Under Oklahoma law, a charter school is a public school and, as such, must be nonsectarian." Finally, the U.S. Supreme Court in consolidated cases 24-394 and 24-396 ordered that the judgment of the Supreme Court of Oklahoma is affirmed.*

### Response

As indicated in our cover letter, the Board reaffirms our commitment to provide a rigorous, values-based education that integrates general academic excellence with Jewish religious learning and ethical development. It is our sincere hope that members of the Oklahoma Statewide Charter Board will recognize our sincere mission to expand quality educational opportunities in Oklahoma with the same level of rigor and academic standards that have marked similar award-winning charter schools in Florida.

**Attachment #1**

STUDENT CONDUCT, BEHAVIOR AND DISCIPLINE

The Ben Gamla Jewish Charter School is committed to providing an environment where students can learn, grow, and interact in ways that promote academic success, personal responsibility, and community well-being. Expectations outlined below apply to all students across virtual platforms, school-sponsored activities, and in-person events.

These policies at Ben Gamla function as a preventative and instructional framework that establishes clear expectations for student conduct and reinforces positive behaviors across the school community. Rather than reacting to misconduct alone, the policy emphasizes teaching and supporting behaviors that contribute to a healthy school culture.

Ben Gamla students are expected to align their actions with three guiding values:

Be Respectful

Be Responsible

Be Resilient

These expectations apply in academic settings, online platforms, school events, and interactions with peers and staff.

Being Respectful includes attentive listening, following instructions, engaging appropriately during virtual sessions, supporting classmates, and maintaining punctuality for both virtual and in-person activities.

Being Responsible requires students to manage their academic and behavioral obligations. This includes submitting coursework by weekly deadlines, completing benchmark assessments on time, attending required virtual sessions, responding to school communications, and accepting accountability for behavior during school-sponsored events.

Being Resilient reflects perseverance and adaptability. Students show resilience by continuing effort when work becomes challenging, seeking assistance from Teachers or Community Family Advisors, asking questions, reviewing feedback to improve performance, completing assignments despite setbacks, and engaging confidently with new peers.

7

Teachers and staff consistently observe and reinforce positive behavior aligned with Ben Gamla values. Students who demonstrate these attributes may receive recognition or rewards. Learning Coaches are encouraged to collaborate with teachers to support and reinforce positive conduct.

## DIGITAL CONDUCT AND K-12 EXPECTATIONS

Appropriate Online Behavior

All students using online platforms are expected to conduct themselves in ways that promote a positive digital learning experience.

Students should:

Communicate respectfully

Maintain a constructive attitude

Treat others with kindness

Offer assistance when appropriate

Participate responsibly and enjoy learning

Students should avoid:

Negative or harmful language

Profanity or inappropriate expressions

Any form of online cruelty

Cyberbullying Prohibited

Cyberbullying includes actions such as intimidation, threats, misuse of another person's login credentials, spreading false or harmful information, sharing offensive images or videos, and engaging in inappropriate discussions or messages. Any online behavior intended to harm, embarrass, or disrupt another individual is not permitted.

## HARASSMENT AND BULLYING PREVENTION

Ben Gamla strictly forbids harassment and bullying in all forms. Staff receive ongoing training to recognize, respond to, document, and report incidents.

Students and Learning Coaches are informed of bullying prevention strategies and school policies through ongoing education, including virtual sessions.

Bullying is defined as repeated conduct—verbal, physical, emotional, social, sexual, or electronic—that targets an individual or group and results in, or is intended to result in, emotional distress, physical harm, or interference with educational participation. Bullying may be directed toward students, staff, or administrators.

Students are encouraged to report bullying whether they experience it directly or witness it occurring. Reports may be made to a Community Advisor, counselor, principal, or other school personnel. All reports are investigated and addressed in accordance with Ben Gamla policy and state law.

## SCHOOL-SUPPORTED EVENTS AND CONDUCT EXPECTATIONS

Students attending school-sponsored activities must follow all behavioral expectations. Disruptive actions such as threatening conduct, physical altercations, or inappropriate language will result in immediate parent notification.

A three-strike system may be applied for minor behavioral violations, potentially resulting in suspension from future in-person events. However, severe infractions —including weapon possession, drug violations, or serious bullying—are subject to immediate disciplinary action without warning.

## DRESS STANDARDS

Attire worn at in-person school functions must be appropriate, modest, and non-disruptive. Clothing that creates safety concerns or discomfort for others is not permitted. Certain events, such as graduation ceremonies, may require specific dress guidelines.

## ACCOUNT ACCESS AND ACADEMIC COMPLIANCE

A student account may be locked when school staff have made multiple unsuccessful attempts to address urgent concerns such as missed academic deadlines, poor Live Class attendance, or failure to participate in required state testing.

Account access will be restored once the student completes the necessary corrective steps, which may include completing assessments, scheduling a Back on Track meeting, or attending required testing. Students or Learning

Coaches who are unsure how to resolve an account lock should immediately contact their Community Advisor.

## WEAPONS AND THREATENING BEHAVIOR

The possession, use, transfer, or display of any weapon—or any item reasonably perceived as a weapon—at any Ben Gamla-sponsored in-person activity is grounds for immediate expulsion.

Weapons include firearms, objects designed or used to cause bodily harm, and imitation or look-alike weapons. Items such as bats, bottles, sticks, locks, pipes, pencils, or pens may be classified as weapons if used or intended to cause harm. Self-defense devices are not permitted at school events.

Threats involving weapons or violent language may result in similar disciplinary consequences. Law enforcement or juvenile authorities will be notified as required. The Head of School or designee may review cases individually.

## DRUGS, ALCOHOL, AND PROHIBITED SUBSTANCES

Ben Gamla maintains a strict alcohol- and drug-free environment. The possession, use, distribution, or sale of illegal drugs, controlled substances, alcohol, mood-altering substances, or prohibited materials is not allowed on school property, during virtual sessions, or at any school-sponsored activity.

Improper use or distribution of prescription or over-the-counter medications is also prohibited. Marijuana use or possession is forbidden in all school-related contexts, including transportation vehicles.

Violations may result in immediate expulsion and notification of law enforcement. The Head of School may consider modifying consequences based on individual circumstances.

## TOBACCO-FREE POLICY

Ben Gamla is dedicated to promoting student and staff health by maintaining a tobacco-free environment. Tobacco products of any kind are prohibited on school property, during virtual sessions, and at school-sponsored events.

Students found using or possessing tobacco products at school-related activities may face expulsion and potential involvement of juvenile authorities. Final disciplinary decisions may be reviewed by the Head of School.

VAPING PROHIBITION

The use, possession, promotion, or distribution of vaping devices or vaping-related products is strictly forbidden in all Ben Gamla learning environments—virtual and in-person.

Prohibited items include e-cigarettes, vape pens, mods, cartridges, e-liquids (with or without nicotine), and all related accessories. This policy applies regardless of student age and covers classes, events, extracurricular activities, and any Ben Gamla-affiliated function.

Violations may result in disciplinary action including parent notification, educational interventions on vaping risks, suspension from activities, or referral to law enforcement. Counseling and prevention resources are available through school wellness programs.

GANG-RELATED ACTIVITY PROHIBITION

Gang involvement or gang-associated behavior is not permitted at any Ben Gamla school activity or event. Such behavior is considered dangerous, disruptive, and inconsistent with the school's mission.

Students engaging in gang-related conduct may face suspension, disciplinary consequences, or criminal charges depending on the severity of the behavior.

Reporting Requirements

In accordance with Section 650.7 of Title 21 of the Oklahoma Statutes, school employees who reasonably suspect gang involvement by a student under eighteen must notify the designated school authority. That authority may contact local law enforcement. Reports may be made verbally, in writing, or through district-approved methods.

Employees or contractors acting in good faith are protected from civil or criminal liability related to such reports.

11

**Attachment #2**

STUDENT DISCIPLINE, REMOVAL, AND DUE PROCESS GUIDELINES

GENERAL AUTHORITY AND DISCIPLINARY OVERSIGHT

Maintaining a safe, orderly, and productive virtual learning environment requires clearly defined disciplinary authority. The Principal, or a designated administrator, may impose a short-term suspension lasting up to ten (10) school days. The Principal has authority to impose long-term suspensions or expulsions of up to eighty (80) school days, and in certain cases, up to one (1) calendar year.

Beginning with the applicable school year, students enrolled in grades kindergarten through three shall not be subjected to out-of-school suspension or expulsion except under limited circumstances. These include incidents involving firearms, knife offenses, bomb threats, criminal acts resulting in serious bodily injury or substantial property damage, or situations in which removal is necessary to protect the immediate safety of the student, peers, or school personnel.

A student may not be suspended or expelled solely due to unexcused absences from virtual instruction.

EMERGENCY REMOVAL IN A VIRTUAL SETTING

If the Principal or designee determines that a student's continued participation in live virtual sessions or school-sponsored activities presents a health concern, poses a threat to individuals or property, or substantially disrupts the educational process, the student may be temporarily removed from participation without completing the full suspension or expulsion procedure beforehand.

For students in grades kindergarten through three, emergency removal will typically apply only for the remainder of the school day, and the student may resume participation the next school day unless further disciplinary review is warranted.

For students in grades four through twelve, removal from virtual classes or activities requires prompt notice and a follow-up opportunity for a hearing on the next school day.

FIREARMS, KNIVES, AND SERIOUS OFFENSES

A mandatory expulsion of one (1) year shall be imposed for bringing a firearm to any school-sponsored activity, field trip, interscholastic event, extracurricular function, or any location being used for an official School program.

Expulsion for a period not exceeding one (1) year may also be imposed for:

Possessing or introducing a firearm at a School-related activity

Bringing a knife to a School-sponsored event

Possessing a firearm or knife at a School function, even if another individual originally introduced the item

Committing an act that would constitute a serious criminal offense if committed by an adult and that results in major physical injury or significant property damage

Issuing a bomb threat connected to a School activity or event

A firearm includes any weapon designed to expel a projectile by explosive action, including starter guns, frames or receivers, silencers, and destructive devices such as bombs, grenades, rockets exceeding four ounces of propellant, missiles with more than one-quarter ounce of explosive charge, mines, or similar devices.

A knife refers to any sharp-bladed instrument capable of inflicting serious bodily harm.

MODIFICATION OF ONE-YEAR EXPULSIONS

The Principal may adjust a mandatory one-year expulsion under specific circumstances, including but not limited to:

Recommendations from individuals knowledgeable about the student's needs under the Individuals with Disabilities Education Act

Evidence that the student did not realize they possessed the prohibited item

Evidence that the student did not understand the item qualified as a firearm or knife

Situations where the item was brought as part of an educational activity without awareness of its prohibited status

13

Eligibility for placement in an alternative program

## ADDITIONAL GROUNDS FOR EXPULSION OR SUSPENSION

Students may be expelled for up to eighty (80) school days for substantial misconduct, serious rule violations, or other justified reasons.

During any period of suspension or expulsion, students may not participate in live virtual sessions, extracurricular programs, field trips, or other School-related events without express permission from the Principal. Participation in school-sponsored functions during disciplinary periods requires administrative approval.

## INSTRUCTIONAL ACCESS DURING DISCIPLINE

Students assigned in-school suspension will participate in a structured, supervised virtual learning setting and may complete academic assignments missed due to the disciplinary action.

For out-of-school suspensions, the Board authorizes continued access to instructional materials. Educational services may include online assignments, tutoring sessions, completion of exams or quizzes, written reflections related to the behavior incident, and graded coursework. Students must be given the opportunity to complete missed assignments and earn at least partial credit. Grades may be adjusted due to the disciplinary status; however, completed work will not automatically receive a failing grade solely because of the suspension.

The Principal may extend all or part of an expulsion into the subsequent school year.

If an out-of-school suspension occurs within the final ten (10) school days of the academic year, it will not carry forward into the next school year. Instead, alternative consequences—such as community service or other approved assignments—may be required during the first full weekday of summer break. Failure to complete assigned consequences may result in further administrative action, though not automatic carryover of the suspension.

## EXTRACURRICULAR PARTICIPATION

Participation in co-curricular and extracurricular activities is considered a privilege. The Principal may prohibit a student from involvement in some or all extracurricular activities based on misconduct. The duration of such restriction will reflect the seriousness of the behavior and will align with the Code of

Conduct. Because extracurricular involvement is not a right, notice and appeal procedures are not required for such restrictions.

## ALTERNATIVE CONSEQUENCES

The Board authorizes the Principal to assign community service or other restorative measures either alongside or instead of suspension or expulsion, except in cases involving mandatory firearm expulsion.

## APPEAL STRUCTURE

For suspension appeals, the Board will designate a representative for appeals of expulsion. Decisions shall be heard by a designee who had no involvement in the original expulsion determination.

The Board will be responsible for ensuring that all disciplinary actions comply with applicable laws and this policy.

## DUE PROCESS: SUSPENSION PROCEDURES

The following procedures apply to out-of-school suspensions (not in-school suspensions):

Before a suspension is imposed, the student will receive written Notice of Intent outlining:

**The reasons for the proposed suspension**

If applicable, and if the student is age sixteen (16) or older, notice that permanent exclusion may be pursued for certain serious criminal offenses

Students will have an opportunity for an informal conference with the Principal or designee to respond to the allegations. Witnesses are not permitted at this informal meeting.

When feasible, and for students in grades kindergarten through three, consultation with a contracted mental health professional will occur prior to suspension. If additional mental health services appear necessary, assistance will be provided to parents or guardians in identifying available providers, without financial obligation to the School.

Within one school day of imposing suspension, written notice will be sent to the parent, guardian, or custodian explaining:

**The reason for suspension**

The right to appeal to the Board of Directors or its designee within fourteen (14) days

The right to representation

The right to request a hearing, including executive session


DUE PROCESS: EXPULSION PROCEDURES

Only the Principal has authority to expel a student.

Prior to expulsion:

Written notice of intent to expel must be delivered to both the student and parent/guardian. The notice must state:

The grounds for the proposed expulsion

The date, time, and location (virtual or otherwise) of the hearing, scheduled no sooner than three (3) and no later than five (5) school days after notice, unless extended at the family's request

If applicable, notice of possible permanent exclusion for students age sixteen (16) or older

For students in grades kindergarten through three, consultation with a mental health professional will occur when feasible, and families will be assisted in locating appropriate services if needed.

A formal hearing will allow the student and family to present their response before the Superintendent.

Within one school day following an expulsion decision, written notice will be provided to the parent/guardian and the Board of Directors detailing:


The reasons for expulsion

The right to appeal within fourteen (14) days

The right to representation

The right to request executive session

**If applicable, notice of potential permanent exclusion**

When expulsion exceeds twenty (20) days or extends into a new semester or school year, families will also receive information about community-based programs designed to address behavioral concerns.

The Principal must complete expulsion proceedings even if the student withdraws before the hearing concludes.

PROHIBITION OF CORPORAL PUNISHMENT

Under no circumstances shall teachers, administrators, non-licensed employees, or transportation personnel use corporal punishment as a disciplinary measure.

Reasonable physical intervention may be used only when necessary to prevent imminent injury, secure dangerous objects, defend oneself, or protect individuals or property during a disturbance at a school-sponsored activity.

# Attachment #3

November 3, 2025

Oklahoma Statewide Charter School Board
M.C. Connors Building
2501 N. Lincoln Blvd., Suite 301
Oklahoma City, OK 73105

Dear Members of the Statewide Charter School Board,

On behalf of The National Ben Gamla Jewish Charter School Foundation, Inc. (the "Applicant"), I am pleased to submit this Letter of Intent to Apply for Authorization to establish Ben Gamla Jewish Charter School, a virtual public charter high school serving students across the State of Oklahoma beginning in the 2026–27 school year.

Vision. Ben Gamla envisions Oklahoma students gaining a rigorous, values-based education that integrates general academic excellence with Jewish religious learning and ethical development.

Mission. Ben Gamla will provide an online grades 9–12 program delivering Oklahoma's state-approved academic standards alongside Jewish religious studies, enabling students to achieve college readiness while developing deep Jewish knowledge, faith, and values within a supportive learning community.

Grades to be Served & Growth. The school will open as a high school (grades 9–12) and will remain a high school. We anticipate an initial enrollment of approximately 40 students across grades 9–12, with growth expected as awareness of the program expands.

Instructional Emphasis. Ben Gamla's virtual program will blend synchronous and asynchronous instruction, featuring:
- College-preparatory coursework aligned to Oklahoma Academic Standards;
- Daily Jewish religious studies (text, practice, ethics) delivered by qualified instructors;
- Individualized supports, advising, and co-curricular enrichment accessible online;
- Robust student attendance, engagement, and assessment systems appropriate to a statewide virtual high school.

Applicant Information & Organizational Readiness.
- Applicant/Operator: The National Ben Gamla Jewish Charter School Foundation, Inc.
- Incorporation: Filed with the Oklahoma Secretary of State on June 5, 2025; nonprofit entity in good standing (EIN pending; the Foundation will pursue 501(c)(3) recognition).
- Training: A member of the founding team will complete the required Charter School Applicant Training prior to submission of the full application.
- Board/Founding Team (initial):
- Peter Deutsch — Yale Law graduate; former Member of the U.S. House of Representatives; founder of Ben Gamla Hebrew language and culture charter schools in Florida.
- Brett Farley — Executive Director, Catholic Conference of Oklahoma; background in policy, advocacy, and organizational leadership.
- Ezra Husney — Yale Law graduate; experience in religious-freedom law (including federal clerkship).

In submitting this Letter of Intent, the Applicant affirms its capacity and commitment to develop a complete application that details governance, academics, operations, finance, virtual-school compliance (attendance, accountability, and student services), and all other requirements of the Oklahoma Statewide Charter School Board.

Thank you for your consideration. We look forward to engaging with the Board and staff during the upcoming authorization cycle.

Sincerely,

Peter Deutsch
For The National Ben Gamla Jewish Charter School Foundation, Inc.
P.O. Box 817689 · Hollywood, FL 33081
Email: prdeutsch1@gmail.com · Phone: 954-232-9579

# STATEMENT OF ASSURANCE

STATE OF OKLAHOMA Tennessee

COUNTY OF Shelby

Brandy Belding, being duly sworn, hereby affirm and state as

member of the governing board of the Ben Gamla Jewish Oklahoma public virtual charter school applicant.

I will fully comply with all applicable statutes, the United States of America, the State of Charter School Board, and the Oklahoma State

comply with the Oklahoma Open Meeting

education and ensure equity for all omic status, academic ability or

effectiveness of the

guaranteeing to meet

onal on July 1 of

Signature of Governing Board Member: *Brandy Belding*

Printed Name: Brandy Belding

Date: 2/23/26

## NOTARY ACKNOWLEDGMENT

STATE OF ~~OKLAHOMA~~ Tennessee

COUNTY OF Shelby

Subscribed and sworn to (or affirmed) before me on this 28rd day of February, 2026 by Brandy Belding, who is personally known to me or who has produced Oklahoma Drivers License as identification.

Pettigrew



STATE OF TENNESSEE NOTARY PUBLIC
TAYLOR PETTIGREW
SHELBY COUNTY

## STATEMENT OF ASSURANCE

STATE OF OKLAHOMA

COUNTY OF _OKUHOMA_

I, _BRETT FARLEY_ , being duly sworn, hereby affirm and state as follows:

1. I am a duly appointed member of the governing board of the Ben Gamla Jewish Charter School ("School"), an Oklahoma public virtual charter school applicant.

2. I hereby affirm and agree that I will fully comply with all applicable statutes, regulations, and requirements of the United States of America, the State of Oklahoma, the Oklahoma Statewide Charter School Board, and the Oklahoma State Department of Education.

3. I affirm and agree that the School will comply with the Oklahoma Open Meeting Act and the Oklahoma Open Records Act.

4. I affirm that the School will provide access to education and ensure equity for all eligible students regardless of race, ethnicity, economic status, academic ability or other factors as established by law.

5. I affirm the performance criteria designed to measure the effectiveness of the proposed School.

6. I affirm the School's commitment to meeting such standards guaranteeing to meet no fewer than ten (10) months of each year in the state.

7. I further affirm that the School will establish all necessary operational components to commence school operations in the State of Oklahoma on July 1 of the first year, including:

  - A public administration facility;
  - A state-approved school financial system;
  - A state-approved student information system;
  - Secured applicable connections to state reporting systems.

I execute this Statement of Assurance voluntarily and under oath, intending to be legally bound hereby.

Signature of Governing Board Member: _____

Printed Name: _Brett Farley_____

Date: __24 FEB 2024_____

NOTARY ACKNOWLEDGMENT

STATE OF OKLAHOMA

COUNTY OF _Oklahoma_____

Subscribed and sworn to (or affirmed) before me on this _26_ day of
_February_____, 20_26_ by _Brett Farley_____, who is personally
known to me or who has produced _Driver's License_____ as
identification.

Notary Public

JUAN CASTRO
Notary Public - State of Oklahoma
Commission Number 22008128
My Commission Expires Jun 14, 2026

My Commission Number: _22008128_____

My Commission Expires: _June 14, 2026_____

## STATEMENT OF ASSURANCE

STATE OF OKLAHOMA

COUNTY OF **Oklahoma**

I, **Kandice Jeske**, being duly sworn, hereby affirm and state as follows:

1. I am a duly appointed member of the governing board of the Ben Gamla Jewish Charter School ("School"), an Oklahoma public virtual charter school applicant.

2. I hereby affirm and agree that I will fully comply with all applicable statutes, regulations, and requirements of the United States of America, the State of Oklahoma, the Oklahoma Statewide Charter School Board, and the Oklahoma State Department of Education.

3. I affirm and agree that the School will comply with the Oklahoma Open Meeting Act and the Oklahoma Open Records Act.

4. I affirm that the School will provide access to education and ensure equity for all eligible students regardless of race, ethnicity, economic status, academic ability or other factors as established by law.

5. I affirm the performance criteria designed to measure the effectiveness of the proposed School.

6. I affirm the School's commitment to meeting such standards guaranteeing to meet no fewer than ten (10) months of each year in the state.

7. I further affirm that the School will establish all necessary operational components to commence school operations in the State of Oklahoma on July 1 of the first year, including:

- A public administration facility;
- A state-approved school financial system;
- A state-approved student information system;
- Secured applicable connections to state reporting systems.

I execute this Statement of Assurance voluntarily and under oath, intending to be legally bound hereby.

Signature of Governing Board Member: _~~Kandy Jue~~_____

Printed Name: _~~Kandice Jeske~~_____

Date: _2·25· 2026_____

NOTARY ACKNOWLEDGMENT

STATE OF OKLAHOMA

COUNTY OF _Oklahoma_____

Subscribed and sworn to (or affirmed) before me on this 25th day of
_February_____, 2026, by _Kandice Jeske_____, who is personally
known to me or who has produced _OK Drivers License_____ as
identification.

```
MICHAEL CARLTON
NOTARY PUBLIC - STATE OF OKLAHOMA
MY COMMISSION EXPIRES JUL. 07, 2029
COMMISSION # 21008876
```

Notary Public

My Commission Number: _21008876_____

My Commission Expires: _07/07/2029_____

## STATEMENT OF ASSURANCE

STATE OF OKLAHOMA

COUNTY OF _Cleveland_

I, _Robert M. Ruiz_, being duly sworn, hereby affirm and state as follows:

1. I am a duly appointed member of the governing board of the Ben Gamla Jewish Charter School ("School"), an Oklahoma public virtual charter school applicant.

2. I hereby affirm and agree that I will fully comply with all applicable statutes, regulations, and requirements of the United States of America, the State of Oklahoma, the Oklahoma Statewide Charter School Board, and the Oklahoma State Department of Education.

3. I affirm and agree that the School will comply with the Oklahoma Open Meeting Act and the Oklahoma Open Records Act.

4. I affirm that the School will provide access to education and ensure equity for all eligible students regardless of race, ethnicity, economic status, academic ability or other factors as established by law.

5. I affirm the performance criteria designed to measure the effectiveness of the proposed School.

6. I affirm the School's commitment to meeting such standards guaranteeing to meet no fewer than ten (10) months of each year in the state.

7. I further affirm that the School will establish all necessary operational components to commence school operations in the State of Oklahoma on July 1 of the first year, including:

- A public administration facility;
- A state-approved school financial system;
- A state-approved student information system;
- Secured applicable connections to state reporting systems.

I execute this Statement of Assurance voluntarily and under oath, intending to be legally bound hereby.

Signature of Governing Board Member: _____

Printed Name: ___Robert M. Ruiz___

Date: ___2/25/2026___

NOTARY ACKNOWLEDGMENT

STATE OF OKLAHOMA

COUNTY OF __Cleveland__

Subscribed and sworn to (or affirmed) before me on this 25th day of
__February__, 2026 by __Robert M. Ruiz__, who is personally
known to me or who has produced __Drivers License__ as
identification.

_____

Notary Public

My Commission Number: __11-124  18011314__

My Commission Expires: __11-16-26__

## STATEMENT OF ASSURANCE

STATE OF OKLAHOMA

COUNTY OF __Oklahoma_____

I, ___James Timberlake_____, being duly sworn, hereby affirm and state as follows:

1. I am a duly appointed member of the governing board of the Ben Gamla Jewish Charter School ("School"), an Oklahoma public virtual charter school applicant.

2. I hereby affirm and agree that I will fully comply with all applicable statutes, regulations, and requirements of the United States of America, the State of Oklahoma, the Oklahoma Statewide Charter School Board, and the Oklahoma State Department of Education.

3. I affirm and agree that the School will comply with the Oklahoma Open Meeting Act and the Oklahoma Open Records Act.

4. I affirm that the School will provide access to education and ensure equity for all eligible students regardless of race, ethnicity, economic status, academic ability or other factors as established by law.

5. I affirm the performance criteria designed to measure the effectiveness of the proposed School.

6. I affirm the School's commitment to meeting such standards guaranteeing to meet no fewer than ten (10) months of each year in the state.

7. I further affirm that the School will establish all necessary operational components to commence school operations in the State of Oklahoma on July 1 of the first year, including:

  - A public administration facility;
  - A state-approved school financial system;
  - A state-approved student information system;
  - Secured applicable connections to state reporting systems.

I execute this Statement of Assurance voluntarily and under oath, intending to be legally bound hereby.

Signature of Governing Board Member: _James Timberlake_____

Printed Name: _James Timberlake_____

Date: _02/26/2026_____

NOTARY ACKNOWLEDGMENT

STATE OF ~~OKLAHOMA~~ Virginia

COUNTY OF _Newport News_____

Subscribed and sworn to (or affirmed) before me on this _26th_ day of
_February_____, 20_26_, by _____James Timberlake_____, who is personally
known to me or who has produced _____drivers license_____ as
identification.

_____
Notary Public

| | |
|---|---|
| COMMONWEALTH OF VIRGINIA / ELECTRONIC NOTARY PUBLIC (N) | **Deja N'Dow** |
| | **REGISTRATION NUMBER** 8039060 |
| | **COMMISSION EXPIRES** July 31, 2027 |

My Commission Number: _8039060_____

My Commission Expires: _07/31/2027_____

Notarized remotely online using communication technology via Proof.

2 of 2
29

## STATEMENT OF ASSURANCE

STATE OF OKLAHOMA

COUNTY OF _TULSA_

I, _Michael LaPolla_ , being duly sworn, hereby affirm and state as
follows:

1. I am a duly appointed member of the governing board of the Ben Gamla Jewish
Charter School ("School"), an Oklahoma public virtual charter school applicant.

2. I hereby affirm and agree that I will fully comply with all applicable statutes,
regulations, and requirements of the United States of America, the State of
Oklahoma, the Oklahoma Statewide Charter School Board, and the Oklahoma State
Department of Education.

3. I affirm and agree that the School will comply with the Oklahoma Open Meeting
Act and the Oklahoma Open Records Act.

4. I affirm that the School will provide access to education and ensure equity for all
eligible students regardless of race, ethnicity, economic status, academic ability or
other factors as established by law.

5. I affirm the performance criteria designed to measure the effectiveness of the
proposed School.

6. I affirm the School's commitment to meeting such standards guaranteeing to meet
no fewer than ten (10) months of each year in the state.

7. I further affirm that the School will establish all necessary operational
components to commence school operations in the State of Oklahoma on July 1 of
the first year, including:

  - A public administration facility;
  - A state-approved school financial system;
  - A state-approved student information system;
  - Secured applicable connections to state reporting systems.

I execute this Statement of Assurance voluntarily and under oath, intending to be
legally bound hereby.

Signature of Governing Board Member: _Michael Lapella_

Printed Name: _MICHAEL LAPELLA_

Date: _3/5/26_

NOTARY ACKNOWLEDGMENT

STATE OF OKLAHOMA

COUNTY OF _Tulsa_

Subscribed and sworn to (or affirmed) before me on this _5th_ day of
_March_, 20_26_, by _Michael Peter Lapella_, who is personally
known to me or who has produced _Oklahoma Drive License_ as
identification.

_Lashon Jeffries_

Notary Public

My Commission Number: _23011554_

My Commission Expires: _08/25/2027_

Notary Public
State of Oklahoma
LASHON JEFFRIES
COMMISSION #23011554
Comm Exp 08-25-2027

**STATEMENT OF ASSURANCE**

STATE OF OKLAHOMA

COUNTY OF _~~ENID~~ GARFIELD_

I, ___Tzvi Meth___, being duly sworn, hereby affirm and state as follows:

1. I am a duly appointed member of the governing board of the Ben Gamla Jewish Charter School ("School"), an Oklahoma public virtual charter school applicant.

2. I hereby affirm and agree that I will fully comply with all applicable statutes, regulations, and requirements of the United States of America, the State of Oklahoma, the Oklahoma Statewide Charter School Board, and the Oklahoma State Department of Education.

3. I affirm and agree that the School will comply with the Oklahoma Open Meeting Act and the Oklahoma Open Records Act.

4. I affirm that the School will provide access to education and ensure equity for all eligible students regardless of race, ethnicity, economic status, academic ability or other factors as established by law.

5. I affirm the performance criteria designed to measure the effectiveness of the proposed School.

6. I affirm the School's commitment to meeting such standards guaranteeing to meet no fewer than ten (10) months of each year in the state.

7. I further affirm that the School will establish all necessary operational components to commence school operations in the State of Oklahoma on July 1 of the first year, including:

- A public administration facility;
- A state-approved school financial system;
- A state-approved student information system;
- Secured applicable connections to state reporting systems.

I execute this Statement of Assurance voluntarily and under oath, intending to be legally bound hereby.

Signature of Governing Board Member: _Tzvi meth_

Printed Name: _Tzvi Meth_

Date: _27 FEB 26_

NOTARY ACKNOWLEDGMENT

STATE OF OKLAHOMA
COUNTY OF _Garfield_

Subscribed and sworn to (or affirmed) before me on this _27_ day of
_February_, 20 _26_, by _Tzvi meth_ ____, who is personally
known to me or who has produced _Drivers License_ as
identification.

Notary Public

My Commission Number: _26010859_

My Commission Expires: _08|26|28_

EXHIBIT C

## STATEMENT OF
## ASSURANCES

The undersigned, ____Brett Farley____, as a member of the Board of Directors ("Board") of Ben Gamla Jewish Charter School, being first duly sworn and under oath certifies that, as a member of the Board, he/she shall take any and all steps necessary to ensure that BGJCS:

1. Fully complies with the Oklahoma public charter school regulations, including, but not limited to, all statutes, regulations, and requirements of the United States of America, the State of Oklahoma, the Oklahoma Statewide Virtual Charter School Board, and the Oklahoma Department of Education to the extent required by law, including the First Amendment, religious exemptions, and the Religious Freedom Restoration Act, with priority given to Jewish history, culture, ethics, and practice , and alignment with the *National Standards and Benchmarks for effective Jewish Elementary and secondary The Schools*.

2. Abides, in all respects, with the Oklahoma Open Meeting Act (25 O.S. §§ 301-314) and the Oklahoma Open Records Act (51 O.S. §§ 24A.1-24A.31);

3. Guarantees access to education and equity for all eligible students regardless of their race ethnicity, economic status, academic ability, or other factors subject to the provisions in Paragraph 1 above;

4. Guarantees to establish the components necessary to begin school operations in the State of Oklahoma on July 1 of the first year;

5. Secures and occupies a school administration facility;

6. Purchases and implements a state-approved school financial system;

7. Purchases and implements state-approved student information system; and

8. Secures connectivity to state reporting systems. EXECUTED this __17th__ day of December 2025.

**INDIVIDUAL ACKNOWLEDGMENT**

State/Commonwealth of __Oklahoma__

County of __Oklahoma__ } ss.

On this the __17ᵗʰ__ day of __December__, __2025__, before me,
Day         Month        Year

__Pouria Adelany__, the undersigned Notary Public,
Name of Notary Public

personally appeared __Brett Anthony Farley__
Name(s) of Signer(s)

☐ personally known to me – OR –

☑ proved to me on the basis of satisfactory evidence

to be the person(s) whose name(s) is/are subscribed to the within instrument, and acknowledged to me that he/she/they executed the same for the purposes therein stated.

WITNESS my hand and official seal.

POURIA ADELANY
Notary Public - State of Oklahoma
Commission Number 24012238
My Commission Expires Sep 30, 2028

_Signature of Notary Public_

exp · Sep 30. 2028

*Place Notary Seal/Stamp Above*

*Any Other Required Information*
*(Printed Name of Notary, Expiration Date, etc.)*

─── **OPTIONAL** ───

*This section is required for notarizations performed in Arizona but is optional in other states. Completing this information can deter alteration of the document or fraudulent reattachment of this form to an unintended document.*

**Description of Attached Document**

Title or Type of Document: __Statement Of Assurances__

Document Date: __12/17/2025__    Number of Pages: __1__

Signer(s) Other Than Named Above: _____

©2023 National Notary Association

M1304-07 (09/23)
Used for states (AL, AZ, CO, CT, DE, GA, IA, ID, IL, IN, KS, KY, LA, MD, ME, MI, MN, MS, MT, NC, ND, NE, NH, NJ, NM, OK, OR, RI, SC, SD, TN, VA, VT, WV, WI, WY)